1 | **K&L GATES LLP**
Michael J. Stortz
2 | 4 Embarcadero Ctr, Suite 1200
San Francisco, California 94111
3 | Telephone: (415) 882-8200
Michael.Stortz@klgates.com
4 |
5 | *Attorneys for Plaintiffs*
6 | *Additional counsel on signature page*

**K&L GATES LLP**
Michael E. Martínez (*pro hac vice forthcoming*)
Lauren Norris Donahue (*pro hac vice forthcoming*)
70 W. Madison St., Suite 3300
Chicago, Illinois 60602
Telephone: (312) 372-1121
michael.martinez@klgates.com
lauren.donahue@klgates.com

7 |

8 | **UNITED STATES DISTRICT COURT**

9 | **NORTHERN DISTRICT OF CALIFORNIA**

10 |

11 | BON SECOURS MERCY HEALTH, INC.;
UNIVERSITY HEALTH SYSTEMS OF
12 | EASTERN CAROLINA, INC.; ENDEAVOR
HEALTH; INTEGRIS HEALTH, INC.; MAIN
13 | LINE HEALTH, INC.; MEDICAL
UNIVERSITY HOSPITAL AUTHORITY;
14 | MERCY HEALTH; NORTON
HEALTHCARE, INC.; PROVIDENCE ST.
15 | JOSEPH HEALTH; ROPER ST. FRANCIS
HEALTHCARE; SANFORD; THOMAS
16 | JEFFERSON UNIVERSITY; THE REGENTS
OF THE UNIVERSITY OF MICHIGAN ON
17 | BEHALF OF UNIVERSITY OF MICHIGAN
HEALTH; UNIVERSITY OF NORTH
18 | CAROLINA HEALTH CARE SYSTEM;
UNIVERSITY OF ROCHESTER; AND
19 | WEST VIRGINIA UNITED HEALTH
SYSTEM, INC.,
20 |
21 |                   Plaintiffs,
22 |            v.
23 | BLUE CROSS BLUE SHIELD
ASSOCIATION; ELEVANCE HEALTH,
24 | INC.; BLUE CROSS OF CALIFORNIA
D/B/A ANTHEM BLUE CROSS; ANTHEM
25 | BLUE CROSS LIFE AND HEALTH
INSURANCE COMPANY; BLUE CROSS OF
26 | NORTHERN CALIFORNIA; BLUE CROSS
OF SOUTHERN CALIFORNIA; ROCKY
27 | MOUNTAIN HOSPITAL AND MEDICAL
SERVICE, INC. D/B/A ANTHEM BLUE
28 | CROSS AND BLUE SHIELD OF
COLORADO; ANTHEM HEALTH PLANS,

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

1  INC. D/B/A ANTHEM BLUE CROSS AND
   BLUE SHIELD; BLUE CROSS AND BLUE
2  SHIELD HEALTHCARE PLAN OF
   GEORGIA, INC.; ANTHEM INSURANCE
3  COMPANIES, INC. D/B/A BLUE CROSS
   AND BLUE SHIELD OF INDIANA AND
4  ANTHEM BLUE CROSS AND BLUE
   SHIELD; ANTHEM HEALTH PLANS OF
5  KENTUCKY, INC. D/B/A ANTHEM BLUE
   CROSS AND BLUE SHIELD; ANTHEM
6  HEALTH PLANS OF MAINE, INC. D/B/A
   ANTHEM BLUE CROSS AND BLUE
7  SHIELD AND D/B/A ASSOCIATED
   HOSPITAL SERVICE; HMO MISSOURI,
8  INC. D/B/A ANTHEM BLUE CROSS AND
   BLUE SHIELD OF MISSOURI; HEALTH
9  ALLIANCE LIFE INSURANCE COMPANY
   D/B/A ANTHEM BLUE CROSS AND BLUE
10 SHIELD; ROCKY MOUNTAIN HOSPITAL
   AND MEDICAL SERVICE, INC. D/B/A
11 ANTHEM BLUE CROSS AND BLUE
   SHIELD NEVADA; ANTHEM HEALTH
12 PLANS OF NEW HAMPSHIRE, INC. D/B/A
   ANTHEM BLUE CROSS AND BLUE
13 SHIELD; ANTHEM HEALTHCHOICE
   ASSURANCE, INC.; ANTHEM
14 HEALTHCHOICE HMO, INC.;
   COMMUNITY INSURANCE COMPANY
15 D/B/A ANTHEM BLUE CROSS AND BLUE
   SHIELD OF OHIO; ANTHEM HEALTH
16 PLANS OF VIRGINIA, INC. D/B/A
   ANTHEM BLUE CROSS AND BLUE
17 SHIELD; BLUE CROSS BLUE SHIELD OF
   WISCONSIN D/B/A ANTHEM BLUE
18 CROSS AND BLUE SHIELD; AWARE
   INTEGRATED, INC.; BCBSM, INC. D/B/A
19 BLUE CROSS AND BLUE SHIELD OF
   MINNESOTA; BLUE CROSS AND BLUE
20 SHIELD OF ALABAMA; HAWAII
   MEDICAL SERVICE ASSOCIATION D/B/A
21 BLUE CROSS AND BLUE SHIELD OF
   HAWAII; BLUE CROSS AND BLUE
22 SHIELD OF KANSAS, INC.; BLUE CROSS
   AND BLUE SHIELD OF KANSAS CITY;
23 LOUISIANA HEALTH SERVICE &
   INDEMNITY COMPANY D/B/A BLUE
24 CROSS AND BLUE SHIELD OF
   LOUISIANA; BLUE CROSS AND BLUE
25 SHIELD OF MASSACHUSETTS, INC.;
   BLUE CROSS AND BLUE SHIELD OF
26 MASSACHUSETTS HMO BLUE, INC.;
   BLUE CROSS BLUE SHIELD OF
27 MICHIGAN MUTUAL INSURANCE
   COMPANY; BLUE CROSS & BLUE
28 SHIELD OF MISSISSIPPI, A MUTUAL

1  INSURANCE COMPANY; BLUE CROSS
   AND BLUE SHIELD OF NORTH
2  CAROLINA, INC.; BLUE CROSS BLUE
   SHIELD OF RHODE ISLAND; BLUECROSS
3  BLUESHIELD OF SOUTH CAROLINA;
   BLUECROSS BLUESHIELD OF
4  TENNESSEE, INC.; BLUE CROSS AND
   BLUE SHIELD OF VERMONT; BLUE
5  CROSS BLUE SHIELD OF WYOMING;
   CALIFORNIA PHYSICIANS' SERVICE,
6  INC. D/B/A BLUE SHIELD OF
   CALIFORNIA; CAMBIA HEALTH
7  SOLUTIONS, INC.; REGENCE
   BLUESHIELD OF IDAHO, INC.; REGENCE
8  BLUECROSS BLUESHIELD OF OREGON;
   REGENCE BLUECROSS BLUESHIELD OF
9  UTAH; REGENCE BLUESHIELD; CAPITAL
   BLUE CROSS; CAREFIRST, INC. D/B/A
10 CAREFIRST BLUECROSS BLUESHIELD;;
   CAREFIRST BLUECHOICE, INC. D/B/A
11 CAREFIRST BLUECROSS BLUESHIELD;
   GROUP HOSPITALIZATION AND
12 MEDICAL SERVICES, INC. D/B/A
   CAREFIRST BLUECROSS BLUESHIELD;
13 CAREFIRST OF MARYLAND, INC. D/B/A
   CAREFIRST BLUECROSS BLUESHIELD;
14 LIFETIME HEALTHCARE, INC.;
   EXCELLUS HEALTH PLAN, INC. D/B/A
15 EXCELLUS BLUECROSS BLUESHIELD;
   GEMSTONE HOLDINGS, INC.; BLUE
16 CROSS OF IDAHO HEALTH SERVICE,
   INC. D/B/A BLUE CROSS OF IDAHO;
17 GOODLIFE PARTNERS, INC.; BLUE
   CROSS AND BLUE SHIELD OF
18 NEBRASKA; GUIDEWELL MUTUAL
   HOLDING CORPORATION; BLUE CROSS
19 AND BLUE SHIELD OF FLORIDA, INC.;
   TRIPLE-S MANAGEMENT
20 CORPORATION; TRIPLE-S SALUD, INC.;
   HEALTH CARE SERVICE CORPORATION;
21 BLUE CROSS AND BLUE SHIELD OF
   ILLINOIS; BLUE CROSS AND BLUE
22 SHIELD OF MONTANA; CARING FOR
   MONTANANS, INC.; BLUE CROSS AND
23 BLUE SHIELD OF NEW MEXICO; BLUE
   CROSS AND BLUE SHIELD OF
24 OKLAHOMA; BLUE CROSS AND BLUE
   SHIELD OF TEXAS; HEALTHYDAKOTA
25 MUTUAL HOLDINGS; BLUE CROSS BLUE
   SHIELD OF NORTH DAKOTA;
26 HIGHMARK HEALTH; HIGHMARK
   BCBSD INC. D/B/A HIGHMARK BLUE
27 CROSS AND BLUE SHIELD DELAWARE;
   HIGHMARK WESTERN AND
28 NORTHEASTERN NEW YORK INC. D/B/A

| | |
|---|---|
| 1 | HIGHMARK BLUE CROSS BLUE SHIELD OF WESTERN NEW YORK AND D/B/A |
| 2 | HIGHMARK BLUE SHIELD OF NORTHEASTERN NEW YORK; |
| 3 | HIGHMARK INC.; HIGHMARK WEST VIRGINIA INC. D/B/A HIGHMARK BLUE |
| 4 | CROSS BLUE SHIELD WEST VIRGINIA; HORIZON HEALTHCARE SERVICES, INC. |
| 5 | D/B/A HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY; |
| 6 | INDEPENDENCE HEALTH GROUP, INC.; PREMERA; PREMERA BLUE CROSS BLUE |
| 7 | SHIELD OF ALASKA; PREMERA BLUE CROSS; PROSANO, INC.; BLUE CROSS |
| 8 | AND BLUE SHIELD OF ARIZONA, INC.; USABLE MUTUAL INSURANCE |
| 9 | COMPANY D/B/A ARKANSAS BLUE CROSS AND BLUE SHIELD AND BLUE |
| 10 | ADVANTAGE ADMINISTRATORS OF ARKANSAS; WELLMARK, INC.; |
| 11 | WELLMARK, INC. D/B/A WELLMARK BLUE CROSS AND BLUE SHIELD OF |
| 12 | IOWA; AND WELLMARK OF SOUTH DAKOTA, INC. D/B/A WELLMARK BLUE |
| 13 | CROSS AND BLUE SHIELD OF SOUTH DAKOTA, |
| 14 | |
| 15 | Defendants. |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

**Table of Contents**

**Page**

NATURE OF THE CASE ................................................................. 1

JURISDICTION AND VENUE ........................................................ 7

INTRADISTRICT ASSIGNMENT ................................................... 8

INTERSTATE COMMERCE ........................................................... 8

PUTATIVE PROVIDER CLASS ACTION SETTLEMENT ............ 8

TOLLING OF THE STATUTE(S) OF LIMITATIONS .................... 9

PARTIES ......................................................................................... 9

    I. Plaintiffs ................................................................................. 9

    II. Defendants .......................................................................... 21

FACTUAL ALLEGATIONS ........................................................... 58

    I. Defendants' Historical Practices ......................................... 58

    II. Formation and Operation of Defendant BCBSA.................. 62

    III. The Blues' Anticompetitive Agreements .......................... 67

        A. Market Allocation Conspiracy ..................................... 67

        B. Price Fixing Conspiracy ................................................ 78

    IV. Enforcing Compliance with the Blues' Anticompetitive Agreements ....................... 86

    V. Rule of Reason Allegations ................................................ 87

        A. Relevant Product Markets ............................................. 88

        B. Relevant Geographic Markets ...................................... 92

        C. Defendant Blues' Market Power ................................... 94

        D. Defendant Blues' Market Power in the Relevant Markets ............... 97

        E. Defendants' Anticompetitive Conduct ........................ 120

    VI. The Blue Conspiracies Have Caused Plaintiffs' Antitrust Injuries ............... 124

    VII. The Blue Conspiracies Should Be Enjoined........................ 135

    VIII. Plaintiffs' Damages from the Blue Conspiracies ............. 136

CAUSES OF ACTION ................................................................... 137

    I. First Cause of Action ......................................................... 137

    II. Second Cause of Action .................................................... 138

    III. Third Cause of Action ..................................................... 139

    IV. Fourth Cause of Action .................................................... 140

    V. Fifth Cause of Action ........................................................ 141

    VI. Sixth Cause of Action ...................................................... 141

    VII. Seventh Cause of Action ................................................ 142

    VIII. Eighth Cause of Action ................................................. 143

    IX. Ninth Cause of Action ..................................................... 144

    X. Tenth Cause of Action....................................................... 144

    XI. Eleventh Cause of Action ................................................ 145

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

XII. Twelfth Cause of Action.........................................................................146

XIII. Thirteenth Cause of Action .................................................................146

XIV. Fourteenth Cause of Action .................................................................147

XV. Fifteenth Cause of Action .....................................................................148

XVI. Sixteenth Cause of Action ...................................................................149

XVII. Seventeenth Cause of Action .............................................................149

XVIII. Eighteenth Cause of Action ..............................................................150

XIX. Nineteenth Cause of Action ................................................................151

XX. Twentieth Cause of Action ...................................................................151

XXI. Twenty-First Cause of Action .............................................................152

XXII. Twenty-Second Cause of Action ........................................................153

XXIII. Twenty-Third Cause of Action .........................................................154

XXIV. Twenty-Fourth Cause of Action ........................................................154

XXV. Twenty-Fifth Cause of Action ............................................................155

XXVI. Twenty-Sixth Cause of Action ..........................................................156

XXVII. Twenty-Seventh Cause of Action ....................................................156

XXVIII. Twenty-Eighth Cause of Action .....................................................157

XXIX. Twenty-Ninth Cause of Action .........................................................158

XXX. Thirtieth Cause of Action ..................................................................159

XXXI. Thirty-First Cause of Action ............................................................159

XXXII. Thirty-Second Cause of Action .......................................................160

XXXIII. Thirty-Third Cause of Action .........................................................161

XXXIV. Thirty-Fourth Cause of Action .......................................................162

XXXV. Thirty-Fifth Cause of Action ...........................................................162

XXXVI. Thirty-Sixth Cause of Action .........................................................163

XXXVII. Thirty-Seventh Cause of Action ...................................................164

XXXVIII. Thirty-Eighth Cause of Action ....................................................164

XXXIX. Thirty-Ninth Cause of Action ........................................................165

XL. Fortieth Cause of Action .......................................................................166

XLI. Forty-First Cause of Action .................................................................166

XLII. Forty-Second Cause of Action ...........................................................167

XLIII. Forty-Third Cause of Action .............................................................168

XLIV. Forty-Fourth Cause of Action ...........................................................169

XLV. Forty-Fifth Cause of Action ...............................................................169

XLVI. Forty-Sixth Cause of Action .............................................................170

REQUEST FOR RELIEF ...............................................................................171

JURY DEMAND ............................................................................................172

Plaintiffs Bon Secours Mercy Health, Inc., University Health Systems of Eastern Carolina, Inc., Endeavor Health, INTEGRIS Health, Inc., Main Line Health, Inc., Medical University Hospital Authority, Mercy Health, Norton Healthcare, Inc., Providence St. Joseph Health, Roper St. Francis Healthcare, Sanford, Thomas Jefferson University, The Regents of the University of Michigan on behalf of University of Michigan Health, University of North Carolina Health Care System, University of Rochester, and West Virginia United Health System, Inc. (collectively, "Plaintiffs"), by their undersigned counsel, allege, with knowledge with respect to their own acts and on information and belief as to other matters, as follows:

## NATURE OF THE CASE

1.      This is an antitrust case. Plaintiffs are not-for-profit health care providers. Defendants include separate health insurance companies and their subsidiaries and affiliates (the "Blues") offering Blue Cross, Blue Shield, or Blue Cross and Blue Shield branded commercial health insurance plans ("Blue Plans"), and the Blue Cross Blue Shield Association ("BCBSA") that the Blues collectively control.

2.      The Blues are separate legal and economic entities. Plaintiffs challenge the Blues' coordinated agreements not to compete with one another. The Blues, with BCBSA, have engaged in ongoing conspiracies that include multiple express, unlawful agreements and various forms of anticompetitive conduct that, individually and collectively, have caused the Blues to underpay Plaintiffs by billions of dollars for the health care goods, services, and facilities that the Blues have purchased on behalf of their health plan subscribers.

3.      While Defendants' anticompetitive conduct includes multiple agreements and business practices, it can be categorized as follows.

4.      **Market Allocation Conspiracy**. First, Defendants have engaged in unlawful market allocation. Defendants expressly have agreed not to compete outside of the Blues' designated, exclusive "Service Areas" (referred to in this Complaint as "Exclusive Service Areas" or "ESAs"). They also expressly have agreed to output restrictions that limit their ability to generate revenue from operating non-Blue branded health insurance plans. Defendants' market allocation agreements and output restrictions are collectively referred to in this Complaint as the "Market

COMPLAINT

Allocation Conspiracy." Individually, each set of agreements in the Market Allocation Conspiracy is unlawful. Together, they are an unlawful aggregation of restraints on trade.

5.     **Price Fixing Conspiracy**. Second, Defendants have engaged in unlawful price fixing. Defendants expressly have agreed to fix the prices the Blues pay to Plaintiffs and other health care providers through their BlueCard Program and National Accounts Program. Defendants, exploiting the Blues' individual and collective market power within their ESAs, have collectively agreed to fix the reimbursement rates paid to Plaintiffs and other health care providers at artificially low, subcompetitive levels. Defendants also have unlawfully exchanged confidential claims reimbursement data to carry out this price fixing. These agreements are collectively referred to in this Complaint as the "Price Fixing Conspiracy." Individually, each set of agreements in the Price Fixing Conspiracy is unlawful. Together, they are an unlawful aggregation of restraints on trade.

6.     In addition to and in support of the agreements comprising the Market Allocation Conspiracy and Price Fixing Conspiracy, the Defendants have engaged in additional unlawful agreements and anticompetitive conduct in furtherance of those conspiracies, as further detailed below.

7.     Through these unlawful agreements, Defendants' conduct has caused Plaintiffs to be under-reimbursed for treating their patients, by billions of dollars. Defendants' conduct has also increased costs for Plaintiffs' patients—the Blues' subscribers—all for Defendants' own financial gain. The Market Allocation Conspiracy and Price Fixing Conspiracy (together, the "Blue Conspiracies"), and each agreement in furtherance of them, are unlawful under a *per se*, quick look, or rule of reason analysis.

*          *          *

8.     Plaintiffs are not-for-profit providers of health care goods, services, and facilities where medical and surgical procedures are performed. Much of Plaintiffs' revenue comes from payments made by commercial health insurers, including the Blues. Plaintiffs submit claims for reimbursement for the medically necessary health care goods, services, and facilities provided to patients covered by plans of insurance issued or administered by these commercial insurers (the

plans of insurance issued or administered by the Blues are the above-defined "Blue Plans").[1] Reimbursements by these commercial insurers are essential to Plaintiffs' ability to continue to operate and retain the staff necessary to provide essential health care goods, services, and facilities to insured and uninsured patients.

9.      Plaintiffs provide health care goods, services, equipment, supplies, and facilities where medical or surgical procedures are performed in the states in which they operate, including Alaska, Arizona, Arkansas, California, Colorado, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Missouri, Montana, Nebraska, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Wyoming (collectively, the "Relevant States"). Plaintiffs, as defined below, have each contracted directly with at least one of the Blues in one or more of the Relevant States.

10.     A significant portion of Plaintiffs' patients are covered by Blue Plans issued or administered locally where the individual Plaintiffs provide health care goods, services, and facilities. Some of Plaintiffs' patients are covered by non-local Blue Plans through the Blues Inter-Plan programs, including the Blue Card Program and/or the National Accounts Program. In such instances, patients have received medically necessary covered goods, services, and facilities at Plaintiffs' locations located outside of their local Blue's corresponding ESA, including where patients have traveled to locations outside of their local Blue's corresponding ESA.

11.     Between July 24, 2008 and the present (the "Relevant Time Period"), Plaintiffs have provided medically necessary covered goods, services, and facilities to patients covered by Blue Plans issued or administered by one or more Defendant Blues. This Complaint refers to these patients as the Blues' subscribers. Plaintiffs provided these medically necessary covered goods, services, and facilities pursuant to "in-network" or "participating" contracts with the Blues.[2]

---

[1] At times, Defendants have used the term "Blue Plan" to refer to a BCBSA licensee. In this Complaint, "Blue Plan" refers to a Blue Cross and/or Blue Shield-branded health insurance plan issued and/or administrated by a Blue.

[2] Health care providers are either "in-network" or "out-of-network" with respect to insurance carriers. "In-network" providers are those who contract with health insurers that require them to accept discounted, pre-negotiated rates as payment in full for covered goods, services, and facilities.

COMPLAINT

1    Plaintiffs then submitted claims for reimbursement for these goods, services, and facilities to one
2    or more Defendant Blues.

3         12.    Defendant Blues provide health insurance coverage or administrative services
4    (collectively referred to in this Complaint as "health insurance") for over 100 million members,
5    located in all 50 states, Washington D.C., Puerto Rico, and the U.S. Virgin Islands. The Blues
6    collectively operate the most extensive provider networks in the United States. There are currently
7    32[3] companies with a Primary License Agreement with BCBSA ("Primary Licensees"). Each
8    Primary Licensee may have ownership and/or control of one or more entities (a "Controlled
9    Affiliate Licensee") that operates as a Blue. For example, Defendant Elevance Health, Inc. is a
10   Primary Licensee of BCBSA and, through various subsidiaries, offers Blue Plans in 14 states. Each
11   Primary Licensee is under separate ownership and control from the other Primary Licensees.

12        13.    Defendants acknowledge that they are separate legal and economic entities. BCBSA
13   has stated on its website that the Blues are "independent companies" that operate in "exclusive
14   geographic areas." The BCBSA License Agreements repeatedly emphasize the "independent nature
15   of every licensee." Defendant Anthem publicly describes the Blues as "independently owned and
16   operated" and state that each is an "independent legal organization." During the Relevant Time
17   Period, the Blues have operated independently.

18        14.    As further described below, Defendants entered into the agreements that constitute
19   the Blue Conspiracies because they knew and agreed that other Blues would do the same, and that
20   all of them would profit from the elimination of competition. The Blue Conspiracies directly
21   reduced the competition that each Blue faces and allowed each Blue to reduce reimbursement
22   payments to Plaintiffs and other health care providers below competitive levels. But for their
23   anticompetitive conduct, the Defendant Blues would have competed and would continue to

24   ―――――――――――――――
     "Out-of-network" providers are those that do not have contracts with insurance carriers to accept
25   pre-negotiated rates and instead, independently set their own fees for the health care goods,
     services, and facilities that they deliver to their patients.
26
     [3] An October 2024 settlement agreement in which Defendants have settled antitrust claims brought
27   by a putative class of health care providers in the MDL Litigation (defined below) reflects 32
     Primary Licensees. BCBSA's website continues to list 33. Regardless, Plaintiffs have sought to
28   identify all relevant Blue entities offering commercial health insurance plans as Defendants in this
     Complaint.

compete against one another, including during the Relevant Time Period and in their ESAs in the Relevant States.

15.    Defendants' agreements and conduct, individually and collectively, have anticompetitive effects. The Blue Conspiracies have caused fewer commercial health insurance companies to compete to buy goods, services, and facilities from Plaintiffs and other health care providers in their ESAs in each of the Relevant States. Defendants' unlawful agreements and conduct have caused Plaintiffs to receive artificially low, subcompetitive reimbursements and reduced Plaintiffs' ability to retain staff, maintain operations and/or incentive to increase the amount of health care goods, services, and facilities offered to patients to the levels that otherwise would be expected in competitive markets. The subcompetitive reimbursements imposed by the Blues include multiple types of payments made pursuant to their contracts with Plaintiffs, including payments made by the Blues to Plaintiffs and payments made by self-insured entities to Plaintiffs under rates negotiated by the Blues. In this Complaint, references to "reimbursements," "payments," "rates," "amounts," or the like include each of these types of payments made to Plaintiffs pursuant to their contracts with the Blues.

16.    Further, due to the Blue Conspiracies, the supply of health care goods, services, and facilities to commercially insured patients has been correspondingly lower than what would prevail absent the Blues' anticompetitive agreements and conduct. Additionally, Defendants' anticompetitive agreements and conduct have increased the cost of health care for patients, including the Blues' own subscribers, decreased the options available to them, and reduced the adoption of innovative contracting methods intended to lower the total cost of health care. The only beneficiaries of Defendants' antitrust violations are Defendants themselves. Absent injunctive relief and an award of monetary damages, Defendants' antitrust violations will continue unabated to the detriment of competition and to the harm of Plaintiffs and others.

17.    Defendants' agreements in furtherance of the Blue Conspiracies were intended to avoid or reduce competition in the purchase of health care goods, services, and facilities. Because these agreements are *per se* illegal, the anticompetitive effects of reducing the amounts paid to health care providers (including Plaintiffs), and corresponding reduction in the supply of health

care goods, services, and facilities provided by health care providers (including Plaintiffs), must be conclusively presumed. Even apart from this conclusive presumption, however, the anticompetitive effects of these agreements have, in fact, been a reduction in the amounts paid to health care providers (including Plaintiffs) and a corresponding reduction in the supply and scope of health care goods, services, and facilities provided by health care providers (including Plaintiffs), as well as increased costs to patients, including the Blues' own subscribers.

18.    The Blue Conspiracies have been the subject of litigation since 2012, when a putative class of health care providers filed substantially similar antitrust claims against Defendants. *See In re Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, N.D. Ala., Case No. 2:13-cv-20000-RDP (the "MDL Litigation"). After years of litigation and extensive summary judgment briefing, in 2018 Judge David Proctor determined that the Market Allocation Conspiracy was "an aggregation of competitive restraints . . . which, considered together, constitute a *per se* violation of the Sherman Act" under controlling Supreme Court precedent. *In re Blue Cross Blue Shield Antitrust Litigation*, 308 F. Supp. 3d 1241, 1267 (N.D. Ala. 2018). Judge Proctor further determined that "the Rule 56 evidence in the record supports the proposition that the allocation of areas was the result of" the Blues' anticompetitive conduct. *Id.* at 1268. When reviewing that evidence, he remarked that "an attorney representing [Defendant] Anthem's predecessors expressed 'significant doubt whether, under the antitrust laws, an association like BCBSA could lawfully bar members from engaging in unbranded business outside their exclusive territories.' . . . In light of [the governing Sherman Act precedent], that attorney's doubts were well founded." *Id.* at 1269. "[T]here is little question," Judge Proctor held, "that, properly analyzed, [Defendants' conduct] is an output restriction. . . . . Output restrictions have been called one of the 'most important per se categories.'" *Id.* at 1272. "The undisputed evidence before the court establishes that, in 2005, Defendants adopted . . . an output restriction on a Plan's non–Blue business." *Id.* at 1273. This "constitutes a *per se* violation of the Sherman Act, particularly when layered on top of other restrictions Defendants have placed on competition." *Id.*

19.    Plaintiffs challenge the very same conduct in this case.

20.     Absent the Blue Conspiracies, Plaintiffs would have been able to further their non-profit missions to a greater extent, which include expanding the availability of health care goods, services, and facilities to their communities and avoid layoffs and closure of services and facilities. But instead, Defendants engaged in the Blue Conspiracies to enrich themselves with billions of dollars in unlawful revenue and profits.

**JURISDICTION AND VENUE**

21.     Plaintiffs' federal antitrust claims are instituted under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367. This Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because such state law claims are related to, and form part of, the same case or controversy.

22.     This Court has personal jurisdiction over Defendants on several grounds. First, certain Defendants entered into contracts directly with Plaintiffs, or entities owned and/or controlled by Plaintiffs, both in California and in other states. Second, all Defendants have significant business in, and contacts with, California through the Defendants' national programs including the BlueCard Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program, both in terms of the Blues' subscribers who receive health care goods, services, and facilities, and in terms of subscribers who receive treatment in their ESAs, with all the Defendants dividing revenue resulting from those goods, services, and facilities. Third, the Defendants operating outside of California have caused harm in California pursuant to the Blue Conspiracies. Fourth, all Defendants have conspired amongst themselves to violate the antitrust laws throughout the United States and this state. Accordingly, this Court has personal jurisdiction over Defendants under:

a.     Section 12 of the Clayton Act, 15 U.S.C. § 22;

b.     The conspiracy theory of jurisdiction because Defendants participated in a conspiracy in which at least one conspirator committed overt acts in this state in furtherance of the Blue Conspiracies; and

COMPLAINT

c.    The long-arm statute in the state of California because the Defendants' business activities constitute minimum contacts with this state, and the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.

23.    Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, because Defendants transact business in this District, and 28 U.S.C. § 1391, because (a) a substantial part of the events, acts and omissions giving rise to this action occurred in this judicial district, and/or (b) this is a judicial district in which Defendants are subject to the Court's personal jurisdiction.

## INTRADISTRICT ASSIGNMENT

24.    Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be assigned to a particular Division of this District, but shall be assigned on a District-wide basis.

## INTERSTATE COMMERCE

25.    The activities of Defendants that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

26.    Plaintiffs provide goods, services, and facilities to persons who reside in the Relevant States and throughout the United States, Washington D.C., and Puerto Rico.

27.    The Defendants' Inter-Plan Programs, including the BlueCard Program and National Accounts Program, are involved in interstate commerce and transactions for health care goods, services, and facilities.

28.    Plaintiffs and other health care providers have used interstate banking facilities and have purchased substantial quantities of health care goods, services, and facilities across state lines for use in providing health care goods, services, and facilities to individuals.

## PUTATIVE PROVIDER CLASS ACTION SETTLEMENT

29.    On or about July 24, 2012, a putative class of health care providers filed a complaint against Defendants, which complaint currently is pending in the MDL Litigation, seeking relief from the same anticompetitive conduct alleged in this Complaint.

30.    On or about October 14, 2024, counsel for the putative class and counsel for defendants in the MDL Litigation filed a notice that they had reached a settlement.

31.     Plaintiffs have filed timely exclusion requests and validly opted out of this provider settlement class in the MDL Litigation. Plaintiffs "preserve absolutely their right to litigate" by opting out of the settlement class. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 385 (1996). Plaintiffs are not seeking to alter or interfere with the injunctive relief in the provider class settlement in the MDL Litigation.

**TOLLING OF THE STATUTE(S) OF LIMITATIONS**

32.     The statute(s) of limitation as to Defendants' continuing antitrust violations alleged in this Complaint were tolled by the pendency of one or more class action complaints, including those cases pending in the MDL Litigation.

33.     In addition, the nature of Defendants' violation of the antitrust laws is a continuing violation in which each reimbursement agreement negotiated with Plaintiffs and each under-reimbursement of a claim paid to Plaintiffs was (i) a new and independent act occurring in furtherance of the Blue Conspiracies and (ii) inflicted a new and accumulating injury to each Plaintiff in the form of anticompetitive reimbursement rates and unfavorable contract terms for the duration of each new contract and beyond. Defendants' actions to continually make and enforce new, anticompetitive contractual terms in furtherance of the Blue Conspiracies is an exception to the governing statute(s) of limitations.

**PARTIES**

**I. Plaintiffs**

34.     Plaintiff Bon Secours Mercy Health, Inc. ("BSMH") is an Ohio not-for-profit entity with its headquarters in Cincinnati, Ohio. For purposes of this Complaint, BSMH includes Bon Secours Mercy Health, Inc., and the subsidiaries, affiliates, and entities over which BSMH has ownership or control or which, through assignment, have provided BSMH with the right to pursue claims in this litigation, all of which are included in Appendix A. BSMH operates numerous hospitals and health care facilities, or otherwise provides health care goods and services, in many states including Florida, Kentucky, Ohio, South Carolina, and Virginia. BSMH's mission is "to extend the compassionate ministry of Jesus by improving the health and well-being of our communities and bring good help to those in need, especially people who are poor, dying and

underserved." In 2023 alone, BSMH provided over $110.3 million of charity care to uninsured members of its community that could not afford to pay for their medical treatment. During the Relevant Time Period, BSMH has provided facilities and medically necessary, covered goods and services to subscribers of Defendants including Anthem-KY, Anthem-OH, Anthem-VA, BCBS-SC, and GuideWell-FL pursuant to its in-network contracts with them and billed them for the same. BSMH has been paid less for those facilities, goods, and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. BSMH has also provided facilities and medically necessary, covered goods and services to other Blues' subscribers through national programs, has billed for same, and has been paid less for those facilities, goods, and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, BSMH has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

35.     Plaintiff University Health Systems of Eastern Carolina, Inc. d/b/a ECU Health ("ECU Health") is a North Carolina not-for-profit entity with its principal place of business in North Carolina. For purposes of this Complaint, ECU Health includes University Health Systems of Eastern Carolina, Inc. d/b/a ECU Health, and the subsidiaries, affiliates, and entities over which ECU Health has ownership or control or which, through assignment, have provided ECU Health with the right to pursue claims in this litigation, all of which are included in Appendix B. ECU Health operates eight community hospitals, one academic medical center and many more health care facilities and clinics in rural eastern North Carolina. ECU Health's mission is "to improve the health and well-being of eastern North Carolina." ECU Health provided more than $140 million in unreimbursed charity care in 2024. In December 2024, as part of ECU Health's commitment to health equity and community benefit—and in advance of the North Carolina Department of Health and Human Services medical debt relief initiative—the health system partnered with national nonprofit Undue Medical Debt to eliminate more than $186 million worth of past medical debt for more than 32,000 qualifying patients. During the Relevant Time Period, ECU Health has provided facilities and medically necessary covered goods and services to subscribers of BCBS-NC pursuant to its in-network contracts with Defendant BCBS-NC and billed BCBS-NC for the same. ECU

1   Health has been paid less for those facilities, goods, and services than it would have been but for

2   Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result

3   thereof. ECU Health has also provided facilities and medically necessary, covered goods and

4   services to other Blues' subscribers through national programs, has billed for same, and has been

5   paid less for those facilities, goods, and services than it would have been but for Defendants'

6   anticompetitive conduct. As set forth herein, ECU Health has been injured in its business or

7   property as a result of Defendants' violations of the antitrust laws.

8       36.    Plaintiff Endeavor Health is an Illinois community-based, non-profit health system

9   with over 130 years of history. Currently, Endeavor Health includes nine hospitals and over three-

10  hundred sites of care across the communities it serves. Endeavor Health is headquartered in

11  Evanston, Illinois. For purposes of this Complaint, Endeavor Health includes Endeavor Health, and

12  the subsidiaries, affiliates, and entities over which Endeavor Health has ownership or control or

13  which , through assignment, have provided Endeavor Health with the right to pursue claims in this

14  litigation, all of which are included in Appendix C. Endeavor Health's mission is "to help everyone

15  in our communities be their best." During the relevant time period, Endeavor Health has provided

16  facilities and medically necessary, covered goods and services to subscribers of Defendant

17  HCSC.IL pursuant to its in-network contracts with HCSC-IL and billed HCSC-IL for the same.

18  Endeavor Health has been paid less for those facilities, goods, and services than it would have been

19  but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a

20  result thereof. Endeavor Health has also provided facilities and medically necessary, covered goods

21  and services to other Blues' subscribers through national programs, has billed for same, and has

22  been paid less for those facilities, goods, and services than it would have been but for Defendants'

23  anticompetitive conduct. As set forth herein, Endeavor Health has been injured in its business or

24  property as a result of Defendants' violations of the antitrust laws.

25      37.    Plaintiff INTEGRIS Health, Inc. ("INTEGRIS") is an Oklahoma non-profit health

26  system with its headquarters in Oklahoma City, Oklahoma. INTEGRIS currently operates

27  numerous hospitals and health care facilities in Oklahoma. For purposes of this Complaint,

28  INTEGRIS includes INTEGRIS Health, Inc., and the subsidiaries, affiliates, and entities over

which INTEGRIS has ownership or control or which, through assignment, have provided INTEGRIS with the right to pursue claims in this litigation, all of which are included in Appendix D. Formed in 1995, INTEGRIS was the result of a merger between Oklahoma Health System and Southwest Medical Center in Oklahoma City. INTEGRIS' mission is "to partner with the people of Oklahoma to live healthier lives," and it furthered that mission by providing over $33 million in charity care in 2023 alone. During the Relevant Time Period, INTEGRIS has provided facilities and medically necessary, covered goods and services to subscribers of Defendant HCSC-OK pursuant to its in-network contracts with HCSC-OK and billed HCSC-OK for the same. INTEGRIS has been paid less for those facilities, goods, and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. INTEGRIS has also provided facilities and medically necessary, covered goods and services to other Blues' subscribers through national programs, has billed for same, and has been paid less for those facilities, goods, and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, INTEGRIS has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

38.    Plaintiff Main Line Health, Inc. ("Main Line Health") is a not-for-profit health system serving portions of Philadelphia and its western suburbs. Its headquarters are located in Pennsylvania. For purposes of this Complaint, Main Line Health includes Main Line Health, Inc., and the parent, subsidiaries, affiliates, and entities over which Main Line Health has ownership or control or which, through assignment, have provided Main Line Health with the right to pursue claims in this litigation, all of which are included in Appendix E. Main Line Health operates numerous hospitals and health care facilities in Pennsylvania. Main Line Health's mission is "to meet the healthcare needs of the communities we serve and to improve the quality of life for all people, by providing a comprehensive range of safe, equitable and high-quality health services, complemented by interdisciplinary education and research programs." During the Relevant Time Period, Main Line Health has provided facilities and medically necessary, covered goods and services to subscribers of Defendants including Independence-PA and Highmark-PA pursuant to its in-network contracts with them and billed them for the same. Main Line Health has been paid

1   less for those facilities, goods, and services than it would have been but for Defendants'

2   anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. Main Line

3   Health has also provided facilities and medically necessary, covered goods and services to other

4   Blues' subscribers through national programs, has billed for same, and has been paid less for those

5   facilities, goods, and services than it would have been but for Defendants' anticompetitive conduct.

6   As set forth herein, Main Line Health has been injured in its business or property as a result of

7   Defendants' violations of the antitrust laws.

8       39.    Plaintiff Medical University Hospital Authority ("MUHA") is a not-for-profit

9   academic health system located in South Carolina. MUHA was established under S.C. Code § 59-

10   123-60 and is described therein as an agency of the State of South Carolina. Its headquarters are

11   located in Charleston, South Carolina. For purposes of this Complaint, MUHA includes Medical

12   University Hospital Authority, and the subsidiaries, affiliates, and entities over which MUHA has

13   ownership or control or which, through assignment, have provided MUHA with the right to pursue

14   claims in this litigation, all of which are included in Appendix F. MUHA operates numerous

15   hospitals and health care facilities in South Carolina. MUHA's mission is "to preserve and optimize

16   human life in South Carolina and beyond." During the Relevant Time Period, MUHA has provided

17   facilities and medically necessary, covered goods and services to subscribers of Defendant BCBS-

18   SC pursuant to its in-network contracts with BCBS-SC and billed BCBS-SC for the same. MUHA

19   has been paid less for those facilities, goods, and services than it would have been but for

20   Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result

21   thereof. MUHA has also provided facilities and medically necessary, covered goods and services

22   to other Blues' subscribers through national programs, has billed for same, and has been paid less

23   for those facilities, goods, and services than it would have been but for Defendants' anticompetitive

24   conduct. As set forth herein, MUHA has been injured in its business or property as a result of

25   Defendants' violations of the antitrust laws.

26       40.    Plaintiff Mercy Health is a Missouri nonprofit Catholic health care organization

27   founded in 1871, with its principal place of business in Missouri. For purposes of this Complaint,

28   Mercy Health includes Mercy Health, and the subsidiaries, affiliates, and entities over which Mercy

COMPLAINT

Health has ownership or control or which, through assignment, have provided Mercy Health with the right to pursue claims in this litigation, all of which are included in Appendix G. Mercy Health operates numerous hospitals and health care facilities, or otherwise provides health care goods and services, including in the states of Arkansas, Illinois, Kansas, Missouri, and Oklahoma. Mercy Health provides more than $550 million in community benefits annually, which includes care for patients who cannot pay and are not eligible for public programs. During the Relevant Time Period, Mercy Health has provided facilities and medically necessary, covered goods and services to subscribers of Defendants including Anthem-MO, BCBS-KC, BCBS-KS, HCSC-IL, HCSC-OK, and USAble-AR pursuant to its in-network contracts with them and billed them for the same. Mercy Health has been paid less for those facilities, goods, and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. Mercy Health has also provided facilities and medically necessary, covered goods and services to other Blues' subscribers through national programs, has billed for same, and has been paid less for those facilities, goods, and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Mercy Health has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

41. Plaintiff Norton Healthcare, Inc. ("Norton Healthcare") is a Kentucky non-profit entity with its principal place of business in Kentucky. For purposes of this Complaint, Norton Healthcare includes Norton Healthcare, Inc., and the subsidiaries, affiliates, and entities over which Norton Healthcare has ownership or control or which, through assignment, have provided Norton Healthcare with the right to pursue claims in this litigation, all of which are included in Appendix H. Norton Healthcare operates numerous hospitals and health care facilities in Indiana and Kentucky, and its mission "is to provide quality health care to all those we serve, in a manner that responds to the needs of our communities and honors our faith heritage." Norton Healthcare provided more than $128 million in community benefits in 2023 alone, which includes over $21 million for charity care. During the Relevant Time Period, Norton Healthcare has provided facilities and medically necessary, covered goods and services to subscribers of Defendants including Anthem-KY and Anthem-IN pursuant to its in-network contracts with them and billed them for the same. Norton

1    Healthcare has been paid less for those facilities, goods, and services than it would have been but

2    for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result

3    thereof. Norton Healthcare has also provided facilities and medically necessary, covered goods and

4    services to other Blues' subscribers through national programs, has billed for same, and has been

5    paid less for those facilities, goods, and services than it would have been but for Defendants'

6    anticompetitive conduct. As set forth herein, Norton Healthcare has been injured in its business or

7    property as a result of Defendants' violations of the antitrust laws.

8           42.    Plaintiff Providence St. Joseph Health ("Providence") is a national, not-for-profit

9    Catholic health system founded in 1856, with its principal place of business in Washington. For

10   purposes of this Complaint, Providence includes Providence St. Joseph Health, and the subsidiaries,

11   affiliates, and entities over which Providence has ownership or control or which, through

12   assignment, have provided Providence with the right to pursue claims in this litigation, all of which

13   are included in Appendix I. Providence comprises a diverse group of organizations driven by the

14   belief that health is a human right. Providence has 51 hospitals, over 1,000 clinics, and many other

15   health care facilities. Providence invested over $2 billion in community benefit programs across its

16   locations in 2023 alone. Providence operates in Alaska, California, Montana, New Mexico, Oregon,

17   Texas and Washington. During the Relevant Time Period, Providence has provided facilities and

18   medically necessary, covered goods and services to subscribers of Defendants including Anthem-

19   CA, BS-CA, HCSC-MT, HCSC-NM, HCSC-TX, Premera-AK, Premera-WA, Regence-OR, and

20   Regence-WA pursuant to its in-network contracts with them and billed them for the same.

21   Providence has been paid less for those facilities, goods, and services than it would have been but

22   for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result

23   thereof. Providence has also provided facilities and medically necessary, covered goods and

24   services to other Blues' subscribers through national programs, has billed for same, and has been

25   paid less for those facilities, goods, and services than it would have been but for Defendants'

26   anticompetitive conduct. As set forth herein, Providence has been injured in its business or property

27   as a result of Defendants' violations of the antitrust laws.

28

43.     Plaintiff Roper St. Francis Healthcare ("RSFH") is a South Carolina non-profit entity with its principal place of business in South Carolina. For purposes of this Complaint, RSFH includes Roper St. Francis Healthcare, and the subsidiaries, affiliates, and entities over which RSFH has ownership or control or which, through assignment, have provided RSFH with the right to pursue claims in this litigation, all of which are included in Appendix J. RSFH has operated in some form in South Carolina for over 160 years, and it operates four hospitals and many other health care facilities throughout South Carolina. RSFH provides millions of dollars in charitable services and care to the communities it serves through patient financial assistance and community-based programs. During the Relevant Time Period, RSFH has provided facilities and medically necessary, covered goods and services to subscribers of Defendant BCBS-SC pursuant to its in-network contracts with BCBS-SC and billed BCBS-SC for the same. RSFH has been paid less for those facilities, goods, and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. RSFH has also provided facilities and medically necessary, covered goods and services to other Blues' subscribers through national programs, has billed for same, and has been paid less for those facilities, goods, and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, RSFH has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

44.     Plaintiff Sanford is a North Dakota non-profit entity. For purposes of this Complaint, Sanford includes Sanford and the subsidiaries, affiliates, and entities over which Sanford has ownership or control or which, through assignment, have provided Sanford with the right to pursue claims in this litigation, all of which are included in Appendix K. Sanford is the largest rural health system in the United States, with 56 hospitals across Iowa, Michigan, Minnesota, Nebraska, North Dakota, Oregon, South Dakota, Wisconsin, and Wyoming. Sanford also operates 270 clinic locations and more than 160 Good Samaritan Society senior living centers, and otherwise provides health care goods and services, in Arizona, Arkansas, Colorado, Florida, Hawaii, Idaho, Illinois, Indiana, Kansas, Michigan, Montana, Nebraska, New Mexico, Ohio, Oregon, Tennessee, Texas, Washington, West Virginia, and Wyoming. Sanford provides hundreds of millions of dollars in subsidized goods, services, and facilities for its patients that are not

1    reimbursed by other sources. During the Relevant Time Period, Sanford has provided facilities and

2    medically necessary, covered goods and services to subscribers of Defendants including Aware-

3    MN, HealthyDakota-ND, Wellmark-IA, Wellmark-SD, GoodLife-NE and Regence-OR pursuant

4    to its in-network contracts with them and billed them for the same. Sanford has been paid less for

5    those facilities, goods, and services than it would have been but for Defendants' anticompetitive

6    conduct and has been injured by Defendants' conduct as a result thereof. Sanford has also provided

7    facilities and medically necessary, covered goods and services to other Blues' subscribers through

8    national programs, has billed for same, and has been paid less for those facilities, goods, and

9    services than it would have been but for Defendants' anticompetitive conduct. As set forth herein,

10   Sanford has been injured in its business or property as a result of Defendants' violations of the

11   antitrust laws.

12       45.    Plaintiff Thomas Jefferson University ("Jefferson Health") is a Pennsylvania non-

13   profit health system with its headquarters in Philadelphia, Pennsylvania. For purposes of this

14   Complaint, Jefferson Health includes Thomas Jefferson University, and the subsidiaries, affiliates,

15   and entities over which Jefferson Health has ownership or control or which, through assignment,

16   have provided Jefferson Health with the right to pursue claims in this litigation, all of which are

17   included in Appendix L. Jefferson Health's operations date back to 1825, and it has undergone

18   several mergers, currently operating 30 hospitals and many other health care facilities in

19   Pennsylvania and New Jersey. Jefferson Health's mission is "to improve lives." During the

20   Relevant Time Period, Jefferson Health has provided facilities and medically necessary, covered

21   goods and services to subscribers of Defendants including Capital-PA, Highmark-PA, Horizon-NJ,

22   and Independence-PA pursuant to its in-network contracts with them and billed them for the same.

23   Jefferson Health has been paid less for those facilities, goods, and services than it would have been

24   but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a

25   result thereof. Jefferson Health has also provided facilities and medically necessary, covered goods

26   and services to other Blues' subscribers through national programs, has billed for same, and has

27   been paid less for those facilities, goods, and services than it would have been but for Defendants'

28

1    anticompetitive conduct. As set forth herein, Jefferson Health has been injured in its business or

2    property as a result of Defendants' violations of the antitrust laws.

3        46.    Plaintiff The Regents of the University of Michigan on behalf of University of

4    Michigan Health ("U-M") is a Michigan constitutional corporation with its principal place of

5    business in Ann Arbor, Michigan. For purposes of this Complaint, U-M includes The Regents of

6    the University of Michigan on behalf of University of Michigan Health, and the subsidiaries,

7    affiliates, and entities over which U-M has ownership or control or which, through assignment,

8    have provided U-M with the right to pursue claims in this litigation, all of which are included in

9    Appendix M. U-M operates numerous hospitals and other health care facilities in Michigan. U-M's

10   mission is "to advance health to serve Michigan and the world." During the Relevant Time Period,

11   U-M has provided facilities and medically necessary, covered goods and services to subscribers of

12   Defendant BCBS-MI (and its affiliate Blue Care Network for employers with HMO coverage)

13   pursuant to its in-network contracts with BCBS-MI and billed BCBS-MI for the same. U-M has

14   been paid less for those facilities, goods, and services than it would have been but for Defendants'

15   anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. U-M has

16   also provided facilities and medically necessary, covered goods and services to other Blues'

17   subscribers through national programs, has billed for same, and has been paid less for those

18   facilities, goods, and services than it would have been but for Defendants' anticompetitive conduct.

19   As set forth herein, U-M has been injured in its business or property as a result of Defendants'

20   violations of the antitrust laws.

21       47.    Plaintiff University of North Carolina Health Care System ("UNC") is a North

22   Carolina non-profit entity with its headquarters in Chapel Hill, North Carolina. For purposes of this

23   Complaint, UNC includes University of North Carolina Health Care System, and the subsidiaries,

24   affiliates, and entities over which UNC has ownership or control or which, through assignment,

25   have provided UNC with the right to pursue claims in this litigation, all of which are included in

26   Appendix N. UNC operates numerous hospitals and health care facilities in North Carolina. UNC's

27   mission is "to improve the health and well-being of North Carolinians and others whom we serve."

28   During the Relevant Time Period, UNC has provided facilities and medically necessary, covered

1    goods and services to subscribers of Defendant BCBS-NC pursuant to its in-network contracts with

2    BCBS-NC and billed BCBS-NC for the same. UNC has been paid less for those facilities, goods,

3    and services than it would have been but for Defendants' anticompetitive conduct and has been

4    injured by Defendants' conduct as a result thereof. UNC has also provided facilities and medically

5    necessary, covered goods and services to other Blues' subscribers through national programs, has

6    billed for same, and has been paid less for those facilities, goods, and services than it would have

7    been but for Defendants' anticompetitive conduct. As set forth herein, UNC has been injured in its

8    business or property as a result of Defendants' violations of the antitrust laws.

9         48.    Plaintiff University of Rochester ("UR") is a New York State educational

10   corporation. The University of Rochester Medical Center is an operating division of the University

11   of Rochester. UR's headquarters is in Rochester, New York. For purposes of this Complaint, UR

12   includes University of Rochester, and the subsidiaries, affiliates, and entities over which UR has

13   ownership or control or which, through assignment, have provided UR with the right to pursue

14   claims in this litigation, all of which are included in Appendix O. UR operates numerous hospitals

15   and health care facilities in New York. The University of Rochester Medical Center's mission is

16   "to provide Medicine of the Highest order and to provide for the well-being of patients and

17   communities by delivering innovative and compassionate medical care, enriched by education,

18   science, and technology, and by placing patients and their families first." During the Relevant Time

19   Period, UR has provided facilities and medically necessary, covered goods and services to

20   subscribers of Defendants Excellus-NY and Highmark-NY pursuant to its in-network contracts

21   with them and billed them for the same. UR has been paid less for those services than it would have

22   been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as

23   a result thereof. UR has also provided facilities and medically necessary, covered goods and

24   services to other Blues' subscribers through national programs, has billed for same, and has been

25   paid less for those facilities and services than it would have been but for Defendants'

26   anticompetitive conduct. As set forth herein, UR has been injured in its business or property as a

27   result of Defendants' violations of the antitrust laws.

28

49.    Plaintiff West Virginia United Health System, Inc. ("WVUHS") is a West Virginia non-profit entity with its principal place of business in West Virginia. For purposes of this Complaint, WVUHS includes West Virginia United Health System, Inc., and the subsidiaries, affiliates, and entities over which WVUHS has whole ownership or control or which, through assignment, have provided WVUHS with the right to pursue claims in this litigation, all of which are included in Appendix P. WVUHS is West Viriginia's largest health system and largest private employer, comprised of over 20 hospitals and many other health care facilities in Maryland, Ohio, Pennsylvania, Virginia, and West Virginia. WVUHS's mission is "to improve the health of West Virginians and all they serve through excellence in patient care, research, and education." In 2022 alone, WVUHS provided over $350 million in free care and Medicaid shortfalls to patients in West Virginia. During the Relevant Time Period, WVUHS has provided facilities and medically necessary, covered goods and services to subscribers of Defendants including Anthem-OH, Anthem-VA, CareFirst, Highmark-PA, and Highmark-WV pursuant to its in-network contracts with them and billed them for the same. WVUHS has been paid less for those facilities, goods, and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. WVUHS has also provided facilities and medically necessary, covered goods and services to other Blues' subscribers through national programs, has billed for same, and has been paid less for those facilities, goods, and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, WVUHS has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

50.    Certain agreements between various Defendants and some of the Plaintiffs may contain what some Defendants may argue are binding arbitration provisions. Plaintiffs do not believe that any such arbitration provisions can or would govern the claims brought in this lawsuit. Nevertheless, for purposes of this Complaint, any Plaintiffs with agreements containing arbitration provisions purportedly covering any claims or parties at issue in this litigation expressly assert the claims herein only against those Defendants with whom they have not directly contracted, which are jointly and severally liable for the alleged conduct.

## II. Defendants

### A.    Blue Cross Blue Shield Association Defendant

51.    **BCBSA.** Defendant BCBSA is a not-for-profit corporation organized in Illinois and headquartered in Chicago, Illinois. It is owned and controlled by the Blues. BCBSA was created by the Blues and purports to operate as a trademark and trade name licensor. Health insurance companies operating Blue Plans provide health insurance coverage for over 100 million Americans. BCBSA itself does not provide health insurance and does not contract with health care providers (including Plaintiffs); it operates to create agreements among its members. It is owned and controlled by its members, the Blues, and is governed by a board of directors, two-thirds of which must be composed of either Blue chief executive officers or Blue board members. BCBSA's funding is provided by the Blues. Through its own actions and through its subsidiaries or affiliated companies, BCBSA has agreed to and participates in the Blue Conspiracies.

52.    The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601.

### B.    Anthem Defendants

53.    **Anthem**. Defendant Elevance Health, Inc. (formerly Anthem, Inc., which itself was formerly Wellpoint, Inc.) is an Indiana corporation with its headquarters in Indiana. Elevance Health, Inc. and its subsidiaries including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and their subsidiaries and affiliated companies are collectively referred to as "Anthem" in this Complaint. Anthem is the largest BCBSA Primary Licensee. It is a publicly-traded, for-profit company. Anthem is one of the largest health benefits companies in the nation. It is the largest or one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected Service Areas. Anthem, by and through its subsidiaries and affiliated companies, owns and/or operates Blues in numerous states, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. Anthem exercises market dominance as a Blue in its states of operation or within areas

1  of those states. Through its own actions and through its subsidiaries, Anthem has agreed to and

2  participates in the Blue Conspiracies.

3      54.    The principal headquarters for Elevance Health, Inc. is located at 20 Virginia

4  Avenue, Indianapolis, IN 46204.

5      55.    **Anthem-CA**. Defendant Blue Cross of California d/b/a/ Anthem Blue Cross is a

6  California company with its headquarters located in California. It is a subsidiary of Defendant

7  Elevance Health, Inc. Blue Cross of California d/b/a/ Anthem Blue Cross, itself or through its

8  subsidiaries or affiliated companies, provides health insurance to subscribers to various health care

9  plans in California. Blue Cross of California d/b/a/ Anthem Blue Cross and its subsidiaries,

10  affiliated companies, and companies under the common ownership of Defendant Elevance Health,

11  Inc., including Anthem Blue Cross Life and Health Insurance Company, Blue Cross of Northern

12  California, and Blue Cross of Southern California, are collectively referred to as "Anthem Blue

13  Cross of California" or "Anthem-CA." Anthem-CA exercises market dominance as a Blue in

14  California or within areas of California. Through its own actions and through its subsidiaries or

15  affiliated companies, Anthem-CA has agreed to and participates in the Blue Conspiracies.

16      56.    The principal headquarters for Anthem-CA is located at One Wellpoint Way,

17  Thousand Oaks, CA 91362.

18      57.    Defendant Anthem Blue Cross Life and Health Insurance Company is a California

19  company with its headquarters located in California. It is a subsidiary of Defendant Elevance

20  Health, Inc. Anthem Blue Cross Life and Health Insurance Company, itself or through its

21  subsidiaries or affiliated companies, provides health insurance to subscribers to various health care

22  plans in California. Anthem Blue Cross Life and Health Insurance Company and its subsidiaries,

23  affiliated companies, and companies under the common ownership of Defendant Elevance Health,

24  Inc., including Blue Cross of California d/b/a/ Anthem Blue Cross, Blue Cross of Northern

25  California, and Blue Cross of Southern California, are collectively referred to as "Anthem Blue

26  Cross of California" or "Anthem-CA." Anthem-CA exercises market dominance as a Blue in

27  California or within areas of California. Through its own actions and through its subsidiaries or

28  affiliated companies, Anthem-CA has agreed to and participates in the Blue Conspiracies.

1    58.    The principal headquarters for Anthem-CA is located at One Wellpoint Way,

2    Thousand Oaks, CA 91362.

3    59.    Defendant Blue Cross of Northern California is a California company with its

4    headquarters located in California. It is a subsidiary of Defendant Elevance Health, Inc. Blue Cross

5    of Northern California, itself or through its subsidiaries or affiliated companies, provides health

6    insurance to subscribers to various health care plans in California. Blue Cross of Northern

7    California and its subsidiaries, affiliated companies, and companies under the common ownership

8    of Defendant Elevance Health, Inc., including Blue Cross of California d/b/a/ Anthem Blue Cross,

9    Anthem Blue Cross Life and Health Insurance Company, and Blue Cross of Southern California,

10   are collectively referred to as "Anthem Blue Cross of California" or "Anthem-CA." Anthem-CA

11   exercises market dominance as a Blue in California or within areas of California. Through its own

12   actions and through its subsidiaries or affiliated companies, Anthem-CA has agreed to and

13   participates in the Blue Conspiracies.

14   60.    The principal headquarters for Anthem-CA is located at One Wellpoint Way,

15   Thousand Oaks, CA 91362.

16   61.    Defendant Blue Cross of Southern California is a California company with its

17   headquarters located in California. It is a subsidiary of Defendant Elevance Health, Inc. Blue Cross

18   of Southern California, itself or through its subsidiaries or affiliated companies, provides health

19   insurance to subscribers to various health care plans in California. Blue Cross of Southern

20   California and its subsidiaries, affiliated companies, and companies under the common ownership

21   of Defendant Elevance Health, Inc., including Blue Cross of California d/b/a/ Anthem Blue Cross,

22   Anthem Blue Cross Life and Health Insurance Company, and Blue Cross of Northern California,

23   are collectively referred to as "Anthem Blue Cross of California" or "Anthem-CA." Anthem-CA

24   exercises market dominance as a Blue in California or within areas of California. Through its own

25   actions and through its subsidiaries or affiliated companies, Anthem-CA has agreed to and

26   participates in the Blue Conspiracies.

27   62.    The principal headquarters for Anthem-CA is located at One Wellpoint Way,

28   Thousand Oaks, CA 91362.

63.    **Anthem-CO**. Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado is a Colorado company with its headquarters located in Colorado. It is a subsidiary of Defendant Elevance Health, Inc. Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Colorado. Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado and its subsidiaries and affiliated companies in Colorado are collectively referred to as "Anthem Blue Cross and Blue Shield of Colorado" or "Anthem-CO" in this Complaint. Anthem-CO exercises market dominance as a Blue in Colorado or within areas of Colorado. Through its own actions and through its subsidiaries or affiliated companies, Anthem-CO has agreed to and participates in the Blue Conspiracies.

64.    The principal headquarters for Anthem-CO is located at 700 Broadway, Denver, CO 80203.

65.    **Anthem-CT**. Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield is a Connecticut company with its headquarters located in Connecticut. It is a subsidiary of Defendant Elevance Health, Inc. Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Connecticut. Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Connecticut" or "Anthem-CT." Anthem-CT exercises market dominance as a Blue in Connecticut or within areas of Connecticut. Through its own actions and through its subsidiaries or affiliated companies, Anthem-CT has agreed to and participates in the Blue Conspiracies.

66.    The principal headquarters for Anthem-CT is located at 370 Bassett Road, North Haven, CT 06473.

67.    **Anthem-GA**. Defendant Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., a health maintenance organization, is a Georgia company with headquarters located in Georgia. It is a subsidiary of Defendant Elevance Health, Inc. Blue Cross and Blue Shield

1   Healthcare Plan of Georgia, Inc., itself or through its subsidiaries or affiliated companies, provides

2   health insurance to subscribers to various health care plans in Georgia. Blue Cross and Blue Shield

3   Healthcare Plan of Georgia, Inc., its subsidiaries and affiliated companies in Georgia are

4   collectively referred to as "Anthem Blue Cross and Blue Shield of Georgia" or "Anthem-GA" in

5   this Complaint. Anthem-GA exercises market dominance as a Blue in Georgia or within areas of

6   Georgia. Through its own actions and through its subsidiaries or affiliated companies, Anthem-GA

7   has agreed to and participates in the Blue Conspiracies.

8         68.    The principal headquarters for Anthem-GA is located at 3350 Peachtree Road NE,

9   Atlanta, GA 30326.

10        69.    **Anthem-IN**. Defendant Anthem Insurance Companies, Inc. d/b/a Blue Cross and

11  Blue Shield of Indiana and Anthem Blue Cross and Blue Shield is an Indiana company with its

12  headquarters located in Indiana. It is a subsidiary of Defendant Elevance Health, Inc. Anthem

13  Insurance Companies, Inc. d/b/a Blue Cross and Blue Shield of Indiana and Anthem Blue Cross

14  and Blue Shield, itself or through its subsidiaries or affiliated companies, provides health insurance

15  to subscribers to various health care plans in Indiana. Anthem Insurance Companies, Inc. d/b/a Blue

16  Cross and Blue Shield of Indiana and Anthem Blue Cross and Blue Shield and its subsidiaries and

17  affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Indiana"

18  or "Anthem-IN" in this Complaint. Anthem-IN exercises market dominance as a Blue in Indiana

19  or within areas of Indiana. Through its own actions and through its subsidiaries or affiliated

20  companies, Anthem-IN has agreed to and participates in the Blue Conspiracies.

21        70.    The principal headquarters for Anthem-IN is located at 120 Monument Circle,

22  Indianapolis, IN 46204.

23        71.    **Anthem-KY**. Defendant Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue

24  Cross and Blue Shield is a Kentucky company with its headquarters located in Kentucky. It is a

25  subsidiary of Defendant Elevance Health, Inc. Anthem Health Plans of Kentucky, Inc. d/b/a

26  Anthem Blue Cross and Blue Shield, itself or through its subsidiaries and affiliated companies,

27  provides health insurance to subscribers to various health care plans in Kentucky. Anthem Health

28  Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated

1    companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Kentucky" or

2    "Anthem-KY" in this Complaint. Anthem-KY exercises market dominance as a Blue in Kentucky

3    or within areas of Kentucky. Through its own actions and through its subsidiaries or affiliated

4    companies, Anthem-KY has agreed to and participates in the Blue Conspiracies.

5          72.    The principal headquarters for Anthem-KY is located at 13550 Triton Park Blvd.,

6    Louisville, KY 40223.

7          73.    **Anthem-ME**. Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue

8    Cross and Blue Shield and d/b/a Associated Hospital Service is a Maine company with its

9    headquarters located in Maine. It is a subsidiary of Defendant Elevance Health, Inc. Anthem Health

10   Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield and d/b/a Associated Hospital

11   Service, itself or through its subsidiaries or affiliated companies, provides health insurance to

12   subscribers to various health care plans in Maine. Anthem Health Plans of Maine d/b/a Anthem

13   Blue Cross and Blue Shield and its subsidiaries and affiliated companies are collectively referred

14   to as "Anthem Blue Cross and Blue Shield of Maine" or "Anthem-ME" in this Complaint. Anthem-

15   ME exercises market dominance as a Blue in Maine or within areas of Maine. Through its own

16   actions and through its subsidiaries or affiliated companies, Anthem-ME has agreed to and

17   participates in the Blue Conspiracies.

18         74.    The principal headquarters for Anthem-ME is located at 2 Gannett Drive, South

19   Portland, ME 04016.

20         75.    **Anthem-MO**. Defendant HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue

21   Shield of Missouri is a Missouri company with its headquarters located in Missouri. It is a

22   subsidiary of Defendant Elevance Health, Inc. HMO Missouri, Inc. d/b/a Anthem Blue Cross and

23   Blue Shield of Missouri, itself or through its subsidiaries or affiliated companies, provides health

24   insurance to subscribers to various health care plans in Missouri. Defendant HMO Missouri, Inc.

25   d/b/a Anthem Blue Cross and Blue Shield of Missouri and its subsidiaries and affiliated companies,

26   including Health Alliance Life Insurance Company d/b/a Anthem Blue Cross and Blue Shield, are

27   collectively referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "Anthem-MO" in

28   this Complaint. Anthem-MO exercises market dominance as a Blue in Missouri or within areas of

1  Missouri. Through its own actions and through its subsidiaries or affiliated companies, Anthem-
2  MO has agreed to and participates in the Blue Conspiracies.

3    76.    The principal headquarters for Anthem-MO is located at 1831 Chestnut Street, St.
4  Louis, MO 63103.

5    77.    Defendant Health Alliance Life Insurance Company d/b/a Anthem Blue Cross and
6  Blue Shield is a Missouri company with its headquarters located in Missouri. It is a subsidiary of
7  Defendant Elevance Health, Inc. Health Alliance Life Insurance Company d/b/a Anthem Blue
8  Cross and Blue Shield, itself or through its subsidiaries or affiliated companies, provides health
9  insurance to subscribers to various health care plans in Missouri. Health Alliance Life Insurance
10  Company d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated companies,
11  including HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri, are
12  collectively referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "Anthem-MO" in
13  this Complaint. Anthem-MO exercises market dominance as a Blue in Missouri or within areas of
14  Missouri. Through its own actions and through its subsidiaries or affiliated companies, Anthem-
15  MO has agreed to and participates in the Blue Conspiracies.

16    78.    The principal headquarters for Anthem-MO is located at 1831 Chestnut Street, St.
17  Louis, MO 63103.

18    79.    **Anthem-NV**. Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a
19  Anthem Blue Cross and Blue Shield Nevada is a Nevada company with its principal place of
20  business in Nevada. It is a subsidiary of Defendant Elevance Health, Inc. Defendant Rocky
21  Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield Nevada,
22  itself or through its subsidiaries and affiliated companies, provides health insurance to subscribers
23  to various health care plans in Nevada. Rocky Mountain and Medical Service, Inc. d/b/a Anthem
24  Blue Cross and Blue Shield Nevada and its subsidiaries and affiliated companies in Nevada are
25  collectively referred to as "Anthem Blue Cross and Blue Shield of Nevada" or "Anthem-NV" in
26  this Complaint. Anthem-NV exercises market dominance as a Blue in Nevada or within areas of
27  Nevada. Through its own actions and through its subsidiaries or affiliated companies, Anthem-NV
28  has agreed to and participates in the Blue Conspiracies.

80. The principal headquarters for Anthem-NV is located at 9133 West Russell Rd. Suite 200, Las Vegas, NV 89148.

81. **Anthem-NH**. Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield is a New Hampshire company with its headquarters located in New Hampshire. It is a subsidiary of Defendant Elevance Health, Inc. Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in New Hampshire. Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of New Hampshire" or "Anthem-NH" in this Complaint. Anthem-NH exercises market dominance as a Blue in New Hampshire or within areas of New Hampshire. Through its own actions and through its subsidiaries or affiliated companies, Anthem-NH has agreed to and participates in the Blue Conspiracies.

82. The principal headquarters for Anthem-NH is located at 3000 Goffs Falls Rd, Manchester, NH 03103.

83. **Anthem-NY**. Defendant Anthem HealthChoice Assurance, Inc., f/k/a Empire HealthChoice Assurance, Inc., d/b/a Anthem Blue Cross and d/b/a Anthem Blue Cross and Blue Shield, formerly d/b/a Empire BlueCross BlueShield, is a New York company with its headquarters located in New York. It is a subsidiary of Defendant Elevance Health, Inc. Anthem HealthChoice Assurance, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in New York. Anthem HealthChoice Assurance, Inc. and its subsidiaries and affiliated companies, including Anthem HealthChoice HMO, Inc., are collectively referred to as "Anthem Blue Cross and Blue Shield of New York" or "Anthem NY" in this Complaint. Anthem NY exercises market dominance as a Blue in areas within New York. Through its own actions and through its subsidiaries or affiliated companies, Anthem-NY has agreed to and participates in the Blue Conspiracies.

84. The principal headquarters for Anthem-NY is located at One Liberty Plaza, New York, NY 10006.

85.     Defendant Anthem HealthChoice HMO, Inc., f/k/a Empire HealthChoice HMO, Inc., is a New York company with its headquarters located in New York. It is a subsidiary of Defendant Elevance Health, Inc. Anthem HealthChoice HMO, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in New York. Anthem HealthChoice HMO, Inc. and its subsidiaries and affiliated companies, including Anthem HealthChoice Assurance, Inc., are collectively referred to as "Anthem Blue Cross and Blue Shield of New York" or "Anthem NY" in this Complaint. Anthem NY exercises market dominance as a Blue within areas of New York. Through its own actions and through its subsidiaries or affiliated companies, Anthem-NY has agreed to and participates in the Blue Conspiracies.

86.     The principal headquarters for Anthem-NY is located at One Liberty Plaza, New York, NY 10006.

87.     **Anthem-OH**. Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is an Ohio company with its headquarters located in Ohio. It is a subsidiary of Defendant Elevance Health, Inc. Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Ohio. Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio and its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Ohio" or "Anthem-OH." Anthem-OH exercises market dominance as a Blue in Ohio or within areas of Ohio. Through its own actions and through its subsidiaries or affiliated companies, Anthem-OH has agreed to and participates in the Blue Conspiracies.

88.     The principal headquarters for Anthem-OH is located at 3075 Vandercar Way Cincinnati, OH 45209.

89.     **Anthem-VA**. Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield is a Virginia company with its headquarters located in Virginia. It is a subsidiary of Defendant Elevance Health, Inc. Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield, itself or through its subsidiaries or affiliated companies, provides

1    health insurance to subscribers to various health care plans in Virginia. Anthem Health Plans of

2    Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated

3    companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Virginia" or

4    "Anthem-VA" in this Complaint. Anthem-VA exercises market dominance as a Blue in Virginia

5    or within areas of Virginia. Through its own actions and through its subsidiaries or affiliated

6    companies, Anthem-VA has agreed to and participates in the Blue Conspiracies.

7         90.    The principal headquarters for Anthem-VA is located at 2235 Staples Mill Road,

8    Suite 401, Richmond, VA 23230.

9         91.    **Anthem-WI**. Defendant Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue

10   Cross and Blue Shield is a Wisconsin company with its headquarters located in Wisconsin. It is a

11   subsidiary of Defendant Elevance Health, Inc. Blue Cross Blue Shield of Wisconsin d/b/a Anthem

12   Blue Cross and Blue Shield, itself or through its subsidiaries or affiliated companies, including

13   Compcare Health Services Insurance Corporation and Claim Management Services, Inc., provides

14   health insurance to subscribers to various health care plans in Wisconsin. Blue Cross Blue Shield

15   of Wisconsin d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated

16   companies are collectively referred to as "Blue Cross Blue Shield of Wisconsin" or "Anthem-WI"

17   in this Complaint. Anthem-WI exercises market dominance as a Blue in Wisconsin or within areas

18   of Wisconsin. Through its own actions and through its subsidiaries or affiliated companies,

19   Anthem-WI has agreed to and participates in the Blue Conspiracies.

20        92.    The principal headquarters for Anthem-WI is located at N17 W24340 Riverwood

21   Drive Waukesha, WI 53188.

22        **C.    Aware Defendants**

23        93.    **Aware**. Defendant Aware Integrated, Inc. is a Minnesota entity with its principal

24   place of business in Minnesota. It operates under the following names or subsidiaries: Blue Cross

25   and Blue Shield of Minnesota; Blue Plus; MII Life, Incorporated; MII Services, Inc.;

26   Comprehensive Care Services, Inc.; Pharmacy Gold, Inc.; ClearStone Solutions; SupportSource,

27   Inc.; Invitation Health and Wellness, Inc.; Invitation Health Institute; and Capital Asset Care, Inc.

28   Aware Integrated, Inc., itself or through its subsidiaries or affiliated companies, provides health

1    insurance to subscribers to various health care plans in Minnesota. Aware Integrated, Inc. and its

2    subsidiaries and affiliated companies, including BCBSM, Inc. d/b/a Blue Cross and Blue Shield of

3    Minnesota, are collectively referred to as "Aware" in this Complaint. Aware exercises market

4    dominance as a Blue in Minnesota or within areas of Minnesota. Through its own actions and

5    through its subsidiaries, Aware has agreed to and participates in the Blue Conspiracies.

6        94.    The principal headquarters for BCBS-MN is located at 3535 Blue Cross Road, St.

7    Paul, MN 55164.

8        95.    **Aware-MN**. Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of

9    Minnesota is a Minnesota company with its headquarters located in Minnesota. BCBSM, Inc. d/b/a

10   Blue Cross and Blue Shield of Minnesota is a wholly owned subsidiary of Aware Integrated, Inc.

11   BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota, itself or through its subsidiaries or

12   affiliated companies, provides health insurance to subscribers to various health care plans in

13   Minnesota. BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota and its subsidiaries and

14   affiliated companies, together with Aware Integrated, Inc., are collectively referred to as "Blue

15   Cross and Blue Shield of Minnesota" or "Aware-MN" in this Complaint. Aware-MN exercises

16   market dominance as a Blue in Minnesota or within areas of Minnesota. Through its own actions

17   and through its subsidiaries or affiliated companies, Aware-MN has agreed to and participates in

18   the Blue Conspiracies.

19       96.    The principal headquarters for Aware-MN is located at 3535 Blue Cross Road, St.

20   Paul, MN 55164.

21       **D.    BCBS-AL Defendant**

22       97.    **BCBS-AL**. Defendant Blue Cross and Blue Shield of Alabama is an Alabama

23   company with its headquarters located in Alabama. It is the health insurance company operating

24   under the Blue Cross and Blue Shield trademarks and trade names in Alabama. Blue Cross and

25   Blue Shield of Alabama, itself or through its subsidiaries or affiliated companies, provides health

26   insurance to subscribers to various health care plans in Alabama. It is the largest provider of health

27   care insurance and administrative services for health care plans in Alabama. Blue Cross and Blue

28   Shield of Alabama and its subsidiaries and affiliated companies are collectively referred to as

1   "BCBS-AL" in this Complaint. BCBS-AL exercises market dominance as a Blue in Alabama or

2   within areas of Alabama. Through its own actions and through its subsidiaries or affiliated

3   companies, BCBS-AL has agreed to and participates in the Blue Conspiracies.

4       98.    The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway

5   East, Birmingham, AL 35244.

6           **E.    BCBS-HI Defendant**

7       99.    **BCBS-HI**. Defendant Hawaii Medical Service Association d/b/a Blue Cross and

8   Blue Shield of Hawaii is a mutual benefit society under the laws of Hawaii with its headquarters

9   located in Hawaii. Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of

10  Hawaii, itself or through its subsidiaries or affiliated companies, provides health insurance to

11  subscribers to various health care plans in Hawaii. Hawaii Medical Service Association d/b/a Blue

12  Cross and Blue Shield of Hawaii and its subsidiaries and affiliated companies are collectively

13  referred to as "Hawaii Medical Service Association" or "BCBS-HI" in this Complaint. BCBS-HI

14  exercises market dominance as a Blue in Hawaii or within areas of Hawaii. Through its own actions

15  and through its subsidiaries or affiliated companies, BCBS-HI has agreed to and participates in the

16  Blue Conspiracies.

17      100.   The principal headquarters for BCBS-HI is located at 818 Keeaumoku Street,

18  Honolulu, HI 96814.

19          **F.    BCBS-KS Defendant**

20      101.   **BCBS-KS**. Defendant Blue Cross and Blue Shield of Kansas, Inc. is a Kansas

21  company with its headquarters located in Kansas. Blue Cross and Blue Shield of Kansas, Inc., itself

22  or through subsidiaries or affiliated companies including Premier Health, Inc., provides health

23  insurance to subscribers to various health care plans in Kansas. Blue Cross and Blue Shield of

24  Kansas, Inc. and its subsidiaries and affiliated companies, including Premier Health, Inc., are

25  collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS." BCBS-KS

26  exercises market dominance as a Blue in Kansas or within areas of Kansas. Through its own actions

27  and through its subsidiaries or affiliated companies, BCBS-KS has agreed to and participates in the

28  Blue Conspiracies.

1    102.    The principal headquarters for BCBS-KS is located at 1133 SW Topeka Boulevard,

2    Topeka, KS 66629.

3    **G.    BCBS-KC Defendant**

4    103.    **BCBS-KC**. Defendant Blue Cross and Blue Shield of Kansas City is a Missouri

5    corporation with its corporate headquarters located in Missouri. Blue Cross and Blue Shield of

6    Kansas City, itself or through its subsidiaries or affiliated companies, provides health insurance to

7    subscribers to various health care plans in Kansas City and its suburbs in Kansas and Missouri.

8    Blue Cross and Blue Shield of Kansas City and its subsidiaries and affiliated companies are

9    collectively referred to as "Blue Cross and Blue Shield of Kansas City," or "BCBS-KC" in this

10   Complaint. BCBS-KC exercises market dominance as a Blue in parts of Kansas and Missouri.

11   Through its own actions and through its subsidiaries or affiliated companies, BCBS-KC has agreed

12   to and participates in the Blue Conspiracies.

13   104.    The principal headquarters for BCBS-KC is located at 2301 Main Street, One

14   Pershing Square, Kansas City, MO 64108.

15   **H.    BCBS-LA Defendant**

16   105.    **BCBS-LA**. Defendant Louisiana Health Service & Indemnity Company d/b/a Blue

17   Cross and Blue Shield of Louisiana is a Louisiana company with its headquarters located in

18   Louisiana. Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue

19   Shield of Louisiana, itself or through its subsidiaries or affiliated companies, provides health

20   insurance to subscribers to various health care plans in Louisiana. Louisiana Health Service &

21   Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and its subsidiaries and

22   affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Louisiana" or

23   "BCBS-LA" in this Complaint. BCBS-LA exercises market dominance as a Blue in Louisiana or

24   within areas of Louisiana. Through its own actions and through its subsidiaries or affiliated

25   companies, BCBS-LA has agreed to and participates in the Blue Conspiracies.

26   106.    The principal headquarters for BCBS-LA is located at 5525 Reitz Avenue, Baton

27   Rouge, LA 70809.

28   **I.    BCBS-MA Defendants**

107.    **BCBS-MA.** Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a Massachusetts company with its headquarters located in Massachusetts. Blue Cross and Blue Shield of Massachusetts, Inc., itself or through subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Massachusetts. Blue Cross and Blue Shield of Massachusetts, Inc. and its subsidiaries and affiliated companies, including Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc., are collectively referred to as "Blue Cross and Blue Shield of Massachusetts" or "BCBS-MA" in this Complaint. BCBS-MA exercises market dominance as a Blue in Massachusetts or within areas of Massachusetts. Through its own actions and through its subsidiaries or affiliated companies, BCBS-MA has agreed to and participates in the Blue Conspiracies.

108.    The principal headquarters for BCBS-MA is located at 401 Park Drive, Boston, MA 02215.

109.    Defendant Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. is a Massachusetts company with its headquarters located in Massachusetts. Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc., itself or through subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Massachusetts. Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. and its subsidiaries and affiliated companies, including Blue Cross and Blue Shield of Massachusetts, Inc., are collectively referred to as "Blue Cross and Blue Shield of Massachusetts" or "BCBS-MA" in this Complaint. BCBS-MA exercises market dominance as a Blue in Massachusetts or within areas of Massachusetts. Through its own actions and through its subsidiaries or affiliated companies, BCBS-MA has agreed to and participates in the Blue Conspiracies.

110.    The principal headquarters for BCBS-MA is located at 401 Park Drive, Boston, MA 02215.

**J.    BCBS-MI Defendant**

111.    **BCBS-MI**. Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company is a Michigan nonprofit mutual insurance company with its headquarters located in Michigan. Blue Cross Blue Shield of Michigan Mutual Insurance Company, itself or through its

subsidiaries or affiliated companies, provides health insurance to subscribers to various health care

plans in Michigan. Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company and

its subsidiaries and affiliated companies in Michigan are collectively referred to as "Blue Cross and

Blue Shield of Michigan" or "BCBS-MI" in this Complaint. BCBS-MI exercises market dominance

as a Blue in Michigan or within areas of Michigan. Through its own actions and through its

subsidiaries or affiliated companies, BCBS-MI has agreed to and participates in the Blue

Conspiracies.

112.    The principal headquarters for BCBS-MI is located at 600 E. Lafayette Blvd.,

Detroit, MI 48226.

### K.    BCBS-MS Defendant

113.    **BCBS-MS**. Defendant Blue Cross & Blue Shield of Mississippi, a Mutual Insurance

Company, is incorporated in Mississippi and has its headquarters located in Mississippi. Blue Cross

& Blue Shield of Mississippi, a Mutual Insurance Company, itself or through its subsidiaries or

affiliated companies, provides health insurance to subscribers to various health care plans in

Mississippi. Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company and its

subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of

Mississippi" or "BCBS-MS" in this Complaint. BCBS-MS exercises market dominance as a Blue

in Mississippi or within areas of Mississippi. Through its own actions and through its subsidiaries

or affiliated companies, BCBS-MS has agreed to and participates in the Blue Conspiracies.

114.    The principal headquarters for BCBS-MS is located at 3545 Lakeland Drive,

Flowood, MS 39232.

### L.    BCBS-NC Defendant

115.    **BCBS-NC**. Defendant Blue Cross and Blue Shield of North Carolina, Inc. is a North

Carolina not-for-profit corporation with its headquarters located in North Carolina. Blue Cross and

Blue Shield of North Carolina, Inc., itself or through its subsidiaries or affiliated companies,

provides health insurance to subscribers to various health care plans in North Carolina. Blue Cross

and Blue Shield of North Carolina, Inc. and its subsidiaries and affiliated companies are collectively

referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC" in this Complaint.

1  BCBS-NC exercises market dominance as a Blue in North Carolina or within areas of North

2  Carolina.

3       116.   The principal headquarters for BCBS-NC is located at 5901 Chapel Hill Road,

4  Durham, NC 27707.

5       **M.**    **BCBS-RI Defendant**

6       117.   **BCBS-RI**. Defendant Blue Cross Blue Shield of Rhode Island is a Rhode Island

7  company with its headquarters located in Rhode Island. Blue Cross Blue Shield of Rhode Island,

8  itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to

9  various health care plans in Rhode Island. Blue Cross Blue Shield of Rhode Island and its

10  subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of

11  Rhode Island" or "BCBS-RI" in this Complaint. BCBS-RI exercises market dominance as a Blue

12  in Rhode Island or within areas of Rhode Island. Through its own actions and through its

13  subsidiaries or affiliated companies, BCBS-RI has agreed to and participates in the Blue

14  Conspiracies.

15       118.   The principal headquarters for BCBS-RI is located at 500 Exchange Street,

16  Providence, RI 02903.

17       **N.**    **BCBS-SC Defendant**

18       119.   **BCBS-SC**. Defendant BlueCross BlueShield of South Carolina is a South Carolina

19  company with its headquarters located in South Carolina. BlueCross BlueShield of South Carolina,

20  itself or through its subsidiaries or affiliated companies, provides health insurance to over one

21  million subscribers to various health care plans in South Carolina. BlueCross BlueShield of South

22  Carolina and its subsidiaries and affiliated companies are collectively referred to as "BlueCross

23  BlueShield of South Carolina" or "BCBS-SC" in this Complaint. BCBS-SC exercises market

24  dominance as a Blue in South Carolina or within areas of South Carolina. Through its own actions

25  and through its subsidiaries or affiliated companies, BCBS-SC has agreed to and participates in the

26  Blue Conspiracies.

27       120.   The principal headquarters for BCBS-SC is located at 2501 Faraway Drive,

28  Columbia, SC 29212

1    **O.    BCBS-TN Defendant**

2    121.    **BCBS-TN**. Defendant BlueCross BlueShield of Tennessee, Inc. is a Tennessee

3    company with its headquarters located in Tennessee. Defendant BlueCross BlueShield of

4    Tennessee, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance

5    to subscribers to various health care plans in Tennessee. BlueCross BlueShield of Tennessee, Inc.

6    and its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield

7    of Tennessee" or "BCBS-TN" in this Complaint. BCBS-TN exercises market dominance as a Blue

8    in Tennessee or within areas of Tennessee. Through its own actions and through its subsidiaries or

9    affiliated companies, BCBS-TN has agreed to and participates in the Blue Conspiracies.

10    122.    The principal headquarters for BCBS-TN is located at 1 Cameron Hill Circle,

11    Chattanooga, TN 37402.

12    **P.    BCBS-VT**

13    123.    **BCBS-VT**. Defendant Blue Cross and Blue Shield of Vermont is a Vermont

14    nonprofit hospital/medical service corporation with headquarters located in Vermont. It was

15    acquired by BCBS-MI in 2023. Blue Cross and Blue Shield of Vermont, itself or through its

16    subsidiaries or affiliated companies, provides health insurance to subscribers to various health care

17    plans within the state of Vermont. Blue Cross and Blue Shield of Vermont and its subsidiaries and

18    affiliated companies in Vermont are collectively referred to as "Blue Cross and Blue Shield of

19    Vermont" or "BCBS-VT" in this Complaint. BCBS-VT exercises market dominance as a Blue in

20    Vermont or within areas of Vermont. Through its own actions and through its subsidiaries or

21    affiliated companies, BCBS-VT has agreed to and participates in the Blue Conspiracies.

22    124.    The principal headquarters for BCBS-VT is located at 445 Industrial Lane, Berlin,

23    VT 05602.

24    **Q.    BCBS-WY**

25    125.    **BCBS-WY**. Defendant Blue Cross Blue Shield of Wyoming is a Wyoming

26    corporation with its headquarters located in Wyoming. Blue Cross Blue Shield of Wyoming, itself

27    or through its subsidiaries or affiliated companies, provides health insurance to subscribers to

28    various health care plans in Wyoming. Blue Cross Blue Shield of Wyoming and its subsidiaries

and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Wyoming" or "BCBS-WY" in this Complaint. BCBS-WY exercises market dominance as a Blue in Wyoming or within areas of Wyoming. Through its own actions and through its subsidiaries or affiliated companies, BCBS-WY has agreed to and participates in the Blue Conspiracies.

126.    The principal headquarters for BCBS-WY is located at 4000 House Avenue Cheyenne, WY 82001.

**R.    BS-CA Defendant**

127.    **BS-CA**. Defendant California Physicians' Service, Inc. d/b/a Blue Shield of California is a California company with its headquarters located in California. California Physicians' Service, Inc. d/b/a Blue Shield of California, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in California. California Physicians' Service, Inc. d/b/a Blue Shield of California and its subsidiaries and affiliated companies are collectively referred to as "Blue Shield of California" or "BS-CA" in this Complaint. BS-CA exercises market dominance as a Blue in California or within areas of California. Through its own actions and through its subsidiaries or affiliated companies, BS-CA has agreed to and participates in the Blue Conspiracies.

128.    The principal headquarters for BS-CA is located at 50 Beale Street, San Francisco, CA 94105-1808.

**S.    Cambia Defendants**

129.    **Cambia**. Defendant Cambia Health Solutions, Inc., formerly known as The Regence Group, Inc., is an Oregon corporation with its corporate headquarters located in Oregon. Cambia Health Solutions, Inc. is one of the largest health insurers in the Pacific Northwest and Mountain regions. Cambia Health Solutions, Inc., through its subsidiary companies and its affiliated companies, including Regence BlueShield of Idaho, Inc., Regence Insurance Holding Corporation, Regence BlueCross BlueShield of Oregon, Regence BlueCross BlueShield of Utah, and Regence BlueShield (Washington), exercises market dominance as a Blue in its states of operation (Idaho, Oregon, Utah, and Washington) or within areas of those states. Cambia Health Solutions, Inc. and its subsidiaries and affiliated companies are collectively referred to as "Cambia"

1  in this Complaint. Through its own actions and through its subsidiaries or affiliated companies,

2  Cambia has agreed to and participates in the Blue Conspiracies.

3      130.    The principal headquarters for Cambia is 200 SW Market Street, Portland, OR

4  97201.

5      131.    **Regence-ID**. Defendant Regence BlueShield of Idaho, Inc. is an Idaho company

6  with its headquarters located in Idaho. It is a subsidiary of Defendant Cambia Health Solutions,

7  Inc. Regence BlueShield of Idaho, Inc., itself or through its subsidiaries or affiliated companies,

8  provides health insurance to subscribers to various health care plans in Idaho. Regence BlueShield

9  of Idaho, Inc. and its subsidiaries and affiliated companies are collectively referred to as "Regence

10 BlueShield of Idaho" or "Regence-ID" in this Complaint. Regence-ID exercises market dominance

11 as a Blue in Idaho or within areas of Idaho. Through its own actions and through its subsidiaries or

12 affiliated companies, Regence-ID has agreed to and participates in the Blue Conspiracies.

13     132.    The principal headquarters for Regence-ID is located at 1602 21st Ave, Lewiston,

14 ID 83501.

15     133.    **Regence-OR**. Defendant Regence BlueCross BlueShield of Oregon is an Oregon

16 company with its headquarters in Oregon. It is a subsidiary of Defendant Cambia Health Solutions,

17 Inc. Regence BlueCross BlueShield of Oregon, itself or through its subsidiaries or affiliated

18 companies, provides health insurance to subscribers to various health care plans in Oregon.

19 Regence BlueCross BlueShield of Oregon and its subsidiaries and affiliated companies in Oregon

20 are collectively referred to as "Blue Cross and Blue Shield of Oregon" or "Regence-OR" in this

21 Complaint. Regence-OR exercises market dominance as a Blue in Oregon or within areas of

22 Oregon. Through its own actions and through its subsidiaries or affiliated companies, Regence-OR

23 has agreed to and participates in the Blue Conspiracies.

24     134.    The principal headquarters for Regence-OR is located at 100 SW Market Street,

25 Portland, OR 97207.

26     135.    **Regence-UT**. Defendant Regence BlueCross BlueShield of Utah is a Utah company

27 with its headquarters located in Utah. It is a subsidiary of Defendant Cambia Health Solutions, Inc.

28 Regence BlueCross BlueShield of Utah, itself or through its subsidiaries or affiliated companies,

1    provides health insurance to subscribers to various health care plans in Utah. Regence BlueCross

2    BlueShield of Utah and its subsidiaries and affiliated companies in Utah are collectively referred

3    to as "Blue Cross and Blue Shield of Utah" or "Regence-UT" in this Complaint. Regence-UT

4    exercises market dominance as a Blue in Utah or within areas of Utah. Through its own actions and

5    through its subsidiaries or affiliated companies, Regence-UT has agreed to and participates in the

6    Blue Conspiracies.

7        136.    The principal headquarters for Regence-UT is located at 2890 East Cottonwood

8    Parkway, Salt Lake City, UT 84121.

9        137.    **Regence-WA**. Defendant Regence BlueShield is a Washington nonprofit

10   corporation with its headquarters located in Washington. It is a subsidiary of Defendant Cambia

11   Health Solutions, Inc. Regence BlueShield, itself or through its subsidiaries or affiliated companies,

12   provides health insurance to subscribers to various health care plans in Washington. Regence

13   BlueShield and its subsidiaries and affiliated companies in Washington are collectively referred to

14   as "Blue Shield of Washington" or "Regence-WA" in this Complaint. Regence-WA exercises

15   market dominance as a Blue in Washington or within areas of Washington. Through its own actions

16   and through its subsidiaries or affiliated companies, Regence-WA has agreed to and participates in

17   the Blue Conspiracies.

18       138.    The principal headquarters for Regence-WA is located at 1800 Ninth Avenue,

19   Seattle, WA 98111.

20       **T.    Capital-PA Defendant**

21       139.    **Capital-PA**. Defendant Capital Blue Cross is a Pennsylvania company with its

22   principal place of business in Pennsylvania, operating within 21 counties in central Pennsylvania.

23   Capital Blue Cross is the parent company to Capital Advantage Insurance Company, Capital

24   Advantage Assurance Company, and Keyston Health Plan Central. Capital Blue Cross, itself or

25   through its subsidiaries or affiliated companies, provides health insurance to subscribers to various

26   health care plans in Pennsylvania. Capital Blue Cross and its subsidiaries and affiliated companies

27   are collectively referred to as "Capital-PA" in this Complaint. Capital-PA exercises market

28

1   dominance as a Blue in areas of Pennsylvania. Through its own actions and through its subsidiaries

2   or affiliated companies, Capital-PA has agreed to and participates in the Blue Conspiracies.

3        140.    The principal headquarters for Capital-PA is located at 2500 Elmerton Avenue,

4   Harrisburg, PA 17177.

5        **U.    CareFirst Defendants**

6        141.    **CareFirst**. Defendant CareFirst, Inc. d/b/a CareFirst BlueCross BlueShield is a

7   Maryland corporation with its headquarters located in Maryland and the District of Columbia.

8   CareFirst, Inc., itself or through its subsidiaries or affiliated companies , provides health insurance

9   to subscribers to various health care plans in Washington, D.C., Maryland, and areas in northern

10  Virginia. It is the largest health care insurer in the Mid-Atlantic Region. CareFirst, Inc. and its

11  subsidiaries and affiliated companies are collectively referred to as "CareFirst" in this Complaint.

12  Through its subsidiaries and affiliated companies, CareFirst exercises market dominance as a Blue

13  in Maryland, Washington, D.C., and northern Virginia, or in areas within Maryland, Washington,

14  D.C., and northern Virginia. Through its own actions and through its subsidiaries or affiliated

15  companies, CareFirst has agreed to and participates in the Blue Conspiracies.

16       142.    The principal headquarters for CareFirst is located at 10455 and 10453 Mill Run

17  Circle, Owings Mill, MD 21117.

18       143.    Defendant CareFirst BlueChoice, Inc. d/b/a CareFirst BlueCross BlueShield is a

19  Maryland corporation with its headquarters located in Maryland and the District of Columbia.

20  CareFirst BlueChoice, Inc. d/b/a CareFirst BlueCross BlueShield, itself or through its subsidiaries

21  or affiliated companies, including CareFirst, Inc. d/b/a CareFirst BlueCross BlueShield and Group

22  Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield, provides health

23  insurance to subscribers to various health care plans in Washington, D.C., Maryland, and areas in

24  northern Virginia. CareFirst BlueChoice, Inc. d/b/a CareFirst BlueCross BlueShield and its

25  subsidiaries and affiliated companies, including CareFirst, Inc. d/b/a CareFirst BlueCross

26  BlueShield and Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross

27  BlueShield, are collectively referred to as "CareFirst" in this Complaint. CareFirst exercises market

28  dominance as a Blue in Maryland, Washington, D.C., and northern Virginia, or in areas within

Washington, D.C., Maryland, and northern Virginia. Through its own actions and through its subsidiaries or affiliated companies, CareFirst has agreed to and participates in the Blue Conspiracies.

144.    The principal headquarters for CareFirst is located at 10455 and 10453 Mill Run Circle, Owings Mill, MD 21117.

145.    Defendant Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield is a Maryland corporation with its headquarters located in Maryland and the District of Columbia. Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield, itself or through its subsidiaries or affiliated companies, including CareFirst, Inc. d/b/a CareFirst BlueCross BlueShield and CareFirst BlueChoice, Inc. d/b/a CareFirst BlueCross BlueShield, provides health insurance to subscribers to various health care plans in Maryland, Washington, D.C., Maryland, and northern Virginia. Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield and its subsidiaries and affiliated companies, including CareFirst, Inc. d/b/a CareFirst BlueCross BlueShield and CareFirst BlueChoice, Inc. d/b/a CareFirst BlueCross BlueShield, are collectively referred to as "CareFirst" in this Complaint. CareFirst exercises market dominance as a Blue in Maryland, Washington, D.C., and northern Virginia, or in areas within Washington, D.C., Maryland, and northern Virginia. Through its own actions and through its subsidiaries or affiliated companies, CareFirst has agreed to and participates in the Blue Conspiracies.

146.    The principal headquarters for CareFirst is located at 10455 and 10453 Mill Run Circle, Owings Mill, MD 21117.

147.    Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield is a Maryland corporation with its headquarters located in Maryland and the District of Columbia. CareFirst of Maryland, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Maryland. CareFirst of Maryland, Inc. and its subsidiaries and affiliated companies in Maryland, and CareFirst, Inc., are collectively referred to as "CareFirst" in this Complaint. CareFirst exercises market dominance as a Blue in

1  Maryland or within areas of Maryland. Through its own actions and through its subsidiaries or
2  affiliated companies, CareFirst has agreed to and participates in the Blue Conspiracies.

3      148.    The principal headquarters for CareFirst is located at 10455 and 10453 Mill Run
4  Circle, Owings Mill, MD 21117.

5      **V.    Excellus Defendants**

6      149.    **Excellus**. Defendant Lifetime Healthcare, Inc. is a New York company with its
7  headquarters located in New York. It is the parent of Excellus Health Plan, Inc. d/b/a Excellus
8  BlueCross BlueShield. Lifetime Healthcare, Inc., itself or through its subsidiaries or affiliated
9  companies, provides health insurance to subscribers to various health care plans in New York.
10 Lifetime Healthcare, Inc., and its subsidiaries and affiliated companies, including Excellus Health
11 Plan, Inc. d/b/a Excellus BlueCross BlueShield, are collectively referred to as "Excellus" in this
12 Complaint. Excellus exercises market dominance as a Blue in areas within New York. Through its
13 own actions and through its subsidiaries or affiliated companies, Excellus has agreed to and
14 participates in the Blue Conspiracies.

15     150.    The principal headquarters for Excellus is located at 165 Court Street, Rochester,
16 NY 14647.

17     151.    **Excellus-NY**. Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross
18 BlueShield is a New York company with its headquarters located in New York. Excellus Health
19 Plan, Inc. d/b/a Excellus BlueCross BlueShield is a subsidiary of Lifetime Healthcare, Inc. Excellus
20 Health Plan, Inc. d/b/a Excellus BlueCross BlueShield, itself or through its subsidiaries or affiliated
21 companies, provides health insurance to subscribers to various health care plans in New York.
22 Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield and its subsidiaries and affiliated
23 companies are collectively referred to as "Excellus-NY" in this Complaint. Excellus-NY exercises
24 market dominance as a Blue in areas within New York. Through its own actions and through its
25 subsidiaries or affiliated companies, Excellus-NY has agreed to and participates in the Blue
26 Conspiracies.

27     152.    The principal headquarters for Excellus-NY is located at 165 Court Street,
28 Rochester, NY 14647.

COMPLAINT

1

**W.    Gemstone Defendants**

2      153.    **Gemstone**. Defendant Gemstone Holdings, Inc. is an Idaho nonprofit mutual

3  holding company with its headquarters located in Idaho. It is the parent company of Blue Cross of

4  Idaho Health Service, Inc. d/b/a Blue Cross of Idaho. Gemstone Holdings, Inc., itself or through its

5  subsidiaries or affiliated companies, provides health insurance to subscribers to various health care

6  plans in Idaho. Gemstone Holdings, Inc. and its subsidiaries and affiliated companies, including

7  Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho, are collectively referred to as

8  "Gemstone" in this Complaint. Gemstone exercises market dominance as a Blue in Idaho or within

9  areas of Idaho. Through its own actions and through its subsidiaries or affiliated companies,

10 Gemstone has agreed to and participates in the Blue Conspiracies.

11     154.    The principal headquarters for Gemstone is located at 3000 East Pine Avenue,

12 Meridian, ID 83642.

13     155.    **Gemstone-ID**. Defendant Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross

14 of Idaho is an Idaho company with its headquarters located in Idaho. Blue Cross of Idaho Health

15 Service, Inc. d/b/a Blue Cross of Idaho, itself or through its subsidiaries or affiliated companies,

16 provides health insurance to subscribers to various health care plans in Idaho. Blue Cross of Idaho

17 Health Service, Inc. d/b/a Blue Cross of Idaho and its subsidiaries and affiliated companies are

18 collectively referred to as "Blue Cross of Idaho" or "Gemstone-ID" in this Complaint. Gemstone-

19 ID exercises market dominance as a Blue in Idaho or within areas of Idaho. Through its own actions

20 and through its subsidiaries or affiliated companies, Gemstone-ID has agreed to and participates in

21 the Blue Conspiracies.

22     156.    The principal headquarters for Gemstone-ID is located at 3000 East Pine Avenue,

23 Meridian, ID 83642.

24     **X.    Goodlife Defendants**

25     157.    **GoodLife**. Defendant GoodLife Partners, Inc. is a Nebraska mutual insurance

26 holding company with its principal place of business in Nebraska. GoodLife Partners, Inc. is the

27 parent company of Blue Cross and Blue Shield of Nebraska. GoodLife Partners, Inc., itself or

28 through its subsidiaries or affiliated companies, provides health insurance to subscribers to various

1   health care plans in Nebraska. GoodLife Partners, Inc. and its subsidiaries and affiliated companies,

2   including and Blue Cross and Blue Shield of Nebraska, are collectively referred to as "GoodLife"

3   in this Complaint. GoodLife exercises market dominance as a Blue in Nebraska or within areas of

4   Nebraska. Through its own actions and through its subsidiaries or affiliated companies, GoodLife

5   has agreed to and participates in the Blue Conspiracies.

6           158.    The principal headquarters for GoodLife is located at 1919 Aksarban Drive, Omaha,

7   NE 68180.

8           159.    **GoodLife-NE**. Defendant Blue Cross and Blue Shield of Nebraska is a Nebraska

9   company with its headquarters located in Nebraska. Blue Cross and Blue Shield of Nebraska, itself

10  or through its subsidiaries or affiliated companies, provides health insurance to subscribers to

11  various health care plans in Nebraska. Blue Cross and Blue Shield of Nebraska and its subsidiaries

12  and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Nebraska"

13  or "GoodLife-NE" in this Complaint. GoodLife-NE exercises market dominance as a Blue in

14  Nebraska or within areas of Nebraska. Through its own actions and through its subsidiaries or

15  affiliated companies, GoodLife-NE has agreed to and participates in the Blue Conspiracies.

16          160.    The principal headquarters for GoodLife-NE is located at 1919 Aksarban Drive,

17  Omaha, NE 68180.

18          **Y.      GuideWell Defendants**

19          161.    **GuideWell**. Defendant GuideWell Mutual Holding Corporation is a Florida mutual

20  insurance holding company with its principal place of business in Florida. GuideWell Mutual

21  Holding Corporation is the parent of Blue Cross and Blue Shield of Florida, Inc. and the parent of

22  Triple-S Management Corporation, which itself is the parent of Triple-S Salud, Inc. GuideWell

23  Mutual Holding Corporation and its subsidiaries and affiliated companies are collectively referred

24  to as "GuideWell" in this Complaint. GuideWell exercises market dominance as a Blue in Florida

25  and Puerto Rico or within areas of Florida and Puerto Rico. Through its own actions and through

26  its subsidiaries, GuideWell has agreed to and participates in the Blue Conspiracies.

27          162.    The principal headquarters for GuideWell is located at 4800 Deerwood Campus

28  Parkway, Jacksonville, FL 32246.

COMPLAINT

1    163.  **GuideWell-FL**. Defendant Blue Cross and Blue Shield of Florida, Inc. is a Florida

2    mutual insurance holding company with its principal place of business in Florida. It is a subsidiary

3    of Defendant GuideWell Mutual Holding Corporation. Blue Cross and Blue Shield of Florida, Inc.,

4    itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to

5    various health care plans in Florida. Blue Cross and Blue Shield of Florida, Inc. and its subsidiaries

6    and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Florida" or

7    "GuideWell-FL" in this Complaint. GuideWell-FL exercises market dominance as a Blue in Florida

8    or within areas of Florida. Through its own actions and through its subsidiaries or affiliated

9    companies, GuideWell-FL has agreed to and participates in the Blue Conspiracies.

10    164.  The principal headquarters for GuideWell-FL is located at 4800 Deerwood Campus

11    Parkway, Jacksonville, FL 32246.

12    165.  **GuideWell-PR**. Defendant Triple-S Management Corporation is a Puerto Rico

13    company with its headquarters located in Puerto Rico. It is a subsidiary of Defendant GuideWell

14    Mutual Holding Corporation. It is the parent of Triple-S Salud, Inc. Triple-S Management

15    Corporation, itself and through its subsidiaries and affiliated companies, including Triple-S Salud,

16    Inc., provides health insurance to subscribers to various health care plans in Puerto Rico. Triple-S

17    Management Corporation and its subsidiaries and affiliated companies, including Triple-S Salud,

18    Inc., are collectively referred to as "GuideWell-PR" in this Complaint. GuideWell-PR exercises

19    market dominance as a Blue in Puerto Rico or within areas of Puerto Rico. Through its own actions

20    and through its subsidiaries or affiliated companies, GuideWell-PR has agreed to and participates

21    in the Blue Conspiracies.

22    166.  The principal headquarters for GuideWell-PR is located at 1441 F.D. Roosevelt

23    Avenue, San Juan, Puerto Rico 00920.

24    167.  Defendant Triple-S Salud, Inc. is a Puerto Rico company with its headquarters

25    located in Puerto Rico. Triple-S Salud, Inc., itself and through its subsidiaries and affiliated

26    companies, including Triple-S Management Corporation, provides health insurance to subscribers

27    to various health care plans in Puerto Rico. Triple-S Salud, Inc. and its subsidiaries and affiliated

28    companies, including Triple-S Management Corporation, are collectively referred to as

1    "GuideWell-PR" in this Complaint. GuideWell-PR exercises market dominance as a Blue in Puerto

2    Rico or within areas of Puerto Rico. Through its own actions and through its subsidiaries or

3    affiliated companies, GuideWell-PR has agreed to and participates in the Blue Conspiracies.

4         168.   The principal headquarters for GuideWell-PR is located at 1441 F.D. Roosevelt

5    Avenue, San Juan, Puerto Rico 00920.

6         **Z.    HCSC Defendants**

7         169.   **HCSC**. Defendant Health Care Service Corporation is an Illinois Mutual Legal

8    Reserve Company with its corporate headquarters located in Illinois. Health Care Service

9    Corporation is one of the largest health insurers in the United States. Health Care Service

10   Corporation does business as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield

11   of Montana, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma,

12   Blue Cross and Blue Shield of Texas. Health Care Service Corporation, itself and through its

13   divisions, subsidiaries, and affiliated companies, operates Blues in numerous states, including

14   Illinois, Montana, New Mexico, Oklahoma, and Texas. In each of its five states or areas within

15   those states, Health Care Service Corporation exercises market dominance. Health Care Service

16   Corporation and its divisions, subsidiaries, and affiliated companies are collectively referred to as

17   "HCSC" in this Complaint. Through its own actions and through its divisions, subsidiaries, and

18   affiliated companies, HCSC has agreed to and participates in the Blue Conspiracies.

19        170.   The principal headquarters for HCSC is 300 East Randolph Street, Chicago, IL

20   60601.

21        171.   **HCSC-IL**. Defendant Blue Cross and Blue Shield of Illinois is a division of

22   Defendant HCSC with its principal place of business located in Illinois. Blue Cross and Blue Shield

23   of Illinois, itself or through its subsidiaries or affiliated companies provides health insurance to

24   subscribers to various health care plans in Illinois. Blue Cross and Blue Shield of Illinois and its

25   subsidiaries and affiliated companies in Illinois are collectively referred to as "Blue Cross and Blue

26   Shield of Illinois" or "HCSC-IL" in this Complaint. HCSC-IL exercises market dominance as a

27   Blue in Illinois or within areas of Illinois. Through its own actions and through its subsidiaries or

28   affiliated companies, HCSC-IL has agreed to and participates in the Blue Conspiracies.

1    172.    The principal headquarters for HCSC-IL is located at 300 E. Randolph Street,

2    Chicago, IL 60601.

3    173.    **HCSC-MT**. Defendant Blue Cross and Blue Shield of Montana is a division of

4    Defendant HCSC with its principal place of business in Montana. Blue Cross and Blue Shield of

5    Montana, itself or through its subsidiaries or affiliates, provides health insurance to subscribers to

6    various health care plans in Montana. Blue Cross and Blue Shield of Montana and its subsidiaries

7    and affiliated companies in Montana are collectively referred to as "Blue Cross and Blue Shield of

8    Montana" or "HCSC-MT" in this Complaint. For purposes of this Complaint, references to Blue

9    Cross and Blue Shield of Montana are deemed to include Caring for Montanans, Inc. and Blue

10   Cross and Blue Shield of Montana, Inc. HCSC-MT exercises market dominance as a Blue in

11   Montana or within areas of Montana. Through its own actions and through its subsidiaries or

12   affiliated companies, HCSC-MT has agreed to and participates in the Blue Conspiracies.

13   174.    The principal headquarters for HCSC-MT is located at 560 N. Park Avenue, Helena,

14   MT 59604-4309.

15   175.    Defendant Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana,

16   Inc. is a Montana company with its headquarters located in Montana. When Blue Cross and Blue

17   Shield of Montana, Inc. was sold to Defendant HCSC, certain of its liabilities including certain

18   liabilities relating to litigation, remained with the corporation now known as Caring for Montanans,

19   Inc. Caring for Montanans, Inc., itself or through subsidiaries or affiliated companies, provides or

20   has provided health insurance to subscribers to various health care plans in Montana. Caring for

21   Montanans, Inc. and its subsidiaries and affiliated companies in Montana are collectively referred

22   to as "Blue Cross and Blue Shield of Montana" or "HCSC-MT" in this Complaint. For purposes of

23   this Complaint, references to Caring for Montanans, Inc. are deemed to include Blue Cross and

24   Blue Shield of Montana and Blue Cross and Blue Shield of Montana, Inc. HCSC-MT exercises

25   market dominance as a Blue in Montana or within areas of Montana. Through its own actions and

26   through its subsidiaries or affiliated companies, HCSC-MT has agreed to and participates in the

27   Blue Conspiracies.

28

1    176.   The principal headquarters for HCSC-MT is located at 560 N. Park Avenue, Helena,

2    MT 59604-4309.

3    177.   **HCSC-NM**. Defendant Blue Cross and Blue Shield of New Mexico is a division of

4    Defendant HCSC with its principal place of business located in New Mexico. Blue Cross and Blue

5    Shield of New Mexico, itself or through its subsidiaries or affiliated companies, provides health

6    insurance to subscribers to various health care plans in New Mexico. Blue Cross and Blue Shield

7    of New Mexico and its subsidiaries and affiliated companies in New Mexico are collectively

8    referred to as "Blue Cross and Blue Shield of New Mexico" or "HCSC-NM" in this Complaint.

9    HCSC-NM exercises market dominance as a Blue in New Mexico or within areas of New Mexico.

10   Through its own actions and through its subsidiaries or affiliated companies, HCSC-NM has agreed

11   to and participates in the Blue Conspiracies.

12   178.   The principal headquarters for HCSC-NM is located at 5701 Balloon Fiesta

13   Parkway Northeast, Albuquerque, NM 87113.

14   179.   **HCSC-OK**. Defendant Blue Cross and Blue Shield of Oklahoma is a division of

15   Defendant HCSC with its principal place of business located in Oklahoma. Blue Cross and Blue

16   Shield of Oklahoma, itself or through subsidiaries or affiliated companies, provides health

17   insurance to subscribers to various health care plans in Oklahoma. Blue Cross and Blue Shield of

18   Oklahoma and its subsidiaries and affiliated companies in Oklahoma are collectively referred to as

19   "Blue Cross and Blue Shield of Oklahoma" or "HCSC-OK" in this Complaint. HCSC-OK exercises

20   market dominance as a Blue in Oklahoma or within areas of Oklahoma.

21   180.   The principal headquarters for HCSC-OK is located at 1400 South Boston, Tulsa,

22   OK 74119.

23   181.   **HCSC-TX**. Defendant Blue Cross and Blue Shield of Texas is a division of

24   Defendant HCSC with its principal place of business located in Texas. Blue Cross and Blue Shield

25   of Texas, itself or through its subsidiaries or affiliated companies, provides health insurance to

26   subscribers to various health care plans in Texas. Blue Cross and Blue Shield of Texas and its

27   subsidiaries and affiliated companies in Texas are collectively referred to as "Blue Cross and Blue

28   Shield of Texas" or "HCSC-TX" in this Complaint. HCSC-TX exercises market dominance as a

1   Blue in Texas or within areas of Texas. Through its own actions and through its subsidiaries or

2   affiliated companies, HCSC-TX has agreed to and participates in the Blue Conspiracies.

3         182.    The principal headquarters for HCSC-TX is located at 1001 E. Lookout Drive,

4   Richardson, TX 75082.

5         **AA.    HealthyDakota Defendants**

6         183.    **HealthyDakota**. Defendant HealthyDakota Mutual Holdings is a North Dakota

7   company with its headquarters in North Dakota. It is the parent of Blue Cross Blue Shield of North

8   Dakota f/k/a Noridian Mutual Insurance Company. HealthyDakota Mutual Holdings, itself or

9   through subsidiaries or affiliated companies, provides health insurance to subscribers to various

10  health care plans in North Dakota. HealthyDakota Mutual Holdings and its subsidiaries and

11  affiliated companies, including Blue Cross Blue Shield of North Dakota, are collectively referred

12  to as "HealthyDakota" in this Complaint. HealthyDakota exercises market dominance as a Blue in

13  North Dakota or within areas of North Dakota. Through its own actions and through its subsidiaries

14  or affiliated companies, HealthyDakota has agreed to and participates in the Blue Conspiracies.

15        184.    The principal headquarters for HealthyDakota is located at 4510 13th Avenue South,

16  Fargo, ND 58121.

17        185.    **HealthyDakota-ND**. Defendant Blue Cross Blue Shield of North Dakota f/k/a

18  Noridian Mutual Insurance Company is a North Dakota company with its headquarters located in

19  North Dakota. Blue Cross Blue Shield of North Dakota, itself or through subsidiaries or affiliated

20  companies, provides health insurance to subscribers to various health care plans in North Dakota.

21  Blue Cross Blue Shield of North Dakota and its subsidiaries and affiliated companies are

22  collectively referred to as "Blue Cross Blue Shield of North Dakota" or "HealthyDakota-ND" in

23  this Complaint. HealthyDakota-ND exercises market dominance as a Blue in North Dakota or

24  within areas of North Dakota. Through its own actions and through its subsidiaries or affiliated

25  companies, HealthyDakota-ND has agreed to and participates in the Blue Conspiracies.

26        186.    The principal headquarters for HealthyDakota-ND is located at 4510 13th Avenue

27  South, Fargo, ND 58121.

28        **BB.    Highmark Defendants**

187.   **Highmark**. Defendant Highmark Health is a Pennsylvania company with its headquarters located in Pennsylvania. Highmark Health is the parent of Highmark BCBSD Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware, Highmark Western and Northeastern New York Inc. d/b/a Highmark Blue Cross Blue Shield of Western New York and d/b/a Highmark Blue Shield of Northeastern New York, Highmark Inc., and Highmark West Virginia Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia. Highmark Health and its subsidiaries and affiliated companies are collectively referred to as "Highmark" in this Complaint. Highmark, itself and through its subsidiaries and affiliated companies, operates Blues in numerous states, including Delaware, New York, Pennsylvania, and West Virginia. Highmark exercises market dominance as a Blue in the states in which it operates or within areas of those states. Through its own actions and through its subsidiaries, Highmark has agreed to and participates in the Blue Conspiracies.

188.   The principal headquarters for Highmark is 120 Fifth Avenue, Pittsburgh, PA 15222.

189.   **Highmark-DE**. Defendant Highmark BCBSD Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware is Delaware company with its headquarters located in Delaware. It is a subsidiary of Highmark, Inc. Highmark BCBSD Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware was formerly known as Blue Cross and Blue Shield of Delaware. It became affiliated with Highmark, Inc. in 2011 and changed its name to Highmark BCBSD Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware in 2012. Highmark BCBSD Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Delaware. Highmark BCBSD Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware and its subsidiaries and affiliated companies in Delaware are collectively referred to as "Highmark Blue Cross and Blue Shield Delaware" or "Highmark-DE" in this Complaint. Highmark-DE exercises market dominance as a Blue in Delaware or within areas of Delaware. Through its own actions and through its subsidiaries or affiliated companies, Highmark-DE has agreed to and participates in the Blue Conspiracies.

190.   The principal headquarters for Highmark-DE is located at 800 Delaware Avenue, Wilmington, DE 19801.

191.    **Highmark-NY**. Defendant Highmark Western and Northeastern New York Inc. d/b/a Highmark Blue Cross Blue Shield of Western New York and d/b/a Highmark Blue Shield of Northeastern New York,[4] is a New York company with its headquarters located in New York. It is a subsidiary of Defendant Highmark Health. Highmark Western and Northeastern New York Inc. d/b/a Highmark Blue Cross Blue Shield of Western New York and d/b/a Highmark Blue Shield of Northeastern New York, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in western New York and northeastern New York. Highmark Western and Northeastern New York Inc. d/b/a Highmark Blue Cross Blue Shield of Western New York and d/b/a Highmark Blue Shield of Northeastern New York and its subsidiaries and affiliated companies in New York are collectively referred to as "Highmark Blue Cross and Blue Shield New York" or "Highmark-NY" in this Complaint. Highmark-NY exercises market dominance as a Blue in areas within New York. Through its own actions and through its subsidiaries or affiliated companies, Highmark-NY has agreed to and participates in the Blue Conspiracies.

192.    The principal headquarters for Highmark-NY is located at 1 Seneca St, 34th Floor, Buffalo, NY 14203.

193.    **Highmark-PA**. Defendant Highmark Inc. f/k/a Highmark Health Services, d/b/a Highmark Blue Cross Blue Shield in western Pennsylvania and northeastern Pennsylvania and d/b/a Highmark Blue Shield in central Pennsylvania and southeastern Pennsylvania, is a Pennsylvania company with its headquarters located in Pennsylvania. It is a subsidiary of Defendant Highmark Health. Highmark Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health plans in Pennsylvania. Highmark Inc. f/k/a Highmark Health Services, d/b/a Highmark Blue Cross Blue Shield in western Pennsylvania and northeastern Pennsylvania and d/b/a Highmark Blue Shield in central Pennsylvania and southeastern Pennsylvania and its subsidiaries and affiliated companies in Pennsylvania are collectively referred to as "Highmark Blue Cross and Blue Shield Pennsylvania" or "Highmark-PA" in this Complaint.

---

[4] Highmark acquired HealthNow in 2021, which operated as BlueCross BlueShield of Western New York and as BlueShield of Northeastern New York.

1    Highmark-PA exercises market dominance as a Blue in Pennsylvania or within areas of

2    Pennsylvania. Through its own actions and through its subsidiaries or affiliated companies,

3    Highmark-PA has agreed to and participates in the Blue Conspiracies.

4        194.    The principal headquarters for Highmark-PA is located at 120 Fifth Avenue Place,

5    Pittsburgh, PA 15222.

6        195.    **Highmark-WV**. Defendant Highmark West Virginia Inc. d/b/a Highmark Blue

7    Cross Blue Shield West Virginia is a West Virginia company with its headquarters located in West

8    Virginia. It is a subsidiary of Defendant Highmark Health. Highmark West Virginia Inc. d/b/a

9    Highmark Blue Cross Blue Shield West Virginia, formerly known as Mountain State Blue Cross

10   Blue Shield, itself or through its subsidiaries or affiliated companies, provides health insurance to

11   subscribers to various health care plans in West Virginia.[5] Highmark West Virginia Inc. d/b/a

12   Highmark Blue Cross Blue Shield West Virginia and its subsidiaries and affiliated companies in

13   West Virginia are collectively referred to as "Highmark Blue Cross Blue Shield West Virginia" or

14   "Highmark-WV" in this Complaint. Highmark-WV exercises market dominance in West Virginia

15   or within areas of West Virginia. Through its own actions and through its subsidiaries or affiliated

16   companies, Highmark-WV has agreed to and participates in the Blue Conspiracies.

17       196.    The principal headquarters for Highmark-WV is located at 700 Market Square,

18   Parkersburg, West Virginia 26101.

19       **CC.    Horizon-NJ Defendant**

20       197.    **Horizon-NJ**. Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue

21   Cross Blue Shield of New Jersey is a New Jersey company with its headquarters located in New

22   Jersey. Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey,

23   itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to

24   various health care plans in New Jersey. Horizon Healthcare Services, Inc. d/b/a Horizon Blue

25   Cross Blue Shield of New Jersey and its subsidiaries and affiliated companies are collectively

26   referred to as "Horizon Blue Cross and Blue Shield of New Jersey" or "Horizon-NJ" in this

27

28   _____
[5] Washington County, Ohio was part of Highmark-WV's Service Area until Highmark-WV requested, and BCBSA granted, its transfer to Anthem-OH in 2023.

1    Complaint. Horizon-NJ exercises market dominance as a Blue in New Jersey or within areas of

2    New Jersey. Through its own actions and through its subsidiaries or affiliated companies, Horizon-

3    NJ has agreed to and participates in the Blue Conspiracies.

4          198.    The principal headquarters for Horizon-NJ is located at Three Penn Plaza East,

5    Newark, NJ 07105.

6          **DD.    Independence-PA Defendant**

7          199.    **Independence-PA**. Defendant Independence Health Group, Inc. is a Pennsylvania

8    company with its headquarters located in Pennsylvania. It is the parent of Independence Hospital

9    Indemnity Plan, Inc., f/k/a Independence Blue Cross, QCC Insurance Company, and Independence

10   Assurance Company, and additional subsidiaries. Independence Health Group, Inc., itself or

11   through its subsidiaries or affiliated companies, provides health insurance to subscribers to various

12   health care plans in areas within Pennsylvania. Independence Health Group, Inc. and its subsidiaries

13   and   affiliated   companies,   including   Independence   Hospital   Indemnity   Plan,   Inc.,   f/k/a

14   Independence Blue Cross, QCC Insurance Company, and Independence Assurance Company, are

15   collectively referred to as "Independence-PA" in this Complaint. Independence-PA exercises

16   market dominance as a Blue in areas of Pennsylvania. Through its own actions and through its

17   subsidiaries or affiliated companies, Independence-PA has agreed to and participates in the Blue

18   Conspiracies.

19         200.    The principal headquarters for Independence-PA is located at 1901 Market Street,

20   Philadelphia, PA 19103.

21         **EE.    Premera Defendants**

22         201.    **PREMERA**. Defendant PREMERA is a Washington nonprofit company with its

23   headquarters located in Washington. It is the sole voting member of Defendant Premera Blue Cross,

24   which is registered as a health care service contractor in Washington and a hospital and medical

25   service corporation in Alaska. PREMERA, itself or through its subsidiaries or affiliated companies,

26   provides health insurance to subscribers to various health care plans in Alaska and Washington.

27   PREMERA and its subsidiaries and affiliated companies are collectively referred to as "Premera"

28   in this Complaint. Premera, through its subsidiaries and affiliated companies, exercises market

dominance as a Blue in its states of operation (Alaska and Washington) or in areas within those states. Through its own actions and through its subsidiaries, Premera has agreed to and participates in the Blue Conspiracies.

202. The principal headquarters for PREMERA is 7001 220th St. SW, Mountlake Terrace, WA 98043.

203. **Premera-AK**. Defendant Premera Blue Cross Blue Shield of Alaska is a division of Defendant Premera Blue Cross, with its principal place of business located in Alaska. Premera Blue Cross Blue Shield of Alaska, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Alaska. Premera Blue Cross Blue Shield of Alaska and its subsidiaries and affiliated companies in Alaska are collectively referred to as "Premera-AK" in this Complaint. Premera-AK exercises market dominance as a Blue in Alaska or within areas of Alaska. Through its own actions and through its subsidiaries or affiliated companies, Premera-AK has agreed to and participates in the Blue Conspiracies.

204. The principal headquarters for Premera-AK is located at 2550 Denali Street, Suite 1404, Anchorage, AK 99503.

205. **Premera-WA**. Defendant Premera Blue Cross is Washington nonprofit corporation that is registered as a health care service contractor in Washington. Defendant PREMERA is the sole voting member of Premera Blue Cross. Premera Blue Cross, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Washington. Premera Blue Cross and its subsidiaries and affiliated companies in Washington are collectively referred to as "Premera Blue Cross" or "Premera-WA" in this Complaint. Premera-WA exercises market dominance as a Blue in Washington or within areas of Washington. Through its own actions and through its subsidiaries or affiliated companies, Premera-WA has agreed to and participates in the Blue Conspiracies.

206. The principal headquarters for Premera-WA is located at 7001 220th St. SW, Mountlake Terrace, WA 98043.

**FF.    Prosano Defendants**

207.   **Prosano**. Defendant Prosano, Inc. is an Arizona company with its headquarters located in Arizona. It is the parent of Blue Cross and Blue Shield of Arizona, Inc. Prosano, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Arizona. Prosano, Inc. and its subsidiaries and affiliated companies are collectively referred to as "Prosano" in this Complaint. Prosano exercises market dominance as a Blue in Arizona or within areas of Arizona. Through its own actions and through its subsidiaries or affiliated companies, Prosano has agreed to and participates in the Blue Conspiracies.

208.   The principal headquarters for Prosano is located at 2444 West Las Palmaritas Drive, Phoenix, AZ 85021.

209.   **Prosano-AZ**. Defendant Blue Cross and Blue Shield of Arizona, Inc. is an Arizona company with its headquarters located in Arizona. Blue Cross and Blue Shield of Arizona, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Arizona. Blue Cross and Blue Shield of Arizona, Inc. and its subsidiaries and affiliated companies in Arizona are collectively referred to as "Blue Cross and Blue Shield of Arizona" or "Prosano-AZ" in this Complaint. Prosano-AZ exercises market dominance as a Blue in Arizona or within areas of Arizona. Through its own actions and through its subsidiaries or affiliated companies, Prosano-AZ has agreed to and participates in the Blue Conspiracies.

210.   The principal headquarters for Prosano-AZ is located at 2444 West Las Palmaritas Drive, Phoenix, AZ 85021.

**GG.   USAble-AR Defendant**

211.   **USAble-AR**. Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and Blue Advantage Administrators of Arkansas is an Arkansas company with its headquarters located in Arkansas. USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and Blue Advantage Administrators of Arkansas, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Arkansas. It is the largest provider of health care insurance and administrative services for health care plans in Arkansas. USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and

1   Blue Shield and Blue Advantage Administrators of Arkansas and its subsidiaries and affiliated
2   companies are collectively referred to as "Arkansas Blue Cross and Blue Shield" or "USAble-AR"
3   in this Complaint. USAble-AR exercises market dominance as a Blue in Arkansas or within areas
4   of Arkansas. Through its own actions and through its subsidiaries or affiliated companies, USAble-
5   AR has agreed to and participates in the Blue Conspiracies.

6          212.    The principal headquarters for USAble-AR is located at 601 S. Gaines Street, Little
7   Rock, Arkansas, 72201.

8          **HH.    Wellmark Defendants**

9          213.    **Wellmark**. Defendant Wellmark, Inc. is an Iowa company with its headquarters
10  located in Iowa. Wellmark, Inc. itself or through its subsidiaries or affiliated companies, provides
11  health insurance to subscribers to various health care plans in Iowa and South Dakota. Wellmark,
12  Inc. and its subsidiaries and affiliated companies are collectively referred to as "Wellmark" in this
13  Complaint. Wellmark exercises market dominance as a Blue in Iowa and South Dakota or within
14  areas of those states. Through its own actions and through its subsidiaries or affiliated companies,
15  Wellmark has agreed to and participates in the Blue Conspiracies.

16         214.    The principal headquarters for Wellmark is located at 1331 Grand Avenue, Des
17  Moines, IA 50306.

18         215.    **Wellmark-IA**. Defendant Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue
19  Shield of Iowa is an Iowa company with its headquarters located in Iowa. Wellmark, Inc. d/b/a
20  Wellmark Blue Cross and Blue Shield of Iowa, itself or through its subsidiaries or affiliated
21  companies, provides health insurance to subscribers to various health care plans in Iowa. Wellmark,
22  Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa and its subsidiaries and affiliated
23  companies in Iowa are collectively referred to as "Blue Cross and Blue Shield of Iowa" or
24  "Wellmark-IA" in this Complaint. Wellmark-IA exercises market dominance as a Blue in Iowa or
25  within areas of Iowa. Through its own actions and through its subsidiaries or affiliated companies,
26  Wellmark-IA has agreed to and participates in the Blue Conspiracies.

27         216.    The principal headquarters for Wellmark-IA is located at 1331 Grand Avenue, Des
28  Moines, IA 50306.

217.    **Wellmark-SD**. Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota is a South Dakota company with its headquarters located in South Dakota. Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota is a subsidiary of Defendant Wellmark, Inc. Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in South Dakota. Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota and its subsidiaries and affiliated companies in South Dakota are collectively referred to as "Wellmark Blue Cross and Blue Shield of South Dakota" or "Wellmark-SD" in this Complaint. Wellmark-SD exercises market dominance as a Blue in South Dakota or within areas of South Dakota. Through its own actions and through its subsidiaries or affiliated companies, Wellmark-SD has agreed to and participates in the Blue Conspiracies.

218.    The principal headquarters for Wellmark-SD is located at 1601 W. Madison, Sioux Falls, SD 57104.

## FACTUAL ALLEGATIONS

### I. Defendants' Historical Practices

219.    The history of the Blue Cross and Blue Shield entities provides context for Defendants' continuous and ongoing Blue Conspiracies and establishes that the Blue Conspiracies are entirely unnecessary for the operation of the Blue Plans. Blue Cross and Blue Shield branded insurance plans developed separately many decades ago based on independent business activities of separate insurers. The Blue Cross insurance plans were originally instituted to cover the cost of hospital care. The Blue Shield insurance plans were originally instituted to cover the cost of physician care. All of the original insurers were non-profit entities.

220.    On information and belief, the first use of a "Blue Cross" branded insurance plan occurred in approximately 1934, when a pre-paid hospital plan developed in St. Paul, Minnesota was advertised with a poster showing a nurse wearing a uniform with a blue Geneva cross and the name "Blue Cross." Soon after, other pre-paid hospital plans began using the "Blue Cross" symbol.

1    The original Blue Cross plan in St. Paul took no action to stop others from using the symbol or

2    name.

3        221.    In 1937, the American Hospital Association ("AHA") created the Blue Cross

4    Commission and began admitting as institutional members certain pre-paid hospital plans that met

5    its criteria. In 1939, AHA adopted "Blue Cross" as the mark for official AHA pre-paid hospital

6    plans.

7        222.    Many of the independent pre-paid hospital plans operating under the "Blue Cross"

8    name engaged in direct competition with one another, operating within the same geographic areas

9    as other Blue Cross plans and Blue Shield plans in the decades that followed.

10       223.    In 1947 and 1948, the AHA applied for and received a federal trademark registration

11   for the "Blue Cross" marks. At the time of its application and the subsequent trademark registration,

12   AHA had not obtained an assignment or other ownership rights of the "Blue Cross" marks from

13   the original pre-paid plan located in St. Paul, Minnesota.

14       224.    The "Blue Shield" plans were developed subsequent to the "Blue Cross" plans as a

15   means to cover the cost of physician care (as opposed to hospital care covered by Blue Cross). On

16   information and belief, the "Blue Shield" name and symbol was first employed by the Western

17   New York Plan in Buffalo, New York in 1939. The Western New York Plan did not take action to

18   stop other plans from using the name or symbol. From 1939 to 1947, the use of the "Blue Shield"

19   name expanded to many other pre-paid physician plans in the United States without intervention

20   from the Western New York Plan.

21       225.    In 1946, an entity known as the Associated Medical Care Plans ("AMCP") was

22   established to coordinate and grant approval to the various then-existing, independent Blue Shield

23   plans. The AMCP's membership was comprised of Blue Shield plans and those members controlled

24   the AMCP. In 1947, the AMCP was succeeded by an entity known as the Blue Shield Medical Care

25   Plans ("BSMCP").

26       226.    The BSMCP adopted the Blue Shield name and mark as its own and, in 1950, it

27   applied for federal registration of the Blue Shield mark.

28

227.    For decades, the Blue Shield plans competed with one another and competed in geographic areas where the Blue Cross plans operated. Blue Cross plans and Blue Shield plans coexisted and competed in the majority of states. Eventually, Blue Cross plans expanded their offerings to include insurance for physician services (*i.e.*, those services historically insured by Blue Shield plans), and Blue Shield plans expanded their offerings to include insurance for hospital services (*i.e.*, those services historically insured by Blue Cross plans).

228.    Competition in the same geographic areas under the Blue Cross name and Blue Shield name was constant in the 1930s and for decades thereafter. Intrastate Cross-on-Cross competition, Shield-on-Shield competition, or both, has existed in at least California, Idaho, Illinois, Kentucky, Maryland, New York, North Carolina, Ohio, Virginia, West Virginia, and Wisconsin. For example, in 1947, there were twenty-two Blue Shield plans in Washington State, five in Oregon, and four in West Virginia. As late as 1980, there were 114 Blues in operation.

229.    To a very limited degree, competition between Blue Cross branded plans and Blue Shield branded plans continues today in some states. For example, some competition among Blue brands exists in at least parts of California, Idaho, New York, Pennsylvania, and Washington. The existence of historical and current competition disproves any pretextual assertion that Defendants' anticompetitive conspiracy is necessary to protect the value of "Blue Cross" and/or "Blue Shield" branding.

230.    In the late 1940s, as competition from other, non-Blue insurers increased, the Blue Cross Commission and the AMCP/BSMCP attempted to create a national entity to govern all plans using a Blue Cross or Blue Shield mark ("Blue Mark"). The proposal to do so failed, in significant part because of the AMA's fear that it might result in a lawsuit alleging a violation of the antitrust laws.

231.    The AMA's fear was a valid concern, as the expressly stated goal of the new national entity was to "prohibit[] the operation of multiple Plans in a single service area to reduce health care costs" by eliminating competition among Blue Cross plans and lowering payments to hospitals. In advocating for the change, the Director of the Blue Cross Commission stated in an affidavit: "One of several Plans operating in the same area with an enrollment of only a small fraction of the

area's eligible subscribers had substantially less influence with and therefore success in convincing the area's hospitals to participate in the Plan. . . . The operation of only one Plan per service area helped the Plan obtain the participation of hospitals *on terms which were favorable to the Plan* and its subscribers, thereby enhancing the Plan's attractiveness in the marketplace." (emphasis added).

232.    In the 1950s, the Blues further consolidated their purported trademark rights and began entering into agreements through their respective controlling entities. In 1952, the AMCP/BSMCP entered into a license agreement with its member medical care plans (the "1952 Blue Shield Agreement"). In 1954, the Blue Cross plans transferred their rights "to the words BLUE CROSS and the design of a blue cross, as service marks, for a prepayment plan for hospital care and related services . . . to [the American Hospital Association]." (the "1954 Blue Cross Agreement").

233.    The 1952 Blue Shield Agreement specified that the words "'Blue Shield' and their accompanying symbol gradually acquired, in the areas in which used and elsewhere, a definite meaning, i.e. as identifying nonprofit prepayment medical care plans owned, controlled or sponsored by county medical societies or state, district, territorial or provincial medical associations." The 1952 Agreement further specified that "[e]ach member plan that is a party hereto is entitled by virtue of its membership to use the words 'Blue Shield' in order to identify to the public its nonprofit medical care plan and its membership in the National Organization [AMCP/BSMCP]."

234.    Similarly, the 1954 Blue Cross Agreement specified that "the words BLUE CROSS and design of a Blue Cross are known and recognized in the United States and in foreign countries as designating plans for prepayment of hospital care and related services." Notably, these agreements in the 1950s did not contain any provisions granting the Blue Cross plans or Blue Shield plans exclusive territorial rights.

235.    In 1972, the AHA assigned its purported trademark rights in the "Blue Cross" mark to an entity known as the Blue Cross Association ("BCA"). The BCA and the Blue Cross Plans then entered into a new license (the "1972 Agreement"). This agreement stated that the BCA was "the owner of the term 'BLUE CROSS' and the design of a Blue Cross as service marks for

1    prepayment plans for hospital care and related services ('BCA Marks')." The 1972 Agreement

2    granted the plans the right to use the marks "as service marks, in the sale and advertising of

3    programs for health care and related services operated on a non-profit basis." The 1972 agreement

4    also provided that the "rights hereby granted are exclusive to [the] Plan within the geographical

5    area served by the Plan on the effective date of this License Agreement."

6    **II. Formation and Operation of Defendant BCBSA**

7        236.    In 1982, the Blue Cross Association and the Blue Shield Association completed a

8    merger to form Defendant BCBSA.

9        237.    BCBSA is a separate legal entity from the Blues that purports to promote the

10    common interests of the Blues. BCBSA currently describes itself as "a national association of 33

11    independent, community-based and locally operated Blue Cross Blue Shield companies." BCBSA

12    further states that it "grants licenses to independent companies to use the trademarks and names in

13    exclusive geographic areas." In actuality, BCBSA serves as a pretextual hub used to effectuate the

14    Blues' communications and arrangements in furtherance of the Blue Conspiracies.

15        238.    Every Blue is a member of BCBSA. Each Blue (or its parent) has a representative

16    on the BCBSA Board of Directors. The Blues' representatives (typically CEOs of the Blues) have

17    continuously controlled BCBSA's Board of Directors from its inception through the present. Blue

18    representatives also participate in numerous BCBSA Committees. BCBSA is entirely controlled by

19    its Primary Licensee members, all of whom are the independent, separately owned health insurance

20    companies that license the Blue Cross and/or Blue Shield trademarks and trade names.

21        239.    BCBSA meetings provide a forum for Defendants to share confidential,

22    competitively sensitive information regarding specific health insurance issues common to the

23    Blues, including reimbursement data for Plaintiffs and others. BCBSA includes numerous

24    committees governed by the Blues; it sponsors various meetings, seminars, and conferences that

25    the Blues attend. These activities are used to further the Blue Conspiracies to reduce or eliminate

26    competition in contracting with Plaintiffs and other health care providers.

27        240.    BCBSA has a Plan Performance and Financial Standards Committee (the "PPFSC").

28    The PPFSC is a standing committee of the BCBSA Board of Directors. The PPFSC has historically

1    held the power to enforce the requirements of the BCBSA license agreements. The PPFSC is a
2    mechanism to impose negative financial consequences on any Blue member of BCBSA that might
3    deviate from the Blues' agreements not to compete. The PPFSC is controlled by individual Blue
4    members.

5    241.    Representatives of the Blues, in their role as Directors of BCBSA, control the entry
6    of new members into BCBSA. This control gives BCBSA the ability to restrict competition among
7    Blue branded entities and restrict output of Blue branded insurance products.

8    242.    After the 1982 merger into BCBSA, Defendants changed the way in which the Blues
9    operated. The Blues established a "work group" within BCBSA that created what became known
10   as the "Long-Term Business Strategy." This effort was led by Edwin R. Werner, President of Blue
11   Cross and Blue Shield of Greater New York (now a part of Defendant Anthem).

12   243.    Prior to 1982, each Blue had its own strategy for competition, with a then-existing
13   local presence and often the potential to compete in other service areas in a given state or across
14   state lines. The Blues called this competition among them "Blue Sharking." The Long-Term
15   Business Strategy was an effort to end such competition.

16   244.    The Long-Term Business Strategy was presented to the Blues at an annual meeting
17   on November 11, 1982. Werner described the Long-Term Business Strategy as a "fundamental
18   change" that would result in "a concentration of power." It was designed to provide "checks and
19   balances" against "open competition." On November 12, 1982, the Blues voted to approve the
20   Long-Term Business Strategy. Among the key provisions:

21       a.    Proposition 1.1 required all Blue Cross plans and Blue Shield plans to become joint
22             Blue Cross Blue Shield plans by the end of 1984, "except where the Association
23             Board of Directors agrees that business needs dictate otherwise."

24       b.    Proposition 1.2 required further consolidation so that there would be only one Blue
25             per state by the end of 1985, "except where the Association Board of Directors
26             agrees that business needs dictate otherwise."

27       c.    Proposition 3.4 sought to "[l]aunch an intensified program to retain, acquire and
28             expand provider and professional payment differentials." "Differentials" refer to the

- 63 -                                          COMPLAINT

1    difference between charges billed by health care providers (such as Plaintiffs) and

2    what the Blues actually paid, which was an advantage for the Blues because its

3    competitors generally paid the Plaintiffs' billed charges. This was an express

4    agreement to reduce the payments the Blues made to Plaintiffs and other providers.

5    As part of Proposition 3.4, the Blues agreed that "Association [would] survey all

6    Plans by March 1, 1983, to determine status to their efforts to protect/secure

7    payment differentials."

8    245.    According to the Long-Term Business Strategy, two of the three "measures of

9    success" for the Blue Cross and Blue Shield organization were market share and profit. The

10   mandates of the Long-Term Business Strategy were designed to further these goals in part by

11   reducing competition among the Blues. During the meetings, Werner expressed this desire directly

12   as a need for "significant reduction in the number of corporations which make up our collective

13   effort" and rejecting the idea that "it makes good business sense for four corporations in one state

14   to chase a total market potential of 677,000 employed people." Werner asked, "Can we really justify

15   12 member corporations in one state—even though it is a large one?"

16   246.    As a result of the Blues' adoption of Propositions 1.1 and 1.2, the number of

17   insurance companies operating a Blue-branded health insurance plan declined from 114 in 1980 to

18   77 in 1990. For example, in the mid-1980s, West Virginia had two Blue Plans whose service areas

19   did not overlap. By 1987, the Plans were competing in each other's service areas. While neither

20   objected, BCBSA required the Plans to either stop competing, face a lawsuit, or merge. The Plans

21   ultimately agreed to merge. As another example, beginning in 1942 and for over 40 years thereafter,

22   Northwest Hospital Service (d/b/a Blue Cross of Oregon) and Oregon Physicians' Service (d/b/a

23   Blue Shield) functioned independently within Oregon. That ended in March 1983, when the two

24   companies merged to form Blue Cross and Blue Shield of Oregon (the predecessor entity to

25   Defendant Regence BlueCross BlueShield of Oregon). Today, BCBSA has 32 Primary Licensees.

26   247.    The Blues' adoption of the Long-Term Business Strategy was not, however,

27   unanimous. Some members expressly noted the likely antitrust risks. A predecessor of Defendant

28   GuideWell-FL sent a letter to Werner in 1982 stating: "[t]he large market share of the system of

- 64 -

plans would have precipitated anti-trust actions were it not for the insurance industry exemptions and the community-service orientation." Further, a member wrote to Werner with respect to Proposition 3.4 that "[P]lans with cost-based reimbursement have evolved into dominant (virtually monopolistic) positions due to the rapid growth in the hospital differential."

248.    In the years that followed adoption of the Long-Term Business Strategy, the Blues used BCBSA to continue planning toward further agreements to reduce competition. In 1987, BCBSA held an "Assembly of Plans" meeting for the purposes of reducing "Blue on Blue" competition. The group sought collective action among the Blues, as well as exclusive operation of Blue-branded health insurance plans within the Blues' service areas. The Blues acknowledged that exclusive service areas were *not essential* to operating a Blue Plan, and may be challenged under the antitrust laws (as they are in this Complaint):

> During the last few years, the exclusivity feature of the license agreements has come under sharp antitrust attack in several federal courts. . . . To date the Blue Cross and Blue Shield Association has devoted its efforts to defending exclusivity and expects to do so in the future. . . . Thus, an issue for the Assembly is whether to consider – at this time – alternatives which might be evaluated in the event exclusivity were to be struck down by the courts.

Defendants further acknowledged that, "[a]s a legal matter, the service marks could be preserved even if the exclusive service areas were abandoned."

249.    Per a BCBSA internal report regarding the Assembly of Plans: "[Blues] benefit from the exclusive service areas because it eliminates competition from other [Blues]. Otherwise there would be open warfare." And Defendants further recognized that the net result of reduced competition was lower payments to Plaintiffs and other health care providers: "By enjoying exclusive territories, Plans can bargain [with health care providers] aggressively. In turn, national accounts enjoy local discounts." Finally, the Blues also acknowledged the ability to develop market power by carving up the service areas: "Larger market share because other Blues stay out and do not fragment the market. . . . *Stronger provider agreements for the same reason*." (emphasis added).

250.    The Assembly of Plans issued a "Final Report" on February 8, 1990. The group recommended to the broader BCBSA the use of new license agreements that would tie together licensure of the Blue Cross and Blue Shield name and marks with membership in BCBSA (*i.e.*,

require every Blue Plan to become a member of BCBSA—prior to this, a Blue Plan was not required to be a member of BCBSA to use a Blue Cross and/or Blue Shield mark). As a result, BCBSA would be given the ability to enforce exclusive service areas by membership restrictions in BCBSA, use of the Blue Cross and Blue Shield name(s) and mark(s), and monetary sanctions. This new "membership required to obtain a license" requirement was implemented to reduce Blue-on-Blue competition.

251.    The Blues also began considering (and eventually adopting) limits on the extent to which each Blue could offer non-Blue branded insurance and contract with health care providers under those non-Blue brands. The stated purpose of these agreements was to restrain competition. In a 2001 memorandum to the Blue Plans, BCBSA noted that growth in non-Blue business came from "the offering, by [Blues], of basic health products outside of their licensed service area. Now, Blue-based organizations are competing with each other for core health customers. Each success of an unbranded venture was a loss for a local [Blue]." BCBSA (controlled by the Blues) further noted that "a [Blue] predominantly devoted to its own national [non-Blue] brand would appear to have incentives to favor that brand in competition with the Blues for a national account." These anticompetitive considerations led to the adoption of additional agreements amongst Defendants to restrict competition.

252.    Since its formation in the 1980s, BCBSA has operated as a thinly veiled front-entity to allow the independent, separately owned Blues to form anticompetitive agreements. Throughout its history and continuing today, BCBSA has been owned and controlled by its member plans. All of BCBSA's anticompetitive agreements (described below) constitute horizontal agreements between and among the member plans themselves.

253.    The Blues have undertaken the Blue Conspiracies to enrich themselves at the expense of Plaintiffs and others. Defendants' anticompetitive practices have resulted in their collection of supracompetitive profits. Because of their artificial and agreed restrictions on competition, the Blues have been able to pay Plaintiffs much less for the medically necessary covered goods, services, and facilities provided to patients enrolled in Blue Plans they insure or administer. These unlawful "savings" have resulted in significantly higher, supracompetitive

profits and/or larger surpluses than Defendants could have realized otherwise. The agreements described above were designed to increase, and have in fact massively increased, the revenue and profits of the Blues at the expense of lower reimbursement rates paid to Plaintiffs and other health care providers, and higher premiums paid by plan subscribers.

### III. The Blues' Anticompetitive Agreements

254.    Defendant BCBSA serves as a pretextual hub used to effectuate the Blues' communications and arrangements in furtherance of the Blue Conspiracies. Defendants' anticompetitive agreements include express written agreements executed through the pretext of the BCBSA and informal agreements between certain of the Blues not to compete even where competition is nominally permitted under BCBSA rules.

255.    Defendants have entered into the anticompetitive agreements as independent legal and economic entities. None of the Blues has or had any franchise agreement with any other Blue. No Blue has any franchise agreement with BCBSA. Each Blue has its own sales, revenue, and expenses, makes its own profits and losses, and acts for the benefit of its own shareholders or stakeholders.

#### A. Market Allocation Conspiracy

256.    **License Agreements**. The first set of Defendants' anticompetitive agreements relevant to the Market Allocation Conspiracy are the "License Agreements" between each Blue and BCBSA. These are "License Agreements" in name only, as they are intended to restrict, and have restricted, competition among the Blues. As described above, BCBSA is entirely owned and controlled by the Blues. The Blue Cross License Agreement states:

> The rights hereby granted are exclusive to the Plan within the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been granted a subsequent license, which is hereby defined as the 'Service Area,' except that BCBSA reserves the right to use the Licensed Marks in said Service Area, and except to the extent that said Service Area may overlap areas served by one or more other licensed Blue Cross Plans as of said date or subsequent license, as to which overlapping areas the rights hereby granted are nonexclusive as to such other Plan or Plans only.

257.    The Blue Shield License Agreement contains identical language.

258.   Nearly all of the Blues' "Service Areas" do not overlap. In other words, they are exclusive.

259.   The License Agreements also contain a provision pursuant to which each Blue agrees that neither it nor its subsidiaries (referred to as "Controlled Affiliates") will compete by operating Blue-branded health insurance plans outside of its designated ESA: "[T]he Plan may not use the Licensed Marks and Name outside the Service Area or in connection with other goods and services. . . . In addition to any and all remedies available hereunder, BCBSA may impose monetary fines on the Plan for the Plan's use of the Licensed Marks and Names outside the Service Area." Further, the License Agreements state that BCBSA "will not grant any other license effective during the term of this License Agreement for the use of the Licensed Marks or Name which is inconsistent with the rights granted to the Plan hereunder . . . ."

260.   Thus, under the License Agreement, each Blue is given the exclusive right to sell insurance and to negotiate contracts with health care providers, including Plaintiffs, within its ESA, both of which reduce or eliminate competition that the Blue would otherwise face from other Blues. The Blues' agreements reflected in these provisions of the License Agreements prevent other Blues from developing competing provider networks or contracting with health care providers outside their ESAs for health care goods, services, and facilities to be provided pursuant to a Blue Plan. A Blue may contract with a health care provider in a county contiguous to that Blue's ESA only under certain conditions and for limited purposes.

261.   In a competitive market free from the Blues' unlawful agreements comprising the Market Allocation Conspiracy, Plaintiffs and other health care providers could contract directly with non-local Blues and, if given the opportunity, they would do so. However, due to the agreements comprising the Market Allocation Conspiracy, Plaintiffs are denied these options, and many Plaintiffs have faced or feared retaliation from their local Blue if they sought to do so.

262.   The Blues have used these ESA restrictions to refuse to enter into, or even engage in conversations regarding, direct contracts with health care providers outside of their ESAs or contiguous counties. For many Plaintiffs, the percentage of patients with non-local Blue-branded commercial health insurance (*i.e.*, patients treated pursuant to the BlueCard Program and/or

1    National Accounts Program) is significant relative to patients with local-Blue branded commercial

2    insurance. When Plaintiffs have sought to negotiate a direct contract with their non-local Blue, they

3    have either been ignored or flatly denied.

4          263.    For example, in 2014, Plaintiff ECU Health attempted to negotiate direct contracts

5    with numerous Blues (besides Defendant BCBS-NC), including Defendants Anthem-NY (formerly

6    Empire), Anthem-VA, BCBS-AL, BCBS-SC, BCBS-TN, and HCSC-IL due to the number of

7    subscribers covered by those out-of-state Blues that had being treated at ECU Health facilities. The

8    volume of subscribers covered by non-local Blues treated by ECU Health, by comparison, has

9    historically been equal to if not greater than the number of all other non-Blue commercial subscriber

10   volume in the area. When ECU Health reached out to Defendant BCBS-TN about the possibility

11   of a direct contract in January 2014, BCBS-TN stated "We are unable to extend contracts to you at

12   this time. The provider must practice within the state of TN or in a county contiguous to the state

13   of Tennessee's border." When ECU Health reached out to Defendant HCSC-IL about the

14   possibility of a direct contract in January 2014, HCSC-IL provided a similar response. The reason

15   that Defendants BCBS-TN, HCSC-IL, and other non-local Blues refused to contract, or even

16   engage in discussions, with ECU Health was because of the Blues' agreements comprising the

17   Market Allocation Conspiracy.

18         264.    As another example, Plaintiff Jefferson Health attempted to negotiate a direct

19   contract with Defendant Independence-PA in approximately 2020 or 2021, for a Jefferson Health

20   hospital located in Carbon County, Pennsylvania, outside of Independence-PA's ESA.

21   Independence-PA refused to do so. Prior to that, Jefferson Health attempted to do the same for

22   hospitals in Schuylkill County, Pennsylvania, East Stroudsburg, Pennsylvania, and Hazleton,

23   Pennsylvania, and was rejected by Independence-PA each time. In 2018, Jefferson Health sought

24   to enter into a direct contract with Defendant Highmark-DE for a narrow category of health care

25   goods, services, and facilities relating to transplant procedures. Highmark-DE refused to even have

26   a conversation about the topic. The reason that Defendants Independence-PA and Highmark-DE

27   refused to contract, or even engage in discussions, with Jefferson Health in these circumstances

28   was because of the Blues' agreements comprising the Market Allocation Conspiracy.

265.    Prior to 2008, Plaintiff Providence had in place a direct contract with Defendant HCSC-NM for a Lubbock, Texas facility that was more than one county away from the Texas-New Mexico border. In late 2008, HCSC-NM terminated that contract, stating that it was required to do so to comply with BCBSA regulations. As a result, Providence's contract at that facility was transitioned to Defendant HCSC-TX, which had far lower reimbursement rates for treating commercially insured patients, and Providence was told that it was no longer permitted to contract with HCSC-NM for commercially insured patients for that facility. In 2024, Providence asked HCSC-NM to negotiate a contract with Providence covering commercially insured patients treated at Providence's facilities in Lubbock, Texas. HCSC-NM declined. The reason that HCSC-NM terminated its contract in late 2008, and subsequently refused to engage in any future contractual relationship with Providence for commercially insured patients at its Lubbock facilities, was because of the Blues' agreements comprising the Market Allocation Conspiracy.

266.    In 2017, a separate Plaintiff requested to include three of its health care facilities (one of which was in a contiguous county) in a direct contract with a non-local Blue whose ESA included a neighboring state. The non-local Blue rejected the Plaintiff's request to include those facilities because of the Blues' agreements comprising the Market Allocation Conspiracy.

267.    As another example, in approximately 2020 and 2021, Plaintiff Mercy Health attempted to contract with Defendant Anthem-MO for home infusion services provided in one county outside of Anthem-MO's contiguous county area. Defendant Anthem-MO refused and stated that Mercy Health must contract with Defendant BCBS-KC for those services. The reason Anthem-MO did so was because of the Market Allocation Conspiracy.

268.    Plaintiff Sanford also sought to contract directly with Defendant BCBS-MN for its Watertown, SD clinic, which resides two-counties from the Minnesota border. Defendant BCBS-MN refused and told Sanford that they could only contract with Defendant Wellmark-SD—again, because of the Market Allocation Conspiracy.

269.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the

1    Plans." BCBSA has described the provisions of the License Agreements as something the member

2    plans together "deliberately chose," "agreed to," and "revised."

3        270.    The License Agreements are not equivalent to the individual enforcement of

4    common-law trademark rights, which give the trademark holder the right to *exclude* others from

5    using the mark in a given territory. Defendants have instead used the License Agreements to

6    collectively promise not to compete outside each Blue's own territory against other Blues. There is

7    no common-law trademark right to form an agreement among competitors not to exceed each

8    competitor's exclusive territory and to not compete. The Blues have used their control of BCBSA

9    to agree collectively to give up their individual decision making with respect to enforcing or not

10   enforcing any individual trademark rights that a Blue may have held.

11       271.    Although the License Agreements purport to be vertical agreements by which

12   independent insurance entities license the Blue Cross and/or Blue Shield marks, the License

13   Agreements are in fact horizontal market allocation agreements among competitors to divide

14   geographic markets for selling health insurance and purchasing health care goods, services, and

15   facilities from Plaintiffs and other health care providers. The License Agreements exist for the

16   purpose of reducing competition and decreasing the amounts paid to Plaintiffs. To the extent

17   Defendants assert that the License Agreements are legitimate, arms-length agreements regarding

18   trademark and trade name enforcement, the use of BCBSA to implement the License Agreements

19   is instead a sham to create and enforce Defendants' Market Allocation Conspiracy.

20       272.    The License Agreements' creation of ESAs is not necessary for the "Blue System"

21   to function. As previously explained, Cross-on-Cross competition, Shield-on-Shield competition,

22   or both have occurred historically, and currently the Blues selectively permit limited Blue-on-Blue

23   competition in certain states.

24       273.    Defendants also do not need the anticompetitive agreements described above to

25   identify the source of any trademarked purchasers of health care goods, services, and facilities or

26   to avoid confusion among health care providers or others. BCBSA has acknowledged that

27   overlapping service areas do not cause confusion. In fact, in 2001 the President and CEO of Blue

28   Cross and Blue Shield of Western New York stated that the Blue brands "are strengthened in

overlapping service areas where two Plans are able to compete freely." There are also significantly less-restrictive means to eliminate any potential confusion, such as requiring that each Blue use its actual name (in whole or in part) to identify the source of the goods, services, and facilities. For example, parts of Washington include geographic territory in which two Blues—Defendants Premera-WA and Regence-WA—are permitted to operate and do so without apparent confusion among plan subscribers or health care providers. The same is true in California.

274.    Two examples illustrate how the Blues have selectively chosen to permit Blue-on-Blue competition to avoid a court decision about whether the Blues' ESAs violate the antitrust laws—demonstrating that such competition is possible.

275.    <u>Ohio</u>. In 1985, four Blues operated in Ohio: Community Mutual Insurance Company ("Community Mutual"), based in Cincinnati; Blue Cross and Blue Shield Mutual of Northern Ohio, based in Cleveland; Blue Cross of Northwest Ohio, based in Toledo; and Blue Cross of Central Ohio, based in Columbus.

276.    In September 1985, BCBSA filed a federal trademark infringement action against Community Mutual, alleging that Community Mutual was operating in areas of Ohio outside its ESA. BCBSA's motion for a preliminary injunction was denied. *Blue Cross & Blue Shield Ass'n v. Cmty. Mut. Ins. Co.*, No. C-85-7872 (N.D. Ohio). That decision was affirmed on appeal. No. 85-3871 (6th Cir. 1985). Thereafter, all the Ohio-based Blues began competing throughout Ohio using the Blue Marks, resulting in competition among multiple Blue Cross licensees and multiple Blue Shield licenses.

277.    In 1986, shortly after the Blues' approval of the Long-Term Business Strategy, Blue Cross of Northwest Ohio merged with Blue Cross and Blue Shield Mutual of Northern Ohio, taking the name Blue Cross and Blue Shield of Ohio.

278.    In 1987, BCBSA agreed to settle its trademark infringement action, allowing the three remaining Blues to compete statewide until 1991. At least two of the Blue plans saw competition as beneficial to consumers. Following the settlement, an attorney for Community Mutual stated that by 1991, "all three Ohio companies should have enough clients across the state to make it impractical for the national association to renew its claim that it has a right to allocate

1    exclusive marketing territories for carriers." Joe Hallett, Settlement Made Among Providers of

2    Health Care, The Blade (Toledo), May 21, 1987, at 1. In response to an article in Cincinnati

3    Magazine that incorrectly implied that there was only one Blue available in Cincinnati, the Director

4    of Sales and Marketing for Blue Cross and Blue Shield of Ohio wrote to the magazine's editor:

5    "Since open competition is generally good for the consumer, I would appreciate your correcting

6    the impression left in the article that there is only one Blue Cross and Blue Shield carrier." Paul T.

7    Teismann, Letter to the Editor, Blue Cross Carriers, Cincinnati Magazine, June 1987, at 8.

8         279.    Competition was not fatal to the Ohio Blues. Although they initially suffered losses

9    when they began competing with each other, all of them had returned to profitability by 1990,

10   demonstrating that competition among the Blues is possible.

11        280.    In 1993, Blue Cross of Central Ohio decided to stop using the Blue Marks and left

12   BCBSA, leaving two Blues in Ohio: Community Mutual, and Blue Cross and Blue Shield of Ohio.

13        281.    In 1995, Community Mutual merged with The Associated Group, an Indianapolis-

14   based insurance and health care company, forming Anthem Blue Cross and Blue Shield. The next

15   year, Blue Cross and Blue Shield of Ohio proposed selling its assets and license to use the Blue

16   Marks to Columbia/HCA, a company that operated a number of hospitals. BCBSA refused, revoked

17   Blue Cross and Blue Shield of Ohio's license, and transferred the license to Anthem. By 1997, what

18   remained of the competition among the Ohio Blues had ended due to the Blues' concerted action

19   through BCBSA.

20        282.    Maryland. As of 1984, BCBSA had divided Maryland between two Blues. Group

21   Hospitalization and Medical Services, Inc. ("GHMSI") operated in two suburban counties of

22   Washington, D.C., while Blue Cross and Blue Shield of Maryland, Inc. operated in the remainder

23   of Maryland.

24        283.    That year, the State of Maryland sued BCBSA, Blue Cross and Blue Shield of

25   Maryland, Inc., and GHMSI in federal court, alleging that their agreement to allocate territories

26   violated Section 1 of the Sherman Act (the same allegation that Plaintiffs make here). *See Maryland*

27   *v. Blue Cross & Blue Shield Ass'n*, 620 F. Supp. 907 (D. Md. 1985). During discovery, Blue Cross

28   and Blue Shield of Maryland, Inc. offered testimony that its marketing department expressed

1   interest from time to time in marketing across the boundary separating it from GHMSI's territory,

2   but its CEO refused in part because it was prohibited by its agreement with BCBSA.

3        284.   Shortly before a ruling on whether the case should be tried on a *per se* theory or

4   under the rule of reason, the defendants settled. BCBSA allowed the Maryland Blues to compete

5   throughout the state of Maryland until the later of January 1, 1991, or the completion of the

6   Assembly of Plans. Describing the settlement, Maryland's Attorney General stated, "The

7   settlement promotes the purpose of the antitrust laws by ensuring that the business decisions of

8   potential competitors are made independently and without regard to artificial marketing barriers."

9        285.   As in Ohio, competition was not fatal in Maryland. In 1993, the Superintendent of

10  Insurance of the District of Columbia reported to the Senate Permanent Subcommittee on

11  Investigations that GHMSI's core business was profitable in 1992. Blue Cross and Blue Shield of

12  Maryland, Inc. reported in 1992 that it had been profitable for the previous three years. GHMSI

13  and Blue Cross and Blue Shield of Maryland, Inc. both continued to exist until they merged in 1998

14  to become Defendant CareFirst. The Blues' experience in Maryland again demonstrates that

15  healthy competition among the Blues could exist but for the Blue Conspiracies.

16       286.   Each Blue Defendant has entered into a License Agreement with BCBSA. The use

17  of the License Agreements to reduce or eliminate competition has injured, and continues to injure,

18  Plaintiffs by allowing the Blue with the ESA rights where Plaintiffs operate to under-pay Plaintiffs.

19  These agreements are a part of the Market Allocation Conspiracy.

20       287.   **Guidelines and Membership Standards**. The second set of Defendants'

21  anticompetitive agreements relevant to the Market Allocation Conspiracy are the BCBSA

22  Guidelines to Administer Membership Standards ("Guidelines") and Membership Standards

23  Applicable to Regular Members ("Membership Standards"). Under the Guidelines and

24  Membership Standards, the Blues agreed, through the pretext of BCBSA, that at least two-thirds of

25  the annual revenue—*i.e.*, revenue from both *inside and outside* of its ESA—from commercial

26  insurance generated by each Blue or its subsidiaries (as defined by BCBSA rules) must be

27  attributable to Blue-branded health insurance plans. Alternatively, the Guidelines allow national

28  enrollment to be substituted for annual revenue, meaning a Blue may derive no less than two-thirds

of its national enrollment from its Blue business. These agreements have been described by the Blues as the "National Best Efforts" rule. They were adopted in 2005, renewed in 2015, and purportedly terminated in April 2021 in connection with Defendants' settlement of a class action antitrust lawsuit brought on behalf of insurance subscribers.

288.    The National Best Efforts rule is a naked output restriction. It was intended to and has limited each Blue's ability to generate revenue from non-Blue branded business and to develop or acquire non-Blue health insurance companies that compete with the Blues. For example, it was a major factor in a 2017 judicial decision to enjoin Defendant Anthem's proposed merger with Cigna, a national non-Blue commercial insurer, which would have caused Anthem to violate the National Best Efforts rule, absent significant conversion of Cigna-branded business to Blue-branded business. Defendant Anthem sought to expand competition outside of its ESAs, but its membership in BCBSA limited its ability to do so.

289.    The limitations the National Best Efforts rule has imposed on non-Blue branded business has lowered Plaintiffs' and other health care providers' output of health care goods, services, and facilities. It has created a disincentive for a Blue to contract with health care providers within an ESA using a non-Blue branded plan, and—of particular relevance to the Market Allocation Conspiracy—a disincentive for a Blue to contract with health care providers *outside* of its ESA for the purpose of supplying health care goods, services, and facilities to subscribers of non-Blue branded insurance plans also owned or controlled by the Blue. Even in the limited instances in which a Blue offers a competing, non-Blue-branded product within or outside of an ESA, the revenue restrictions limit investment in the non-Blue branded product, making it less competitive.

290.    By means of their membership in BCBSA, each Blue agreed to comply with, and did in fact comply with, the National Best Efforts rule. These agreements have been a part of the Market Allocation Conspiracy and operated to limit the number of commercial insurers who purchase health care goods, services, and facilities from Plaintiffs and other health care providers and to reduce or eliminate competition for contracts with Plaintiffs and other health care providers. Despite the Blues' agreement supposedly to end the National Best Efforts rule as part of their 2021

1  settlement of antitrust claims brought by a national class of Blue Plan subscribers, the effects of the

2  National Best Efforts rule have continued to cause artificially low reimbursement rates to Plaintiffs

3  and other health care providers.

4        291.    In addition to the National Best Efforts rule, under the Guidelines and Membership

5  Standards, each Blue has also agreed that at least 80% of the annual revenue (as defined by BCBSA

6  rules) that it or its subsidiaries generate from commercial insurance *within* its ESA must be derived

7  from services offered under the licensed Blue Cross and/or Blue Shield trademarks and trade

8  names. These agreements have been described by the Blues as the "Local Best Efforts" rule. The

9  Local Best Efforts rule was adopted in 1994. Like the National Best Efforts rule, these agreements

10 are also output restrictions that limit the number of commercial insurers who purchase health care

11 goods, services, and facilities from Plaintiffs and other health care providers and to reduce or

12 eliminate competition for contracts with Plaintiffs and other health care providers. Unlike the

13 National Best Efforts rule, the Local Best Efforts rule was not terminated in April 2021. According

14 to Elevance Health, Inc.'s 2023 Form 10-K, Anthem-CA is required to have "substantially all" of

15 its annual combined local net revenue be attributable to health care plans and related services "sold,

16 marketed, administered or underwritten under the BCBS names and marks."

17       292.    **Side Agreements.** In addition to the agreements addressed above, certain Blues

18 have at times entered into additional, side agreements not to compete in geographic areas where

19 limited competition is ostensibly permitted by BCBSA.

20       293.    Plaintiffs have experienced the Blues' side agreements, including in Pennsylvania.

21 In 1996, Defendant Highmark was formed from the merger of two Pennsylvania BCBSA member

22 plans: Blue Cross of Western Pennsylvania, which operated Blue Cross-branded health insurance

23 plans in the twenty-nine counties of Western Pennsylvania, and Pennsylvania Blue Shield, which

24 operated Blue Shield-branded health insurance plans for the entire state of Pennsylvania. Prior to

25 this merger, Pennsylvania Blue Shield and Defendant Independence-PA, the Blue Cross licensee

26 for five counties in southeastern Pennsylvania, had competed in southeastern Pennsylvania through

27 subsidiaries.

28

294.    When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to form what is now part of Defendant Highmark, Pennsylvania Blue Shield (now part of Highmark) and Independence-PA entered into an agreement not to compete. Specifically, Pennsylvania Blue Shield (now part of Defendant Highmark) agreed not to enter southeastern Pennsylvania, despite being licensed to compete under the Blue Shield name and mark throughout Pennsylvania.

295.    This agreement was contrary to their historical business practices. Historically, predecessors of Defendants Highmark-PA and Independence-PA had competed against each other. They would have continued to compete absent their agreement not to do so. Yet Defendant Highmark-PA did not begin competing with Independence-PA in southeastern Pennsylvania until 2024.

296.    In addition to the foregoing example, each Blue could (if it wished) contract with health care providers such as Plaintiffs located one county into a contiguous or adjacent Blue's ESA, in certain circumstances and for certain types of patients, without violating the BCBSA License Agreements. Each Blue has an economic incentive to do so where, for example, a major city is located immediately across a state border. Yet many of the Blues have entered into side agreements not to compete in those counties adjacent to their borders. For example, in Missouri, Defendant HCSC-IL had refused to enter into contracts with health care facilities located in St. Louis, Missouri (which sits on the border of Missouri and Illinois) because it and Defendant Anthem-MO had agreed not to compete in contiguous counties in each other's ESAs, despite nominally being allowed to do so under BCBSA's Licensing Agreements. As another example, Plaintiff Sanford attempted for many years to engage in contiguous-county contracting with Defendant HealthyDakota-ND for a Sanford facility located in Aberdeen, South Dakota. After many years of refusal, HealthyDakota-ND finally agreed to do so beginning in 2022. And in 2019, Plaintiff MUHA sought to contract with Defendant BCBS-NC for a facility located in Fort Mill, South Carolina—approximately one mile from the North Carolina border and within a South Carolina county contiguous to the North Carolina border. MUHA was told that Defendant BCBS-SC objected and therefore Defendant BCBS-NC refused.

297.    These "side agreements" are part of and further evidence of the Market Allocation Conspiracy, which operated to limit the number of commercial insurers who purchase health care goods, services, and facilities from Plaintiffs and other health care providers and to reduce or eliminate competition for contracts with Plaintiffs and other health care providers.

298.    In October 2024, Defendants entered into a settlement agreement with a putative class of health care provider plaintiffs with antitrust claims pending in the MDL Litigation. In the settlement agreement, Defendants agreed to a number of structural changes to contiguous area provider contracting and other BCBSA requirements. Although Defendants disclaimed liability for antitrust violations, Defendants' agreement to such structural changes to their agreements illustrates the prior competitive harm of Defendants' agreements and conduct.

### B. Price Fixing Conspiracy

299.    The first set of Defendants' anticompetitive agreements relevant to the Price Fixing Conspiracy include the Blues' agreements to participate in the BlueCard Program, which was intended to and has artificially lowered reimbursement rates to Plaintiffs and other health care providers.

300.    The BlueCard Program was developed by Defendants in the 1990s and has been in effect during the Relevant Time Period. The BlueCard Program is one of BCBSA's Inter-Plan Programs. The BlueCard Program requires, by agreement of all Defendants, that every Blue must participate in the BlueCard Program.

301.    The BlueCard Program is the means by which the Blues process claims by health care providers (such as Plaintiffs) operating in a given ESA on behalf of a patient whose Blue Plan is based in another ESA. Defendants refer to the Blue that has the subscriber as the "Home Plan." The Blue located in the ESA where the health care goods, services, and facilities are provided to the patient is referred to as the "Host Plan."

302.    Through the BlueCard Program, the Blues have agreed that when a patient receives treatment from a contracted health care provider outside the Home Plan's ESA (*i.e.*, the Host Plan's ESA), the Home Plan will reimburse the health care provider at a predetermined and agreed-upon rate—typically, the rate contained in the provider's contract with the Host Plan.

303.    The BlueCard Program amounts to price fixing. The Blues, which are separate legal and economic entities, have agreed among themselves the rates at which they will reimburse Plaintiffs and other health care providers—that is, the Host Plan's artificially low rates. There is no opportunity for Plaintiffs and other health care providers to negotiate higher rates with the Home Plan directly: the Blues' Market Allocation Conspiracy prohibits the Home Plan from contracting with Plaintiffs and other health care providers.

304.    In this way, the BlueCard Program also supports the Market Allocation Conspiracy by providing a *quid pro quo* of billions in dollars in payments made to the Blues, whereby each Blue gets the benefit of the artificially reduced reimbursement rates that the other Blues pay to health care providers (Host Plan rates) in exchange for entering into and abiding by the agreements comprising the Market Allocation Conspiracy.

305.    Standing alone, the BlueCard Program is price fixing. But it is also one of the tools the Blues use in furtherance of the Market Allocation Conspiracy. Because the Blues can aggregate their market power and pay health care providers at the Host Plan's contracted reimbursement rates (or other, pre-determined and artificially low reimbursement rates), they have further reduced their incentive to compete with each other.

306.    Plaintiffs are effectively required to participate in the BlueCard Program as a condition of their participation with the local Blue located in their ESA. To obtain a reimbursement through the BlueCard Program, Plaintiffs must comply with the claim processing and appeal requirements of the dozens of other Home Plans throughout the United States—but cannot negotiate with them directly and, instead, must interact only with the Host Plan. In these circumstances, Plaintiffs must (i) submit a claim to the Host Plan, (ii) wait for the claim to be transmitted to and processed by the Home Plan, (iii) be reimbursed at the Host Plan's artificially low rates and (iv) appeal any inappropriate denial through the Host Plan.

307.    Because the BlueCard Program prohibits Plaintiffs from working directly with Home Plan Blues and, instead, requires the Host Plan Blue to act as an intermediary, the BlueCard Program predictably creates inefficiencies in exactly the way that the children's game of "telephone" would predict. Communication takes longer. Information is misunderstood or lost. And

1    there is no way for Plaintiffs or other health care providers to pinpoint where each breakdown

2    occurred, or to do anything about it.

3        308.    During the Relevant Time Period, Plaintiffs estimate that they have collectively

4    submitted hundreds of thousands, if not millions, of claims through the BlueCard Program.

5    Plaintiffs have collectively thereby transacted with all or nearly all Blue Defendants. To do so,

6    Plaintiffs have been forced to comply with myriad different Blue reimbursement policies in a time-

7    consuming and inefficient manner, without the ability to contract directly with any Blue other than

8    the local Host Plan Blue. The inability to contract with, or even speak with, the Home Plan Blue

9    creates significant delays and ambiguity. Plaintiffs are often provided no explanation beyond an

10   ambiguous denial code for why a Home Plan Blue is denying claims or reducing reimbursements.

11   They must also drain administrative resources and incur time delays to merely check the status of

12   claim and appeal submissions.

13       309.    Home Plan Blues may have slightly different coverage requirements as well. For

14   example, with respect to drug infusion services, certain Home Plan Blues may impose "white

15   bagging" rules that require a patient to purchase medication from a particular specialty pharmacy

16   before a health care provider can administer infusion services. The Home Plan Blue will then deny

17   a health care provider's reimbursement claim for sourcing the medication elsewhere, such as a

18   provider hospital or infusion center, and thus failing to comply with the Home Plan Blue's white

19   bagging rule, despite the provider having no way of knowing about the Home Plan Blue's

20   requirement.

21       310.    As another example, a Host Plan Blue may approve of certain health care services

22   for its own subscribers, but the Home Plan Blue may deem the same services "experimental" or

23   "not medically necessary." For instance, Plaintiff U-M has sought to work with its local Blue

24   (Defendant BCBS-MI) on many issues regarding BCBS-MI medical policies, so that those policies

25   are consistent with the most recent clinical findings and information. U-M and BCBS-MI have

26   physician-to-physician meetings where U-M demonstrates findings and shows research to support

27   policy changes. However, even if BCBS-MI approves a particular procedure or test, the Home Plan

28   Blue will nevertheless deny the same under its own, separate policies.

311.    There are countless other circumstances in which differences in a coverage or procedural policy provided by a Home Plan Blue and Host Plan Blue cause under-reimbursement to Plaintiffs and other health care providers. For example, whether certain procedures like a colonoscopy must take place in a certain type of health care facility, or whether a specific x-ray procedure must be used instead of an MRI, or the length of time a patient may stay in one type of facility before being transitioned to another type of facility. To the Blues, the ambiguities and inconsistencies inherent in the BlueCard Program is oftentimes a benefit, because it provides a way for Home Plan Blues to deny or under-reimburse health care providers for legitimate claims, and to do so in a manner where they cannot be held accountable by the health care providers because they have no direct contractual relationship with them.

312.    Home Plan Blues often leverage the lack of transparency and communication created by the BlueCard Program to intentionally and unjustifiably deny reimbursement claims, delay payments, and under-reimburse health care providers, who have no ability to even try to hold them accountable for their actions. A health care provider's contract states that it must participate according to certain specified BlueCard Program rules, but those rules are not provided or clearly communicated to the provider. For example, Plaintiff Main Line Health has requested for many years to be provided with the rules and requirements of the BlueCard Program but has never received a concrete response.

313.    Home Plan Blues often have time limitation requirements that differ from Host Plan Blues for notices of admission, claim filing, claim resubmission, and appeals, leaving Plaintiffs without adequate information from which they can structure processes and procedures to effectively meet deadlines.

314.    As another example, for reimbursement under the BlueCard Program, certain Home Plan Blues require patients to sign a Designation of Representative ("DOR") form allowing a health care provider to appeal for payment on their behalf. It is nearly impossible for a health care provider to obtain a signed DOR form. Many patients are unconscious or unable to understand at the time they are being treated, or the practicalities of the situation make a signature impossible—for example, if a patient is unconscious or being airlifted to a hospital. The Blues knowingly and

intentionally require a DOR form for the BlueCard Program because it allows them to take advantage of the inherent lack of transparency and inefficiencies associated with it.

315.    As a result, in addition to receiving artificially low reimbursement rates through the BlueCard Program, Plaintiffs have also suffered significantly increased administrative costs, far higher levels of claim denials, significantly more underpaid claims, and significant delays in receiving reimbursements. For example, for many Plaintiffs, it takes up to approximately three times as long to receive a reimbursement for a claim subject to payment under the BlueCard Program compared to a claim paid by its local Blue.

316.    The second set of Defendants' anticompetitive agreements relevant to the Price Fixing Conspiracy is the National Accounts Program. The National Accounts Program is another of BCBSA's Inter-Plan Programs. The National Accounts Program is an agreement by which the Blues have divided up, and agreed not to compete for, national or multi-state employee benefit plans. Under the Blues' License Agreements, BCBSA rules, or both, the Blues have agreed that only one Blue may bid for and administer a National Account, known as the "Control Plan." The Blues' License Agreements state that "The Control Plan of a National Account is the Plan in whose Service Area the National Account is located." The other Blues in whose ESAs the Control Plan's patient-subscribers receive health care goods, services, and facilities are known as the "Participating Plans." Only the Blue in whose ESA the National Account is headquartered has been permitted to bid on a National Account using a Blue-branded plan. Another Blue has not been permitted to bid on a National Account headquartered outside its ESA using a Blue-branded plan unless the Blue in whose service area the National Account is headquartered agrees to "cede" the right to bid. Absent the National Account Program, the Blues would compete for National Accounts headquartered outside of their ESAs. For example, executives at Defendant Anthem have indicated that they would like to compete for National Accounts in all fifty states. Additionally, Defendant Blue Cross Blue Shield of Alabama has asked other Blues to "cede" the right to bid on certain National Accounts, indicating a desire to win business outside of its ESA.

317.    Each Control Plan will not contract directly with health care providers outside of its ESA. Instead, when health care providers are reimbursed for health care goods, services, and

facilities provided to a subscriber of a Control Plan based in another ESA, the Blues have agreed that the health care providers are reimbursed at the Participating Plan's artificially low reimbursement rates—by default, the License Agreements state that the BlueCard Program's rules apply. For example, when Plaintiff Sanford attempted to negotiate with Defendants BCBS-MN, Wellmark-SD, and HealthyDakota-ND, Sanford was told that BCBSA rules would not allow different rates and the BlueCard Program's Host Plan rates were its "standard payment methodology" for reimbursement rates for patients covered by Blues outside of the corresponding local Blue's ESA.

318.    The National Accounts Program is part of the Price Fixing Conspiracy and creates an additional disincentive for non-local Blues to contract with Plaintiffs and other health care providers. It has operated to limit the number of commercial insurers who purchase health care goods, services, and facilities from Plaintiffs and other health care providers, and to reduce or eliminate competition for contracts with Plaintiffs and other health care providers. This results in artificially low reimbursement rates and output for Plaintiffs and other health care providers.

319.    Defendants have used an entity known as National Account Service Company L.L.C. ("NASCO") to facilitate the National Accounts Program. Per its own marketing brochure, NASCO works with the Blues to "ensure their compliance with Blue Cross and Blue Shield Association (BCBSA) mandates."

320.    Changes to the National Accounts Program pursuant to the MDL Litigation's subscriber class settlement approved on August 9, 2022, which allow certain employers with over 5,000 employees to solicit a bid from a second Blue plan, have not undermined or diminished the harmful effects of these agreements on Plaintiffs and other health care providers. Indeed, the National Accounts Program continues to limit artificially the number of commercial insurers who purchase health care goods, services, and facilities from Plaintiffs and other health care providers, thereby eliminating competition in the manner described above.

321.    The BlueCard Program and National Accounts Program are horizontal agreements among the Blues formed through the pretext of BCBSA. They are part of the Price Fixing Conspiracy and are also used to further the Market Allocation Conspiracy. The BlueCard Program

- 83 -

1    provides the Blues with a pretextual reason not to negotiate contracts with Plaintiffs located in

2    contiguous counties, even where ostensibly permitted under the Licensing Agreements. The non-

3    local Blues sometimes point to the BlueCard Program as a reason not to negotiate with Plaintiffs

4    even where, for example, Plaintiffs operate in large cities and suburban areas that straddle ESA

5    borders. The BlueCard Program and National Accounts Program are also used to impose

6    significantly increased administrative burdens, claims denials and underpayments, and delayed

7    payments that would not otherwise exist.

8         322.    The third set of Defendants' anticompetitive agreements relevant to the Price Fixing

9    Conspiracy involve the Blues' agreements and mechanisms to share confidential reimbursement

10   payment data and other competitively-sensitive information. An entity known as Blue Health

11   Intelligence ("BHI") acts as a licensee of BCBSA. BHI has historically been managed by a "Board

12   of Managers" entirely comprised of Blue Plan executives. BHI acquired Intelimedix, which licenses

13   a claims database that holds the in-network pricing data of more than 100 million insureds,

14   contributed by the Blues.

15        323.    BHI uses confidential claims data, which is held in what is known as the BCBSA

16   National Data Warehouse Core, to perform analytic reports for use by the Blues. BHI is one means

17   for the Blues to share otherwise-confidential claims data among all the Blues, in furtherance of the

18   Price Fixing Conspiracy. The Blues have used this data to monitor the contracting activities of other

19   Blues and to lower reimbursements rates paid to Plaintiffs and other health care providers.

20        324.    In addition to exchanging Plaintiffs and other health care providers' confidential

21   claims information through BHI, several of the Defendants[6] also do so through Consortium Health

22   Plans, Inc. ("CHP"). CHP has described itself as a "national coalition of 21 leading BCBS Plans,

23   [which] provides a clear and unified voice, as well as effective central coordination, for the Blue

24

25   [6] Member Plans of CHP include Defendants Anthem Blue Cross and Blue Shield, Arkansas Blue
     Cross Blue Shield, Blue Cross Blue Shield of Alabama, Blue Cross Blue Shield of Massachusetts,
26   Blue Cross Blue Shield of Michigan, Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield
     of North Carolina, Blue Cross Blue Shield of Rhode Island, BlueCross BlueShield of Vermont (via
27   affiliation with Blue Cross Blue Shield of Michigan), Blue Cross of Idaho, Blue Shield of
     California, Cambia Health Solutions, Capital Blue Cross, CareFirst Blue Cross Blue Shield, Florida
28   Blue, Health Care Service Corporation, Highmark, Horizon Blue Cross Blue Shield of New Jersey,
     Independence Blue Cross, Premera, and Wellmark.

                                            - 84 -                                    COMPLAINT

System among national accounts . . . ." and "help[s] its founding Blue Cross Blue Shield Plans position themselves as the preferred choice for national accounts."

325.    In a 2013 marketing brochure for one of its data tools (ValueQuest), CHP stated:

> ValueQuest is Blue Cross Blue Shield's leading-edge analytical platform for measuring total health plan value. ValueQuest incorporates sophisticated data analytics with relevant industry benchmarks, new advances in measurement around cost, access to care, and lifestyle and behavioral characteristics. ValueQuest has the ability to compare each carrier's per-member, per-month (PMPM) cost in markets where employees reside.

The brochure further explains that "[t]he ValueQuest data set contains claims and membership data for BCBS nationally. The data is pulled from Blue Health Intelligence (BHI) as well as directly from BCBS Plans." CHP collected and made available to the Blues extensive, competitively sensitive data regarding Plaintiffs and other health care providers. The Blues have used this data to monitor the contracting activities of other Blues and to lower reimbursements rates paid to Plaintiffs.

326.    The Blues have used BHI and CHP to fix prices. Through BHI and CHP, the Blues share confidential claims data reflecting provider reimbursements on a nationwide basis. Defendants use this data to collectively, and through concerted action, reduce in their contracts with Plaintiffs and other health care providers the level of reimbursements below what those levels would be if Defendants were acting unilaterally instead of collectively.

327.    In October 2024, Defendants entered into a settlement agreement with a putative class of health care provider plaintiffs with antitrust claims pending in the MDL Litigation. In the settlement agreement, Defendants agreed to a number of structural changes to the BlueCard Program and other BCBSA requirements. In April 2021, Defendants entered into a settlement agreement with a putative class of health care subscriber plaintiffs with antitrust claims then pending in the MDL Litigation. In that settlement agreement, Defendants agreed to a number of structural changes, including changes to the National Accounts Program. Although Defendants disclaimed liability for antitrust violations, Defendants' agreement to such structural changes to their agreements illustrates the prior competitive harm of Defendants' agreements and conduct.

## IV. Enforcing Compliance with the Blues' Anticompetitive Agreements

328.    Defendants have developed mechanisms to enforce compliance with their conspiratorial agreements not to compete.

329.    First, the Blues' License Agreements expressly state that BCBSA may impose fines if a Blue operates outside of its ESA: "BCBSA may impose monetary fines on the Plan for the Plan's use of the Licensed Marks and Names outside the Service Area."

330.    Second, Defendants use the BCBSA Guidelines to enforce compliance with the Blue Conspiracies. The Guidelines provide that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards. Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." The Guidelines further state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

331.    Third, the Blues use BCBSA to impose discipline on a Blue that fails to comply with the Blue Conspiracy agreements. If a Blue fails to comply with the agreements, it faces "Immediate Termination," "Mediation and Arbitration," and "Sanctions." The PPFSC has the power to impose such discipline. Under the Guidelines, after the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." A Blue's licenses and membership in BCBSA may be terminated on a three-fourths or greater affirmative Blue and Blue-weighted vote. And, "[i]n addition to any and all remedies available hereunder, BCBSA may impose monetary fines on the Blue for the Blue's use of the Licensed Marks and Names outside the Service Area" under the License Agreements.

332.    If a Blue's supposed trademark license and membership in BCBSA were terminated due to violations of the Blue Conspiracies' agreements, that Blue would face the threat of serious economic consequences. For example, BCBSA would argue that the Blue should lose its right to operate a Blue-branded health insurance plan and be required to incur the costs of re-branding itself.

333.    The License Agreements themselves further state that, in the event of a termination, the Blue would be required to pay a fee to the other Blues through BCBSA (the "Re-Establishment Fee"). The Re-Establishment Fee would be used to establish a new Blue in the vacated ESA, essentially forcing a Blue to fund a new, Blue-branded competitor in its existing territory. In 2024, Defendant Anthem stated that its Re-Establishment Fee was $98.33 per enrollee. If applied to Anthem's Blue subscribers, the fee would be approximately $3 billion. The Re-Establishment Fee helps enforce the Blue Conspiracies' agreements by dissuading the Blues from violating their promises not to compete.

334.    Fourth, BCBSA has what is known as an Inter-Plan Programs Committee ("IPPC"). The IPPC members are comprised of employees or representatives of the Blues. The IPPC controls the national or Inter-Plan Programs of the Blues, including the BlueCard Program and the National Accounts Program. The Blues have collectively agreed to comply with the requirements established by the IPPC.

335.    Fifth, the Blues have developed mechanisms to share reimbursement payment data and other competitively sensitive information to fix prices in furtherance of the Price Fixing Conspiracy, as described above. Sharing this information allows the Blues to confirm that no Blue is "cheating" by offering reimbursement rates above those agreed by the Blues.

## V. Rule of Reason Allegations

336.    Defendants conduct is *per se* unlawful under federal and state antitrust law. If, however, the quick look or rule of reason standard were to apply, Defendants' conduct would nonetheless violate federal and state antitrust law. The following allegations apply to Plaintiffs' claims under the rule of reason.

337.    This case involves a number of markets in which the Blues participate, and which have been affected by the Blues' anticompetitive agreements in furtherance of the Blue

1    Conspiracies. The Blues have market power in many markets over reimbursement rates for health

2    care providers. Even in markets where the Blues do not have high market shares, they have market

3    power or have otherwise exploited anticompetitive actions by leveraging their more than one

4    hundred million subscribers in the United States.

5                              *A. Relevant Product Markets*

6         338.    The Relevant Product Market is the purchase by commercial insurers of goods,

7    services, and facilities from health care providers, excluding the purchase of prescription drugs and

8    purchases for Medicare Advantage and managed Medicaid.

9         339.    Commercial insurers are in the business of (i) selling commercial health insurance;

10   (ii) administering commercial health plans for private employers, other groups, or individuals; or

11   (iii) both (as noted above, collectively referred to in this Complaint as "health insurance").

12   Commercial insurers purchase health care goods, services, and facilities from health care providers,

13   including Plaintiffs. Commercial insurers are typically paid a premium by private employers,

14   individuals, or other groups at regular intervals, which generally depends on the terms and coverage

15   of the insured's plan, and which is untethered to the actual amount of health care goods, services,

16   and facilities received by individuals covered by the insurance plan at any given point in time.

17        340.    With respect to the Relevant Product Market, the Blues are commercial insurers and

18   would-be competitors who purchase health care goods, services, and facilities on behalf of patients

19   whom they insure, or for whom they administer self-insured health care benefit plans

20   ("subscribers"). The Blues directly purchase health care goods, services, and facilities from health

21   care providers, including Plaintiffs, on behalf of their plan subscribers. The Blue Conspiracies

22   involve agreements among Defendants inhibiting competition among the Blues in the Relevant

23   Product Market.

24        341.    *The Relevant Product Market is consistent with industry practice and commercial*

25   *realities.* Health care providers such as Plaintiffs engage in two-stage competition: (i) first they

26   compete for inclusion in the provider networks of commercial insurers health' plans, and then

27   (ii) they compete for patients within a plan. The Relevant Product Market relates to the first stage

28   of competition. Plaintiffs and other health care providers must first determine which commercial

                                        - 88 -                                    COMPLAINT

1    insurance and government payors with which they will contract. In nearly all of the states and areas

2    in which Plaintiffs operate, the majority of commercial insurance payments are attributable to the

3    Blues. All Plaintiffs and other health care provider entities, regardless of whether they offer

4    inpatient, outpatient, or other health care goods, services, and facilities, must decide whether to

5    contract with the Blues, with other commercial insurance providers, and/or with government

6    payors.

7        342.    Commercial insurers separately contract to purchase goods, services, and facilities

8    from health care providers, such as Plaintiffs. As part of their effort to build a competitive provider

9    network, commercial insurers' contracting teams regularly formulate their own business plans and

10    develop reimbursement strategies specific to health care providers. Commercial insurers, including

11    the Blues, contract with health care providers to establish reimbursement rates for a broad array of

12    health care goods, services, and facilities, which are then reflected as "covered" by the insurance

13    plan sold to subscribers to their plans.

14        343.    The Relevant Product Market is not segmented by the type of health care goods,

15    services, or facilities at issue. The extent to which individual covered goods, services, and facilities

16    compete or do not compete with each other or with goods, services, and facilities not covered by a

17    particular health plan is not relevant.

18        344.    Health care goods, services, and facilities sold to government insurers through

19    government programs, including Medicare Advantage and managed Medicaid, are excluded from

20    the Relevant Product Market. Plaintiffs and other health care providers' contracting processes for

21    patients covered by government programs, including Medicare Advantage and managed Medicaid,

22    are often separate from the processes used for commercial insurers, including separately negotiated

23    contracts and separate contracting teams. In addition, reimbursement rates for government

24    programs such as Medicare Advantage and managed Medicaid are very often substantially different

25    from, and lower than, the rates paid by commercial insurers. Often, reimbursement rates for

26    commercial insurers are expressed in multiples of rates for government programs, such as

27    Medicare.

28

345. _The Relevant Product Market satisfies the hypothetical monopsonist test._ A profit-maximizing hypothetical monopsonist in the Relevant Product Market likely would reduce amounts paid to Plaintiffs and other health care providers below competitive levels by imposing at least a small but significant and non-transitory reduction in price (SSNRP).

346. Plaintiffs and other health care providers earn revenue by treating commercially insured patients (_i.e._, subscribers of health plans offered by commercial insurers and on whose behalf commercial insurers purchase health care goods, services, and facilities) and non-commercially insured patients (_i.e._, patients who pay entirely out-of-pocket and patients covered by government insurance programs).

347. Plaintiffs and other health care providers would be forced to accept a SSNRP because they have no reasonable substitutes to serving commercially insured patients. Plaintiffs and other health care providers have no reasonable alternative to contracting with commercial insurers in order to be in-network for the health plans sold to private employers, other groups, or individuals.

348. Plaintiffs and other health care providers cannot feasibly forgo sales to commercial insurers by selling to other buyers. Plaintiffs and other health care providers often rely on revenue from treating commercially insured patients to subsidize losses from treating non-commercially insured patients, including uninsured patients and patients reimbursed through government programs. Plaintiffs and other health care providers could not make up for even a small loss in commercial patients by substituting non-commercially insured patients, including uninsured patients and government patients, because Plaintiffs and other health care providers make little to no money (and often lose money) treating non-commercially insured patients. Often, uninsured patients cannot pay out-of-pocket costs for their treatment, and, in any event, there are very few such patients compared to commercially insured patients. Additionally, government insurers' typically lower reimbursement rates for health care goods, services, and facilities are often effectively non-negotiable. Plaintiffs and other health care providers could not remain operational in the absence of commercially insured patients. The Blues recognize these commercial realities—

1    for example, Defendant Anthem's CEO testified during the DOJ's Anthem/Cigna merger trial that

2    these are "the rules of engagement in the industry."

3        349.    For Plaintiffs and other health care providers, the substitutability between

4    commercial insurers and other payors (uninsured patients paying out-of-pocket and government

5    insurers) of health care goods, services, and facilities is low, as reflected in measures such as a low

6    cross elasticity of supply.

7        350.    *Alternative Relevant Product Submarkets.* In the alternative, three submarkets exist

8    within the Relevant Product Market (the "Relevant Product Submarkets"). These Relevant Product

9    Submarkets are:

10       a.     The purchase by commercial insurers of goods, services, and facilities from health

11              care professionals;

12       b.     The purchase by commercial insurers of goods, services, and facilities from health

13              care facilities; and

14       c.     The purchase by commercial insurers of durable medical equipment ("DME") by

15              residents in states and regions in which Plaintiffs operate.

16       351.    Like the Relevant Product Market, each of the Relevant Product Submarkets

17   excludes the purchase of prescription drugs and purchases for Medicare Advantage and managed

18   Medicaid.

19       352.    Several factors support the existence of these alternative Relevant Product

20   Submarkets. The health care industry frequently adopts the distinctions among health care

21   professional services, health care facility services, and DME. Commercial insurers, including the

22   Blues, may negotiate different reimbursement methodologies for each Relevant Product

23   Submarket. By way of example, commercial insurers reimburse health care facilities for in-patient

24   services based on diagnosis-related group ("DRG") codes instead of paying for each good or service

25   individually. Commercial insurers' contracting teams and processes often differ among these

26   alternative Relevant Product Submarkets. Plaintiffs and other providers of health care facility

27   services face the same options for the purchase of their goods, services, and facilities described

28   above. As a result, in each alternative Relevant Product Submarket, the substitution between

commercial insurers and other payors is low, as reflected in measures such as a low cross elasticity of demand. A profit-maximizing hypothetical monopsonist in these alternative Relevant Product Submarkets would likely reduce amounts paid to Plaintiffs and other health care providers below competitive levels by imposing at least a SSNRP.

### B. Relevant Geographic Markets

353.    For the Relevant Product Market and the alternative Relevant Product Submarkets (other than for alternative Relevant Product Submarket for DME), the Relevant Geographic Markets are each Blue's ESA in which a Plaintiff has operated during the Relevant Time Period. For DME, the Relevant Geographic Market is nationwide because DME can be shipped across state lines.

354.    But for the Conspiracy, each Blue would compete or would potentially compete in multiple Relevant Geographic Markets, if not throughout the entire United States.

355.    *The Relevant Geographic Markets are consistent with industry practice and commercial realities.* In most instances, an ESA is defined by state boundaries. Sometimes, however, an ESA includes only a region within a state, or areas in multiple states.

356.    Plaintiffs have built their patient base and have invested in physical assets to treat patients located in their respective Relevant Geographic Markets.

357.    When Plaintiffs contract with the Blues for provider reimbursement, the negotiations are generally done on a state-by-state (and thus, ESA-by-ESA) basis. For example, in Plaintiffs' negotiations with BCBS-KS and HealthyDakota-ND, those Blues have stated that they use a state-wide reimbursement rate for commercial health care plans. Similarly, when Plaintiffs negotiate with non-Blue commercial insurers, such negotiations generally occur at the state level— even with large national commercial payors.

358.    *The Relevant Geographic Market satisfies the hypothetical monopsonist test.* Plaintiffs are unlikely or unable to respond to a SSNRP by moving their goods, services, and facilities out of their respective Relevant Geographic Market. Therefore, a profit-maximizing hypothetical monopsonist in the Relevant Product Markets or alternative Relevant Product

1    Submarkets in the Relevant Geographic Markets would likely reduce amounts paid to Plaintiffs
2    and other providers below competitive levels by imposing at least a SSNRP.

3          359.    *Alternative Relevant Geographic Submarkets.* In the alternative, for the Relevant
4    Product Market and the alternative Relevant Product Submarkets (other than for alternative
5    Relevant Product Submarket for DME), the Relevant Geographic Submarkets are the Core-Based
6    Statistical Areas, which include Metropolitan Statistical Areas ("MSAs"), Micropolitan Statistical
7    Areas ("µSAs"), and counties not included in either an MSA or µSA, in the ESAs in which Plaintiffs
8    are located.

9          360.    Core-Based Statistical Areas are defined by the U.S. Office of Management and
10   Budget according to published standards applied to U.S. Census Bureau data. The U.S. Office of
11   Management and Budget states that "[t]he general concept of a metropolitan or metropolitan
12   statistical area is that of a core area containing a substantial population nucleus, together with
13   adjacent communities having a high degree of economic and social integration with that core."

14         361.    Plaintiffs typically provide health care goods, services, and facilities to patients
15   located in relatively close proximity to Plaintiffs' facilities. Plaintiffs have invested in physical
16   capital in their local geographic areas constituting the Relevant Geographic Submarkets and
17   invested in their human capital (reputation and referral patterns) that is specific to their local
18   geographic areas constituting the Relevant Geographic Submarkets. Plaintiffs also often define
19   their primary service areas based on where the majority of their patients live or work, regardless of
20   whether they are familiar with the term Core-Based Statistical Area.

21         362.    Relocating a health care facility, such as a hospital, would generate substantial fixed
22   costs, including building or purchasing a new facility, and also would cause significant disruption
23   in operations. For a physician, relocation would damage professional relationships, including
24   patient relationships developed over time, and further disrupt the physician's personal and family
25   life. Therefore, Plaintiffs and other health care providers are unlikely to respond to a SSNRP by
26   moving their facilities and practices out of their respective Relevant Geographic Submarket.

27         363.    The disincentive to moving is even stronger because the Blues outside of the
28   Relevant Geographic Market or alternative Relevant Geographic Submarket in which a health care

provider is located often have market power. Plaintiffs cannot contract with Blues outside of the Relevant Geographic Markets or alternative Relevant Geographic Submarkets, except in limited circumstances due to the Blue Conspiracies. Therefore, even if a health care provider sought to leave a Relevant Geographic Market or alternative Relevant Geographic Submarket to avoid its local Blue's market power, that provider would have little or no alternative.

364.    Thus, for the Relevant Product Market or alternative Relevant Product Submarkets, the substitution between commercial insurers in the Relevant Geographic Markets or alternative Relevant Geographic Submarkets and commercial insurers outside the Relevant Geographic Markets or alternative Relevant Geographic Submarkets identified above is low, as reflected in measures such as a low cross elasticity of supply. A profit-maximizing hypothetical monopsonist in the Relevant Product Market or alternative Relevant Product Submarkets in the Relevant Geographic Markets or alternative Relevant Geographic Submarkets would likely reduce prices below competitive levels by imposing at least a SSNRP.

### C. Defendant Blues' Market Power

365.    The Defendant Blues have market power in the Relevant Markets and alternative Submarkets described above. The agreements described above were intended to create, and have successfully created, areas of Blue market power in the Relevant States. Defendants have allowed individual Blues operating in their ESAs to obtain large numbers of members without competition from other Blues, and to use those increased membership numbers in negotiations with Plaintiffs to reduce reimbursement rates—including rates paid to Blues located outside those ESAs. An internal BCBSA Assembly of Plans report states that ESAs create "[l]arger market share because other Blues stay out and do not fragment the market. . . . Stronger provider agreements for the same reason."

366.    The Blue Conspiracies have caused Plaintiffs to be under-reimbursed by billions of dollars. Additional data obtained through discovery will enable Plaintiffs to identify the full extent of Plaintiffs' harm caused by the Blue Conspiracies.

367.    The fact that Plaintiffs have suffered harm is further confirmed by Defendants' own statements. Since the early 1980s, Defendants have expressly referenced their efforts to maintain

and increase their "differentials," a term Defendants use to refer to their unlawfully obtained reimbursement rate advantage.

368. With respect to their "differentials," an increase in one Blue's differential benefits the entire Blue system. The CEO of BCBSA stated in a letter to the CEOs of the Blues: "Every 1% increase in the differential in the priority Plans results in a system-wide increase of .12%. The psychological impact for the other Plans as well as hospitals for breakthrough in these major states would be extremely important. In addition, there would be significant dollar impact in each Plan."

369. Defendants also identified and took action to stop threats to their differentials. In an effort known as "Project State Watch," Defendants calculated how much the overall differential for the entire Blue system might be reduced if a given state differential was reduced.

370. Defendants have conspired to suppress the amounts paid to Plaintiffs in an effort to protect and increase their "differentials." Defendants have further used the CHP entity to identify and develop "action plans" for "critical markets" to further BCBSA's "corporate obj[ective]" of reducing reimbursements and increasing "discounts" obtained from Plaintiffs and other health care providers.

371. The differentials enabled by the Blue Conspiracies were not mere cost savings passed on to the Blues' subscribers. Rather, Defendants have used these differentials to unlawfully obtain significantly higher profits and/or larger surpluses for each of the Blues, and to provide excessive compensation to the Blues' high-level executives responsible for orchestrating the Blue Conspiracies.

372. The express, concerted conduct by Defendants to coordinate their efforts to lower reimbursement rates paid to Plaintiffs is further evidence that the Blue Conspiracies have caused damages to Plaintiffs.

373. The nature of the agreements that constitute the Blue Conspiracies increases the Blues' market power. The Blues have agreed not to enter each other's ESAs, have instituted rules limited their ability to generate revenue from competing non-Blue health plans, and have agreed to fix reimbursement rates for Blue subscribers treated by health care providers outside of their ESAs. The Blues negotiate with Plaintiffs and other providers under such artificially reduced competition.

During contract negotiations with a Blue, Plaintiffs and other health care providers face the choice between accepting their local Blue's contract terms or accepting a net loss of critically important commercially insured patients and cash flow that could end their ability to operate. Thus, "negotiations" with the Blues often constitute little more than a provider accepting the local Blue's "take it or leave it" offer.

374.    Several of the Blues are among the largest commercial health insurers in the country. Given their size and efforts to expand through mergers and acquisitions, multiple Blues would have entered or attempted to enter others' ESAs. For example:

a.    Defendant Anthem operates as a Blue Cross and/or Blue Shield licensee for 14 states: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. Anthem also has customers throughout the country through its non-Blue brand subsidiary, UniCare, which would be even larger but for the Blues' output restrictions, including its so-called National Best Efforts rule. Anthem has shown a clear intent to expand its operations. If it had not entered into the anticompetitive agreements that constitute the Blue Conspiracies, Anthem would very likely have expanded its operations on a near-nationwide basis.

b.    Defendant HCSC operates as a Blue in Illinois, Montana, New Mexico, Oklahoma, and Texas. It is the largest mutual health insurance company in the country and the fourth largest health insurance company overall. Similar to Anthem, HCSC would be very likely to purchase health care goods, services, and facilities throughout the United States in direct competition with the other Blues, but HCSC has not done so because it is part of the Blue Conspiracies.

c.    Defendant Highmark is also one of the largest health insurers in the country by market share. Its affiliated Blues operate in Delaware, New York, Pennsylvania, and West Virginia. Given its size, Highmark likely would have expanded to other ESAs but for its participation in the Blue Conspiracies.

d.    Defendant BCBS-MI operates in Michigan and Vermont and is the ninth largest health insurer in the country by total medical enrollment. BCBS-MI operates in other states on a limited basis through a Medicare subsidiary. Given its size, BCBS-MI likely would have expanded to other ESAs but for its participation in the Blue Conspiracies.

375.    Defendants Cambia, CareFirst, GuideWell, Premera, and Wellmark each currently operates as a Blue in multiple ESAs. Given their demonstrated ability to do so, it is reasonable that they would be able to operate in other ESAs, absent the Blue Conspiracies.

### D. Defendant Blues' Market Power in the Relevant Markets

376.    When commercial insurers purchase health care goods, services, and facilities from Plaintiffs and other health care providers, the vast majority of the time they do so pursuant to a fee-for-service contracting model, in which the amount they pay is based on the amount of health care goods, services, and facilities provided to their commercially-insured patients. Accordingly, commercial realities dictate that the greater the number of subscribers on whose behalf a commercial insurer purchases health care goods, services, and facilities, the greater the overall amount of health care goods, services, and facilities the commercial insurer will purchase from Plaintiffs and other health care providers, and the greater the commercial insurer's bargaining leverage to negotiate more favorable contractual terms, including reimbursement rates, with Plaintiffs and other health care providers.

377.    A commercial insurer's total enrollment (that is, a commercial insurer's total number of subscribers) is thus a relevant and reliable measure of that insurer's competitive significance, and that insurer's market power, in the Relevant Markets or alternative Submarkets. This is because a commercial insurer with greater enrollment in the Relevant Markets or alternative Submarkets will typically account for a greater amount of a health care provider's patient volume and revenue. Additionally, as alleged herein, Plaintiffs engage in two-stage competition. In contracting with commercial insurers, Plaintiffs obtain access to a total addressable pool of subscribers for which it can compete with other in-network providers.

378.    Also, in Plaintiffs' experience and consistent with commercial realities, a commercial insurer's enrollment share (that is, the proportion of that insurer's subscribers compared to all commercial insurers' subscribers) is a relevant and reliable measure for that insurer's competitive significance, and that insurer's market power, in the Relevant Markets or alternative Submarkets. This is because a commercial insurer with greater enrollment share in the Relevant Markets or alternative Submarkets will typically account for a greater share of a health care provider's patient volume and revenue. Here, this means that the Blues have market power in Relevant Markets or alternative Submarkets with high numbers of Blue subscribers.

379.    To evaluate an individual Blue's market power, it is appropriate to include the total enrollment and enrollment share of all Blues together within the Relevant Markets or alternative Submarkets. When an individual Blue Plan is contracting with Plaintiffs and other health care providers, its enrollment share includes its own subscribers and those subscribers for whom Plaintiffs and other health care providers are compensated pursuant to the Blues' agreements made pursuant to Inter-Plan Programs, including the BlueCard Program and National Accounts Program.

380.    The Blues recognize these commercial realities. For example, an internal BCBSA Assembly of Plans report states that the Blues' ESAs create "[l]arger market share because other Blues stay out and do not fragment the market. . . . Stronger provider agreements for the same reason."

381.    Defendant Premera-AK has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA (Alaska), including in each CBSA within its ESA in which Plaintiff Providence has operated during the Relevant Time Period. Premera-AK's market power derives from the Blues' total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, Premera-AK's share of commercially insured patients in Alaska currently is at least 46%, and has been as high as 77% during the Relevant Time Period. In the Anchorage MSA, where Plaintiff Providence operates, Premera-AK's share is at least 50%. In addition to Premera-AK's own subscribers, its market power also derives from its participation in the BlueCard and

National Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

382.    Defendant Prosano-AZ has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA (Arizona), including in each CBSA within its ESA in which Plaintiff Sanford has operated during the Relevant Time Period. Prosano-AZ's market power derives from the Blues' total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, Prosano-AZ's share of commercially insured patients in the Prescott Valley-Prescott MSA, in which Plaintiff Sanford operates, currently is at least 59%, and has not been below 43% during the Relevant Time Period. In addition to Prosano-AZ's own subscribers, its market power also derives from its participation in the BlueCard and National Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

383.    Defendant USAble-AR has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA (Arkansas), including in each CBSA within its ESA in which Plaintiffs Mercy Health and/or Sanford have operated during the Relevant Time Period. USAble-AR's market power derives from the Blues' total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, USAble-AR's share of commercially insured patients in Arkansas currently is at least 45%, and has been as high as 57% during the Relevant Time Period. In the Fayetteville-Springdale-Rogers MSA, where Plaintiff Mercy Health operates, USAble-AR's share is at least 57%. In the Fort Smith MSA, where Plaintiff Mercy Health operates, USAble-AR's share is at least 56%. In addition to USAble-AR's own subscribers, its market power is also derived from its participation in the BlueCard and National Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

384.    Defendants BS-CA and Anthem-CA have market power in the Relevant Product Markets or alternative Relevant Product Submarkets in their shared ESA (California), including in each CBSA within their shared ESA in which Plaintiff Providence has operated during the Relevant Time Period. BS-CA and Anthem-CA's market power derives from the Blues' total enrollment and

1    enrollment share of commercially insured patients in the Relevant Product Markets or alternative

2    Relevant Product Submarkets in their shared ESA. For example, in the Eureka-Arcata MSA, one

3    of the MSAs where Plaintiff Providence operates, BS-CA and Anthem-CA's share in 2021 was

4    36% and 57%, respectively. In addition to BS-CA and Anthem-CA's own subscribers, their market

5    power is also derived from their participation in the BlueCard and National Accounts Programs,

6    through which they have access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

7        385.    Defendant Anthem-CO has market power in the Relevant Product Markets or

8    alternative Relevant Product Submarkets in its ESA (Colorado), including in each CBSA within its

9    ESA in which Plaintiff Sanford has operated during the Relevant Time Period. Anthem-CO's

10   market power derives from the Blues' total enrollment and enrollment share of commercially

11   insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its

12   ESA. For example, Anthem-CO's share of commercially insured patients in Colorado is currently

13   24% and has been has high as 28% during the Relevant Time Period. In some CBSAs within

14   Colorado, Anthem-CO's share is significantly higher. For example, in the Fort Collins MSA, one

15   of the ESAs in which Plaintiff Sanford operates, Anthem-CO's share currently is 42%. In addition

16   to Anthem-CO's own subscribers, its market power is also derived from its participation in the

17   BlueCard and National Accounts Programs, through which it has access to subscribers in all 50

18   states, Washington D.C., and Puerto Rico.

19       386.    Defendant GuideWell-FL has market power in the Relevant Product Markets or

20   alternative Relevant Product Submarkets in its ESA (Florida), including in each CBSA within its

21   ESA in which Plaintiff Sanford has operated during the Relevant Time Period. GuideWell-FL's

22   market power derives from the Blues' total enrollment and enrollment share of commercially

23   insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its

24   ESA. For example, GuideWell-FL's share of commercially insured patients in Florida is currently

25   36% and has been has high as 42% during the Relevant Time Period. In addition to GuideWell-

26   FL's own subscribers, its market power is also derived from its participation in the BlueCard and

27   National Accounts Programs, through which it has access to subscribers in all 50 states, Washington

28   D.C., and Puerto Rico.

387.    Defendant BCBS-HI has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA (Hawaii), including in each CBSA within its ESA in which Plaintiff Sanford has operated during the Relevant Time Period. BCBS-HI's market power derives from the Blues' total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, BCBS-HI's share of commercially insured patients in Hawaii is currently 63% and has been as high as 75% during the Relevant Time Period. In addition to BCBS-HI's own subscribers, its market power is also derived from its participation in the BlueCard and National Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

388.    Defendant Gemstone-ID has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA[7] (Idaho), including in each CBSA within its ESA in which Plaintiff Providence has operated during the Relevant Time Period. Gemstone-ID's market power derives from the Blues' total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, Gemstone-ID's share of commercially insured patients in Idaho is currently 42%. In 2016, Gemstone-ID's share of commercially insured patients in Idaho was 48%. In 2010, Gemstone-ID's share of commercially insured patients in Idaho was 52%. In addition to Gemstone-ID's own subscribers, its market power is also derived from its participation in the BlueCard and National Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

389.    Defendant HCSC-IL has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA (Illinois), including in each CBSA within its ESA in which Plaintiffs BSMH, Endeavor Health, Mercy Health, and/or Sanford have operated during the Relevant Time Period. HCSC-IL's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, HCSC-IL's share of commercially insured

[7] Defendant Gemstone-ID shares its ESA with Regence-ID.

1    patients in Illinois is currently 63% and has not been below 55% during the Relevant Time Period.

2    In the Chicago-Naperville-Elgin MSA, where Plaintiff Endeavor Health operates, HCSC-IL's share

3    is at least 69%. In addition to HCSC-IL's own subscribers, its market power is also derived from

4    its participation in the BlueCard and National Accounts Programs, through which it has access to

5    subscribers in all 50 states, Washington D.C., and Puerto Rico.

6         390.    Defendant Anthem-IN has market power in the Relevant Product Markets or

7    alternative Relevant Product Submarkets in its ESA (Indiana), including in each CBSA within its

8    ESA in which Plaintiff Norton Healthcare has operated during the Relevant Time Period. Anthem-

9    IN's market power derives from its total enrollment and enrollment share of commercially insured

10   patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.

11   For example, Anthem-IN's share of commercially insured patients in Indiana is currently 56% and

12   has been has high as 61% during the Relevant Time Period. In the Madison μSA, where Plaintiff

13   Norton Healthcare operates, Anthem-IN's share is at least 66%. In addition to Anthem-IN's own

14   subscribers, its market power is also derived from its participation in the BlueCard and National

15   Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C.,

16   and Puerto Rico.

17        391.    Defendant Wellmark-IA has market power in the Relevant Product Markets or

18   alternative Relevant Product Submarkets in its ESA (Iowa), including in each CBSA within its ESA

19   in which Plaintiff Sanford has operated during the Relevant Time Period. Wellmark-IA's market

20   power derives from its total enrollment and enrollment share of commercially insured patients in

21   the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example,

22   Wellmark-IA's share of commercially insured patients in Iowa is currently 47% and has been has

23   high as 77% during the Relevant Time Period. In addition to Wellmark-IA's own subscribers, its

24   market power is also derived from its participation in the BlueCard and National Accounts

25   Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto

26   Rico.

27        392.    Defendant BCBS-KS has market power in the Relevant Product Markets or

28   alternative Relevant Product Submarkets within its ESA (Kansas, except Johnson and Wyandotte

counties), including in each CBSA within its ESA in which Plaintiff Mercy Health has operated during the Relevant Time Period. BCBS-KS's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, BCBS-KS's share of commercially insured patients in its ESA in 2021 was 71%. In addition to BCBS-KS's own subscribers, its market power is also derived from its participation in the BlueCard and National Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

393.    Defendant BCBS-KC has market power in the Relevant Product Markets or alternative Relevant Product Submarkets within its ESA (in Kansas, Johnson and Wyandotte counties; in Missouri, Andrew, Atchison, Bates, Benton, Buchanan, Caldwell, Carroll, Cass, Clay, Clinton, Daviess, DeKalb, Gentry, Grundy, Harrison, Henry, Holt, Jackson, Johnson, Lafayette, Livingston, Mercer, Nodaway, Pettis, Platte, Ray, St. Clair, Saline, Vernon, and Worth counties), including in each CBSA within its ESA in which Plaintiff Mercy Health has operated during the Relevant Time Period. BCBS-KC's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, BCBS-KC's share of commercially insured patients in its ESA was 54% in 2021. In addition to BCBS-KC's own subscribers, its market power is also derived from its participation in the BlueCard and National Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

394.    Defendant Anthem-KY has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA (Kentucky), including in each CBSA within its ESA in which Plaintiffs BSMH and/or Norton Healthcare have operated during the Relevant Time Period. Anthem-KY's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, Anthem-KY's share of commercially insured patients in Kentucky is currently 67%. In the Huntington-Ashland MSA, where Plaintiff BSMH operates, Anthem-KY's share is at least 69%. In the Louisville-Jefferson County MSA, where Plaintiff Norton Healthcare operates, Anthem-KY's share is at least 66%. In the Paducah MSA, where

1    Plaintiff BSMH operates, Anthem-KY's share is at least 71%. In addition to Anthem-KY's own

2    subscribers, its market power is also derived from its participation in the BlueCard and National

3    Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C.,

4    and Puerto Rico.

5           395.    Defendant BCBS-LA has market power in the Relevant Product Markets or

6    alternative Relevant Product Submarkets in its ESA (Louisiana), including in each CBSA within

7    its ESA in which Plaintiff Mercy Health has operated during the Relevant Time Period. BCBS-

8    LA's market power derives from its total enrollment and enrollment share of commercially insured

9    patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.

10   For example, BCBS-LA's share of commercially insured patients in Louisiana is currently 66%

11   and has been as high as 72% during the Relevant Time Period. In addition to BCBS-LA's own

12   subscribers, its market power is also derived from its participation in the BlueCard and National

13   Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C.,

14   and Puerto Rico.

15          396.    Defendant CareFirst has market power in the Relevant Product Markets or

16   alternative Relevant Product Submarkets in its ESA (Maryland), including in each CBSA within

17   its ESA in which Plaintiff WVUHS has operated during the Relevant Time Period. CareFirst's

18   market power derives from its total enrollment and enrollment share of commercially insured

19   patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.

20   For example, CareFirst's share of commercially insured patients in Maryland is currently 43% and

21   has been as high as 48% during the Relevant Time Period. In Garrett County, where Plaintiff

22   WVUHS operates, CareFirst's share is at least 56%. In addition to CareFirst's own subscribers, its

23   market power is also derived from its participation in the BlueCard and National Accounts

24   Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto

25   Rico.

26          397.    Defendant BCBS-MI has market power in the Relevant Product Markets or

27   alternative Relevant Product Submarkets in its ESA (Michigan), including in each CBSA within its

28   ESA in which Plaintiffs U-M and/or Sanford have operated during the Relevant Time Period.

1   BCBS-MI's market power derives from its total enrollment and enrollment share of commercially

2   insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its

3   ESA. For example, BCBS-MI's share of commercially insured patients in Michigan is currently

4   67% and has not been below 66% during the Relevant Time Period. In the Ann Arbor MSA, where

5   Plaintiff U-M operates, BCBS-MI's share is at least 82%. In the Lansing-East Lansing MSA, where

6   Plaintiff U-M operates, BCBS-MI's share is at least 74%. In the Grand Rapids-Wyoming-

7   Kentwood MSA, where Plaintiff U-M operates, BCBS-MI's share is at least 58%. In addition to

8   BCBS-MI's own subscribers, its market power is also derived from its participation in the BlueCard

9   and National Accounts Programs, through which it has access to subscribers in all 50 states,

10  Washington D.C., and Puerto Rico.

11         398.   Defendant Aware-MN has market power in the Relevant Product Markets or

12  alternative Relevant Product Submarkets in its ESA (Minnesota), including in each CBSA within

13  its ESA in which Plaintiff Sanford has operated during the Relevant Time Period. Aware-MN's

14  market power derives from its total enrollment and enrollment share of commercially insured

15  patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.

16  For example, Aware-MN's share of commercially insured patients in Minnesota has been between

17  38% and 53% during the Relevant Time Period. In the Bemidji μSA, where Plaintiff Sanford

18  operates, Aware-MN's share is at least 67%. In the Worthington μSA, where Plaintiff Sanford

19  operates, Aware-MN's share is at least 78%. In addition to Aware-MN's own subscribers, its

20  market power is also derived from its participation in the BlueCard and National Accounts

21  Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto

22  Rico.

23         399.   Defendant Anthem-MO has market power in the Relevant Product Markets or

24  alternative Relevant Product Submarkets in its ESA (all of Missouri except those counties included

25  in BCBS-KC's ESA), including in each CBSA within its ESA in which Plaintiff Mercy Health has

26  operated during the Relevant Time Period. Anthem-MO's market power derives from its total

27  enrollment and enrollment share of commercially insured patients in the Relevant Product Markets

28  or alternative Relevant Product Submarkets in its ESA. For example, Anthem-MO's share of

COMPLAINT

1   commercially insured patients in its ESA in 2021 was 41%. In the Lebanon μSA, where Plaintiff

2   Mercy operates, Anthem-MO's share was 40% in 2021. In the Springfield MSA, where Plaintiff

3   Mercy operates, Anthem-MO's share was 43% in 2021. In the Joplin MO-KS MSA, where Plaintiff

4   Mercy operates, Anthem-MO's share was 57% in 2021. In the St. Louis MO-IL MSA, where

5   Plaintiff Mercy operates, Anthem-MO's share was 38% in 2021. In addition to Anthem-MO's own

6   subscribers, its market power is also derived from its participation in the BlueCard and National

7   Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C.,

8   and Puerto Rico.

9       400.    Defendant HCSC-MT has market power in the Relevant Product Markets or

10  alternative Relevant Product Submarkets in its ESA (Montana), including in each CBSA within its

11  ESA in which Plaintiff Providence has operated during the Relevant Time Period. HCSC-MT's

12  market power derives from its total enrollment and enrollment share of commercially insured

13  patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.

14  For example, HCSC-MT's share of commercially insured patients in Montana is currently 50% and

15  consistently has been above 45% for many years during the Relevant Time Period. In the Missoula

16  MSA, where Plaintiff Providence operates, HCSC-MT's share is at least 46%. In addition to HCSC-

17  MT's own subscribers, its market power is also derived from its participation in the BlueCard and

18  National Accounts Programs, through which it has access to subscribers in all 50 states, Washington

19  D.C., and Puerto Rico.

20      401.    Defendant GoodLife-NE has market power in the Relevant Product Markets or

21  alternative Relevant Product Submarkets in its ESA (Nebraska), including in each CBSA within its

22  ESA in which Plaintiff Sanford has operated during the Relevant Time Period. GoodLife-NE's

23  market power derives from its total enrollment and enrollment share of commercially insured

24  patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.

25  For example, GoodLife-NE's share of commercially insured patients in Nebraska is currently 45%

26  and has been as high as 66% during the Relevant Time Period. In the Grand Island MSA, where

27  Plaintiff Sanford operates, GoodLife-NE's share is at least 56%. In addition to GoodLife-NE's own

28  subscribers, its market power is also derived from its participation in the BlueCard and National

1　Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C.,

2　and Puerto Rico.

3　　　　402.　Defendant Horizon-NJ has market power in the Relevant Product Markets or

4　alternative Relevant Product Submarkets in its ESA (New Jersey), including in each CBSA within

5　its ESA in which Plaintiff Jefferson Health has operated during the Relevant Time Period. Horizon-

6　NJ's market power derives from its total enrollment and enrollment share of commercially insured

7　patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.

8　For example, Horizon-NJ's share of commercially insured patients in New Jersey has been between

9　39% and 43% during the Relevant Time Period. In the portion of the Allentown-Bethlehem-Easton

10　MSA in New Jersey, where Plaintiff Jefferson Health operates, Horizon-NJ's share was 56% in

11　2021. In addition to Horizon-NJ's own subscribers, its market power is also derived from its

12　participation in the BlueCard and National Accounts Programs, through which it has access to

13　subscribers in all 50 states, Washington D.C., and Puerto Rico.

14　　　　403.　Defendant HCSC-NM has market power in the Relevant Product Markets or

15　alternative Relevant Product Submarkets in its ESA (New Mexico), including in each CBSA within

16　its ESA in which Plaintiffs Providence and/or Sanford have operated during the Relevant Time

17　Period. HCSC-NM's market power derives from its total enrollment and enrollment share of

18　commercially insured patients in the Relevant Product Markets or alternative Relevant Product

19　Submarkets in its ESA. For example, HCSC-NM's share of commercially insured patients in New

20　Mexico is currently 48% and has not been below 33% during the Relevant Time Period. In the

21　Hobbs μSA, where Plaintiff Providence operates, HCSC-NM's share is at least 69%. In addition to

22　HCSC-NM's own subscribers, its market power is also derived from its participation in the

23　BlueCard and National Accounts Programs, through which it has access to subscribers in all 50

24　states, Washington D.C., and Puerto Rico.

25　　　　404.　Defendant Highmark-NY has market power in the Relevant Product Markets or

26　alternative Relevant Product Submarkets in its ESAs in New York (in northeastern New York:

27　Albany, Clinton, Columbia, Essex, Fulton, Greene, Montgomery, Rensselaer, Saratoga,

28　Schenectady, Schoharie, Warren, and Washington counties; in western New York: Allegany,

Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming counties), including in the CBSAs within its ESAs in which Plaintiff UR has operated during the Relevant Time Period. Highmark-NY's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESAs in New York. For example, Highmark-NY's share of commercially insured patients in its ESAs in New York in 2021 was 40%. In addition to Highmark-NY's own subscribers, its market power is also derived from its participation in the BlueCard and National Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

405.    Defendant Excellus-NY has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA (in New York: Broome, Cayuga, Chemung, Chenango, Cortland, Franklin, Hamilton, Herkimer, Jefferson, Lewis, Livingston, Madison, Monroe, Oneida, Onondaga, Ontario, Oswego, Otsego, Schuyler, Seneca, Steuben, St. Lawrence, Tioga, Tompkins, Wayne, and Yates counties), including in the CBSAs within its ESA in which Plaintiff UR has operated during the Relevant Time Period. Excellus-NY's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, Excellus-NY's share of commercially insured patients in its ESA in 2021 was 69%. In the Rochester MSA, where Plaintiff UR operates, Excellus-NY's share is at least 77%. In addition to Excellus-NY's own subscribers, its market power is also derived from its participation in the BlueCard and National Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

406.    Defendant BCBS-NC has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA (North Carolina), including in the CBSAs within its ESA in which Plaintiffs ECU Health and/or UNC have operated during the Relevant Time Period. BCBS-NC's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, BCBS-NC's share of commercially insured patients in North

1    Carolina is currently 48% and has been as high as 59% during the Relevant Time Period. In the

2    Asheville MSA, where Plaintiff UNC operates, BCBS-NC's share is at least 61%. In the Boone

3    μSA, where Plaintiff UNC operates, BCBS-NC's share is at least 83%. In Duplin County, where

4    Plaintiff ECU Health operates, BCBS-NC's share is at least 79%. In the Durham-Chapel Hill MSA,

5    where Plaintiff UNC operates, BCBS-NC's share is at least 54%. In the Goldsboro MSA, where

6    Plaintiff UNC operates, BCBS-NC's share is at least 82%. In the Greensboro-High Point MSA,

7    where Plaintiff UNC operates, BCBS-NC's share is at least 56%. In the Greenville MSA, where

8    Plaintiff ECU Health operates, BCBS-NC's share is at least 81%. In Hertford County, where

9    Plaintiff ECU Health operates, BCBS-NC's share is at least 75%. In the Hickory-Lenoir-Morganton

10   MSA, where Plaintiff UNC operates, BCBS-NC's share is at least 72%. In the Kinston μSA, where

11   Plaintiffs ECU Health and UNC operate, BCBS-NC's share is at least 81%. In the Lumberton μSA,

12   where Plaintiff UNC operates, BCBS-NC's share is at least 70%. In the Raleigh-Cary MSA, where

13   Plaintiff UNC operates, BCBS-NC's share is at least 53%. In the Roanoke Rapids μSA, where

14   Plaintiff ECU Health operates, BCBS-NC's share is at least 82%. In the Rocky Mount MSA, where

15   Plaintiffs UNC and ECU Health operate, BCBS-NC's share is at least 78%. In the Washington

16   μSA, where Plaintiff ECU Health operates, BCBS-NC's share is at least 84%. In addition to BCBS-

17   NC's own subscribers, its market power is also derived from its participation in the BlueCard and

18   National Accounts Programs, through which it has access to subscribers in all 50 states, Washington

19   D.C., and Puerto Rico.

20        407.    Defendant HealthyDakota-ND has market power in the Relevant Product Markets

21   or alternative Relevant Product Submarkets in its ESA (North Dakota), including in the CBSAs

22   within its ESA in which Plaintiff Sanford has operated during the Relevant Time Period.

23   HealthyDakota-ND's market power derives from its total enrollment and enrollment share of

24   commercially insured patients in the Relevant Product Markets or alternative Relevant Product

25   Submarkets in its ESA. For example, HealthyDakota-ND's share of commercially insured patients

26   in North Dakota currently is at least 48%, and has been as high as 56% during the Relevant Time

27   Period. In the Bismarck MSA, where Plaintiff Sanford operates, HealthyDakota-ND's share is at

28   least 53%. In the Fargo MSA, where Plaintiff Sanford operates, HealthyDakota-ND's share is at

COMPLAINT

1  least 37%.[8] In addition to HealthyDakota-ND's own subscribers, its market power is also derived

2  from its participation in the BlueCard and National Accounts Programs, through which it has access

3  to subscribers in all 50 states, Washington D.C., and Puerto Rico.

4       408.   Defendant Anthem-OH has market power in the Relevant Product Markets or

5  alternative Relevant Product Submarkets in its ESA (Ohio), including in the CBSAs within its ESA

6  in which Plaintiffs BSMH and/or WVUHS have operated during the Relevant Time Period.

7  Anthem-OH's market power derives from its total enrollment and enrollment share of

8  commercially insured patients in the Relevant Product Markets or alternative Relevant Product

9  Submarkets in its ESA. For example, Anthem-OH's share of commercially insured patients in Ohio

10  has been as high as 38% during the Relevant Time Period. In the Defiance μSA, where Plaintiff

11  BSMH operates, Anthem-OH's share is at least 45%. In the Lima MSA, where Plaintiff BSMH

12  operates, Anthem-OH's share is at least 43%. In the Norwalk μSA, where Plaintiff BSMH operates,

13  Anthem-OH's share is at least 37%. In the Springfield MSA, where Plaintiff BSMH operates,

14  Anthem-OH's share is at least 51%. In the Tiffin μSA, where Plaintiff BSMH operates, Anthem-

15  OH's share is at least 36%. In the Youngstown-Warren MSA, where Plaintiff BSMH operates,

16  Anthem-OH's share is at least 44%. In the Cincinnati MSA, where Plaintiff BSMH operates,

17  Anthem-OH's share is at least 52%. In addition to Anthem-OH's own subscribers, its market power

18  is also derived from its participation in the BlueCard and National Accounts Programs, through

19  which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

20       409.   Defendant HCSC-OK has market power in the Relevant Product Markets or

21  alternative Relevant Product Submarkets in its ESA (Oklahoma), including in the CBSAs within

22  its ESA in which Plaintiffs INTEGRIS and/or Mercy Health have operated during the Relevant

23  Time Period. HCSC-OK's market power derives from its total enrollment and enrollment share of

24  commercially insured patients in the Relevant Product Markets or alternative Relevant Product

25  Submarkets in its ESA. For example, HCSC-OK's share of commercially insured patients in

26  Oklahoma currently is at least 57%, and has not been below 46% during the Relevant Time Period.

27

28  [8] In the portion of the Fargo MSA located in Minnesota, Defendant Aware-MN had 22% market share in 2021.

1    In the Ada μSA, where Plaintiff Mercy Health operates, HCSC-OK's share is at least 87%. In the

2    Ardmore μSA, where Plaintiff Mercy Health operates, HCSC-OK's share is at least 69%. In

3    Delaware County, where Plaintiff INTEGRIS operates, HCSC-OK's share is at least 68%. In the

4    Enid MSA, where plaintiff INTEGRIS operates, HCSC-OK's share is at least 69%. In the Miami

5    μSA, where Plaintiff INTEGRIS operates, HCSC-OK's share is at least 63%. In the Oklahoma City

6    MSA, where Plaintiffs INTEGRIS and Mercy Health operate, HCSC-OK's share is at least 58%.

7    In addition to HCSC-OK's own subscribers, its market power is also derived from its participation

8    in the BlueCard and National Accounts Programs, through which it has access to subscribers in all

9    50 states, Washington D.C., and Puerto Rico.

10           410.    Defendant Regence-OR has market power in the Relevant Product Markets or

11    alternative Relevant Product Submarkets in its ESA (Oregon, and Clark County, Washington),

12    including in the CBSAs in its ESA in which Plaintiffs Providence and/or Sanford have operated

13    during the Relevant Time Period. Regence-OR's market power derives from its total enrollment

14    and enrollment share of commercially insured patients in the Relevant Product Markets or

15    alternative Relevant Product Submarkets in its ESA. For example, in the Medford MSA, where

16    Plaintiff Providence operates, Regence-OR's share is at least 36%. In addition to Regence-OR's

17    own subscribers, its market power is also derived from its participation in the BlueCard and

18    National Accounts Programs, through which it has access to subscribers in all 50 states, Washington

19    D.C., and Puerto Rico.

20           411.    Defendant Capital-PA has market power in the Relevant Product Markets or

21    alternative Relevant Product Submarkets in its shared ESA with Highmark (Adams, Berks, Centre,

22    Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin,

23    Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union and York counties in

24    Pennsylvania), including in the CBSAs within its shared ESA in which Plaintiff Jefferson Health

25    has operated during the Relevant Time Period. Capital-PA's market power derives from its total

26    enrollment and enrollment share of commercially insured patients in the Relevant Product Markets

27    or alternative Relevant Product Submarkets in its service area. In the Pottsville μSA, where Plaintiff

28

                                                                                    COMPLAINT

1    Jefferson Health operates, Capital's share was 27% in 2021.[9] In the Pennsylvania counties within

2    the Allentown-Bethlehem-Easton MSA, where Plaintiff Jefferson Health operates, Capital-PA's

3    share was 31% in 2021. In addition to Capital-PA's own subscribers, its market power is also

4    derived from its participation in the BlueCard and National Accounts Programs, through which it

5    has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

6        412.    Defendant Highmark-PA has market power in the Relevant Product Markets or

7    alternative Relevant Product Submarkets in its ESA (Pennsylvania, excluding Adams, Berks,

8    Centre, Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh,

9    Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, York, Bucks,

10   Chester, Delaware, Montgomery, and Philadelphia counties), including in the CBSAs within its

11   ESA in which Plaintiffs Jefferson Health, Main Line Health, and/or WVUHS have operated during

12   the Relevant Time Period. Highmark-PA's market power derives from its total enrollment and

13   enrollment share of commercially insured patients in the Relevant Product Markets or alternative

14   Relevant Product Submarkets in its ESA. For example, Highmark-PA's share of commercially

15   insured patients in its ESA was 50% in 2021. In the East Stroudsburg μSA, where Plaintiff Jefferson

16   Health operates, Highmark-PA's share was 57% in 2021. In the Pittsburgh MSA, where Plaintiff

17   WVUHS operates, Highmark-PA's share was 46% in 2021. In the Scranton-Wilkes-Barre MSA,

18   where Plaintiff Jefferson Health operates, Highmark-PA's share was 59% in 2021. In the 21

19   counties (Pennsylvania: Adams, Berks, Centre, Columbia, Cumberland, Dauphin, Franklin, Fulton,

20   Juniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry,

21   Schuylkill, Snyder, Union and York counties) that Capital-PA also serves, Highmark-PA's share

22   was 39% in 2021. In the Pottsville μSA, where Plaintiff Jefferson Health operates, Highmark-PA's

23   share was 43% in 2021. In the Allentown-Bethlehem-Easton MSA, where Plaintiff Jefferson Health

24   operates, Highmark-PA's share was 38% in 2021. In addition to Highmark-PA's own subscribers,

25   its market power is also derived from its participation in the BlueCard and National Accounts

26   Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto

27   Rico.

28
_____
[9] Defendant Highmark-PA's share was 43% in the same MSA.

413.    Defendant Independence-PA has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA (Pennsylvania: Bucks, Chester, Delaware, Montgomery, and Philadelphia counties), including in the CBSAs within its ESA in which Plaintiffs Jefferson Health and/or Main Line Health have operated during the Relevant Time Period.[10] Independence-PA's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, Independence-PA's share of commercially insured patients in its ESA, where Plaintiffs Jefferson Health and Main Line Health operate, was 64% in 2021. In addition to Independence-PA's own subscribers, its market power is also derived from its participation in the BlueCard and National Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

414.    Defendant BCBS-SC has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA (South Carolina), including in the CBSAs within its ESA in which Plaintiffs BSMH, MUHA, and/or RSFH have operated during the Relevant Time Period. BCBS-SC's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, BCBS-SC's share of commercially insured patients in South Carolina currently is at least 59%, and has been as high as 67% during the Relevant Time Period. In the Charleston-North Charleston MSA, where Plaintiffs RSFH and MUHA operate, BCBS-SC's share is at least 72%. In the Charlotte-Concord-Gastonia MSA, where Plaintiff MUHA operates, BCBS-SC's share is at least 59%. In the Columbia MSA, where Plaintiff MUHA operates, BCBS-SC's share is at least 73%. In the Florence MSA, where Plaintiff MUHA operates, BCBS-SC's share is at least 69%. In the Greenville-Anderson-Greer MSA, where Plaintiff BSMH operates, BCBS-SC's share is at least 66%. In Marion County, where Plaintiff MUHA operates, BCBS-SC's share is at least 78%. In the Orangeburg μSA, where Plaintiff MUHA operates, BCBS-SC's share is at least 73%. In Williamsburg County, where Plaintiff MUHA operates, BCBS-SC's share is at

---

[10] As of 2024, Highmark is an additional Blue licensee in Bucks, Chester, Delaware, Montgomery, and Philadelphia counties in Pennsylvania.

COMPLAINT

1   least 72%. In addition to BCBS-SC's own subscribers, its market power is also derived from its

2   participation in the BlueCard and National Accounts Programs, through which it has access to

3   subscribers in all 50 states, Washington D.C., and Puerto Rico.

4          415.    Defendant Wellmark-SD has market power in the Relevant Product Markets or

5   alternative Relevant Product Submarkets in its ESA (South Dakota), including in the CBSAs within

6   its ESA in which Plaintiff Sanford has operated during the Relevant Time Period. Wellmark-SD's

7   market power derives from its total enrollment and enrollment share of commercially insured

8   patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.

9   For example, Wellmark-SD's share of commercially insured patients in South Dakota has been

10  between 31% and 53% during the Relevant Time Period. In some CBSAs, Wellmark-SD's share is

11  also high. For example, in the Aberdeen μSA, where Plaintiff Sanford operates, Wellmark-SD's

12  share is at least 34%. In the portion of the Sioux Falls MSA in South Dakota, where Plaintiff

13  Sanford operates, Wellmark-SD's share is at least 39%. In addition to Wellmark-SD's own

14  subscribers, its market power is also derived from its participation in the BlueCard and National

15  Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C.,

16  and Puerto Rico.

17         416.    Defendant BCBS-TN has market power in the Relevant Product Markets or

18  alternative Relevant Product Submarkets in its ESA (Tennessee), including in the CBSAs within

19  its ESA in which Plaintiff Sanford has operated during the Relevant Time Period. BCBS-TN's

20  market power derives from its total enrollment and enrollment share of commercially insured

21  patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.

22  For example, BCBS-TN's share of commercially insured patients in Tennessee has been between

23  41% and 70% during the Relevant Time Period. In addition to BCBS-TN's own subscribers, its

24  market power is also derived from its participation in the BlueCard and National Accounts

25  Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto

26  Rico.

27         417.    Defendant HCSC-TX has market power in the Relevant Product Markets or

28  alternative Relevant Product Submarkets in its ESA (Texas), including in the CBSAs within its

1    ESA in which Plaintiffs Mercy Health and/or Providence have operated during the Relevant Time

2    Period. HCSC-TX's market power derives from its total enrollment and enrollment share of

3    commercially insured patients in the Relevant Product Markets or alternative Relevant Product

4    Submarkets in its ESA. For example, HCSC-TX's share of commercially insured patients in Texas

5    currently is at least 44%. In certain CBSAs where Plaintiff Providence operates, HCSC-TX's shares

6    are even higher. For example, in the Lubbock MSA, where Plaintiff Providence operates, HCSC-

7    TX's share is at least 63%. In the Plainview μSA, where Plaintiff Providence operates, HCSC-TX's

8    share is at least 69%. In addition to HCSC-TX's own subscribers, its market power is also derived

9    from its participation in the BlueCard and National Accounts Programs, through which it has access

10    to subscribers in all 50 states, Washington D.C., and Puerto Rico.

11        418.    Defendant Anthem-VA has market power in the Relevant Product Markets or

12    alternative Relevant Product Submarkets in its ESA (Virginia, except portions of northern Virginia

13    included in CareFirst's ESA), including in the CBSAs within its ESA in which Plaintiffs BSMH

14    and/or WVUHS have operated during the Relevant Time Period. Anthem-VA's market power

15    derives from their total enrollment and enrollment share of commercially insured patients in the

16    Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example,

17    Anthem-VA's share of commercially insured patients in Virginia has been between 41% and 57%

18    during the Relevant Time Period. In Emporia City, where Plaintiff BSMH operates, Anthem-VA's

19    share is at least 96%. In Franklin City, where Plaintiff BSMH operates, Anthem-VA's share is at

20    least 67%. In the Richmond MSA, where Plaintiff BSMH operates, Anthem-VA's share is at least

21    60%. In the Virginia Beach-Chesapeake-Norfolk MSA, where Plaintiff BSMH operates, Anthem-

22    VA's share is at least 54%. In addition to Anthem-VA's own subscribers, its market power is also

23    derived from its participation in the BlueCard and National Accounts Programs, through which it

24    has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

25        419.    Defendant Premera-WA has market power in the Relevant Product Markets or

26    alternative Relevant Product Submarkets in its ESA (Washington: Adams, Benton, Chelan,

27    Douglas, Ferry, Franklin, Grant, Kittitas, Lincoln, Okanogan, Pend Oreille, Spokane, Stevens, and

28    Whitman), including in the CBSAs within its ESA in which Plaintiff Providence has operated

1    during the Relevant Time Period. For example, Premera-WA's share of commercially insured

2    patients in its ESA was 45% in 2021. In the Kennewick-Richland MSA, where Plaintiff Providence

3    operates, Premera-WA's share was 47% in 2021. In the Spokane-Spokane Valley MSA, where

4    Plaintiff Providence operates, Premera-WA's share was 38% in 2021. In addition to Premera-WA's

5    own subscribers, its market power is also derived from its participation in the BlueCard and

6    National Accounts Programs, through which it has access to subscribers in all 50 states, Washington

7    D.C., and Puerto Rico.

8        420.    Defendant Highmark-WV has market power in the Relevant Product Markets or

9    alternative Relevant Product Submarkets in its ESA (West Virginia), including in the CBSAs within

10    its ESA in which Plaintiff WVUHS has operated during the Relevant Time Period. Highmark-

11    WV's market power derives from its total enrollment and enrollment share of commercially insured

12    patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.

13    For example, Highmark-WV's share of commercially insured patients in West Virginia currently

14    is at least 52%, and has been as high as 55% during the Relevant Time Period. In the Clarksburg

15    μSA, where Plaintiff WVUHS operates, Highmark-WV's share is at least 72%. In the Hagerstown-

16    Martinsburg MSA, where Plaintiff WVUHS operates, Highmark-WV's share is at least 51%. In

17    the Morgantown MSA, where Plaintiff WVUHS operates, Highmark-WV's share is at least 62%.

18    In Nicholas County, where Plaintiff WVUHS operates, Highmark-WV's share is at least 63%. In

19    the Parkersburg-Vienna MSA, where Plaintiff WVUHS operates, Highmark-WV's share is at least

20    65%. In Upshur County, where Plaintiff WVUHS operates, Highmark-WV's share is at least 75%.

21    In Wetzel County, where Plaintiff WVUHS operates, Highmark-WV's share is at least 68%. In the

22    Bluefield μSA, where Plaintiff WVUHS operates, Highmark-WV's share is at least 66%. In the

23    Weirton-Steubenville MSA, where plaintiff WVUHS operates, Highmark-WV's share is at least

24    50%. In the Wheeling MSA, where Plaintiff WVUHS operates, Highmark-WV's share is at least

25    57%. In addition to Highmark-WV's own subscribers, its market power is also derived from its

26    participation in the BlueCard and National Accounts Programs, through which it has access to

27    subscribers in all 50 states, Washington D.C., and Puerto Rico.

28

421.    Defendant Anthem-WI has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA (Wisconsin), including in the CBSAs within its ESA in which Plaintiff Sanford has operated during the Relevant Time Period. Anthem-WI's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, Anthem-WI's share of commercially insured patients in Wisconsin has been as high as 27% during the Relevant Time Period. In the Eau Claire MSA, where Plaintiff Sanford operates, Anthem-WI's share has been as high as 31% during the Relevant Time Period. In the Wausau-Weston MSA, where Plaintiff Sanford operates, Anthem-WI's share has been as high as 28% during the Relevant Time Period. In addition to Anthem-WI's own subscribers, its market power is also derived from its participation in the BlueCard and National Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

422.    Defendant BCBS-WY has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA (Wyoming), including in the CBSAs within its ESA in which Plaintiff Sanford has operated during the Relevant Time Period. BCBS-WY's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, BCBS-WY's share of commercially insured patients in Wyoming has been as high as 32% during the Relevant Time Period. In addition to BCBS-WY's own subscribers, its market power is also derived from its participation in the BlueCard and National Accounts Programs, through which it has access to subscribers in all 50 states, Washington D.C., and Puerto Rico.

423.    But for the Blue Conspiracies, one or more Blues would have been permitted to enter, or would have in fact entered, the ESAs and Relevant States above and competed with the incumbent Blues. This entry or potential entry would have reduced the market power of the incumbent Blues, resulting in higher reimbursement rates paid to Plaintiffs and other health care providers.

424.    There are also significant barriers to entry for a commercial insurer to enter the Relevant Markets and alternative Submarkets. The barriers to entry include, among others,

1    (i) establishing a provider network, (ii) establishing a subscriber base, and (iii) complying with state

2    regulatory requirements. These barriers to entry are particularly detrimental to the entry of new

3    competitors where the Blue Conspiracies have allowed an incumbent Blue to achieve substantial

4    market power. In particular, a non-incumbent Blue may face fewer barriers to entry into a new ESA

5    at least because the non-incumbent Blue may have a significant number of subscribers within that

6    ESA through the BlueCard Program and/or National Accounts Program.

7       425.    The Blues have taken other actions to protect their market power. As explained

8    above, most Blues have a policy of prohibiting assignments of Blue Plan benefits from subscribers

9    to Plaintiffs. This effort helps force Plaintiffs to remain in network. The Blues also structure and

10   implement out-of-network benefits for subscribers to discourage subscribers from using those out-

11   of-network benefits. Some Blue Plans also eliminate or cap out-of-network benefits. The Blues

12   have retaliated or threatened retaliation against health care providers who attempt to operate outside

13   of a Blue network.

14      426.    As another means of creating and maintaining market power, the Blues have at times

15   demanded most favored nation clauses ("MFN"), or functional equivalents, from health care

16   providers who seek to contract with the Blues. These power imbalance ultimatums are common

17   and pervasive. For example, from 2006 until the present, in each of its contractual negotiations one

18   of the Defendant Blues has imposed MFN provisions for commercial health plan reimbursement

19   rates in its contracts with one of the Plaintiffs. That Defendant Blue has required that Plaintiff to

20   guarantee that its overall reimbursement rate structure is at least as low as, if not substantially lower

21   than, any other commercial insurer. That Plaintiff repeatedly has sought to eliminate this MFN

22   provision, including as recently as late 2024, but the Defendant Blue categorically has refused to

23   do so.

24      427.    As another example, a different Defendant Blue imposed MFN provisions for

25   commercial health plan reimbursement rates in its contracts with a different Plaintiff, in a different

26   ESA, as late as 2012, despite that Plaintiff's repeated pleas that the Defendant Blue remove those

27   provisions.

28

COMPLAINT

428.    As another example, in approximately 2009, yet another, different Defendant Blue imposed MFN provisions for commercial health plan reimbursement rates in its contracts with yet another Plaintiff, in a different ESA. That Defendant Blue required the Plaintiff to provide written assurance that its rates would not disadvantage that Defendant Blue relative to any other commercial payer.

429.    In approximately 2016 or 2017, yet another Defendant Blue required a different Plaintiff to enter into a side agreement that included MFN provisions for commercial health plan reimbursement rates as a condition for contracting.

430.    Other Blues have used MFNs or similar power imbalance ultimatums as leverage during contract negotiations. For example, an additional, separate Defendant Blue no longer includes MFN provisions in its contracts with a separate Plaintiff; however, during negotiations in 2023, that Defendant Blue has insisted upon receiving the lowest reimbursement rates of any of commercial insurer that that Plaintiff contracts with.

431.    The MFN provisions and other contractual provisions used by Defendants, which reflect systematic power imbalances, create additional barriers to entry because any new, competing commercial health care insurers cannot undercut the Blues' reimbursement rates.

432.    The Blues have sought to leverage and entrench their market power in additional ways. Certain Blues have sought to prevent health care providers from entering into transactions that the Blues believed could potentially diminish the Blues' ability to exploit their market power in the future. For example, throughout the 2010s Defendant Highmark-PA and a large health care provider in Pittsburgh, Pennsylvania, were engaged in long-running dispute. Highmark-PA proactively sought to prevent Plaintiff Jefferson Health from engaging in joint ventures or otherwise combining with that health care provider in a way that could potentially reduce Highmark's ability to exert its market dominance over Jefferson Health.

433.    Similarly, on multiple occasions since 2020, a different Blue Defendant has exploited routine "change of control" provisions in its contracts with a different Plaintiff and its predecessor entities to impose financial penalties on that Plaintiff for engaging in corporate transactions with other area health care providers, which the Defendant Blue considered to pose a

1    future threat to its ability to exploit its market power. On multiple occasions, when the Plaintiff was

2    pursuing a transaction with another health care provider, the Defendant Blue ceased following its

3    customary reimbursement practices and unilaterally invoked significantly reduced payments for a

4    period of time to pressure the Plaintiff not to do so. On one occasion, the Defendant Blue exploited

5    its previously imposed right to terminate its contract with a predecessor entity of the Plaintiff

6    pursuant to a change of control provision, solely for the purpose of reducing previously agreed-to

7    annual reimbursement increases and for reasons having nothing to do with the underlying

8    transaction. The Defendant Blue's conduct was intended to limit the Plaintiff's ability to negotiate

9    less punitive provider agreements with the Defendant Blue, and to impose a financial cost on the

10    Plaintiff for engaging in transactions that the Defendant Blue believed could threaten the Defendant

11    Blue's market dominance.

12          434.    Although they are independent entities that should be in heated competition with

13    one another, the individual Blues use their ability to steer (or not steer) patients through the

14    BlueCard and National Accounts Programs as a means to exercise market power.

### E. Defendants' Anticompetitive Conduct

16          435.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

17    set forth herein.

18          436.    Defendants' anticompetitive conduct is an unreasonable and undue restraint on

19    trade. The following anticompetitive acts by Defendants violate the antitrust laws both

20    independently and collectively:

21          a.      Defendants have created the ESAs, which are facially anticompetitive because they

22                  both protect each Blue from other Blues entering, or potentially entering, their ESA

23                  (a protective fence) and prohibit each Blue from entering, or potentially entering,

24                  any other Blue's ESA (a restrictive cage).

25          b.      The Blues' agreements as to Local Best Efforts and National Best Efforts rules are

26                  anticompetitive because they limit the amount of non-Blue business each Blue may

27                  conduct. These agreements artificially limit competition between commercial

28                  insurers purchasing health care goods, services, and facilities, disincentivize the

establishment of additional commercial health insurance purchasers of health care goods, services, and facilities in Plaintiffs' states and regions, and reduce the overall output of health care purchasing.

c.    Defendants have collectively implemented the BlueCard and National Accounts Programs. Pursuant to these programs, the Blues gain additional power within their conspiracy-created ESAs and also significantly increase Plaintiffs' administrative costs, claim denials, underpayments, and payment delays, and dissuade non-local Blues from negotiating contracts with Plaintiffs even if doing so makes economic and practical sense.

d.    Certain Defendant Blues have established side agreements not to compete with Blues in contiguous areas even where ostensibly permitted to do so by the Licensing Agreements.

e.    Defendant Blues have used their unlawfully obtained market power to demand MFN provisions in contracts with Plaintiffs and other health care providers.

f.    The Blues are independent, separate entities that should be competing against one another. Yet, the Blues often implement payment policies and contract terms on a uniform basis, both inside and outside the Relevant States. The Blues' parallel action, and their express coordination through BCBSA, indicates agreements among competitors to demand certain contract terms even within those limited geographic areas where the Blues are (or should be) direct competitors.

g.    The Blues share Plaintiffs' competitively-sensitive contract information among themselves either directly or through third parties created or controlled by the Blues. This decreases reimbursement rates paid to Plaintiffs and harms competition even within those limited geographic areas where the Blues are (or should be) direct competitors.

h.    The Blues engage in various other conduct that discourages health care providers such as Plaintiffs from being out-of-network. It is a contracting tactic—possible only because of the Blue Conspiracies—used by the Blues to coerce health care

providers such as Plaintiffs who attempt to be out-of-network into entering the Blues' network at subcompetitive reimbursement rates. This conduct creates inefficiencies for both consumers and Plaintiffs.

437.    As alleged above, Defendants have created processes to monitor and impose draconian consequences on any Blue that attempts to act outside of the anticompetitive agreements.

438.    But for the anticompetitive conduct described above, the Blues would compete with each other, with at least one more additional Blue operating in each of the Blues' ESAs, or at the very least reducing the local Blue's ability to exploit its market power through the possibility of potential entry. The existence of additional competition in a "but for" world is evidenced by the following:

439.    Historically, Blue-on-Blue competition occurred in many states and/or regions. No contractual prohibition against competition was required for the Blues to operate or protect their purported common law trademark rights.

440.    Certain Blue Cross and Blue Shield organizations still engage in direct competition, to some limited degree, in at least parts of California, Idaho, New York, Pennsylvania, and Washington.

441.    Executives at Defendant Anthem have indicated that they would like to compete for National Accounts in all fifty states. Additionally, Defendant Blue Cross Blue Shield of Alabama has asked other Blues to "cede" the right to bid on certain National Accounts, indicating a desire to win business outside of its ESA.

442.    The *BCBSA v. Community Mutual Insurance Co.* litigation in Ohio federal court resulted from one Blue seeking to compete outside of its service area.

443.    The *Maryland v. Blue Cross & Blue Shield Ass'n* litigation in Maryland federal court resulted in the Maryland- and D.C.-area Blues competing against each other.

444.    Where not prohibited by side agreements, the Blues compete against each other in a limited way in certain areas permitted by the "contiguous county rule," which ostensibly allows a Blue to compete in a contiguous county outside its ESA.

445. Many Blues have National Accounts resulting in subscribers living and receiving health care goods, services, and facilities outside their ESAs, indicating that the Blues could compete in states outside of their ESAs and the absence of trademark confusion.

446. Many of the Blues have expanded or attempted to expand through their ability (limited by the National Best Efforts rule) to operate under non-Blue brands or to acquire other Blues, indicating their desire to grow beyond their ESAs.

447. BCBSA members and working groups expressly designed the anticompetitive agreements to combat Blue-on-Blue competition that was perceived to harm the Blues' collective "differentials."

448. Defendants' anticompetitive conduct has prevented both new Blues and non-Blue brands from entering Plaintiffs' states and regions, while also preventing Plaintiffs from negotiating with non-local Blues on the rate of reimbursement for treating their patients.

449. Defendants' anticompetitive conduct has resulted in the Blues having monopsony power in the Relevant Markets or alternative Submarkets in which they operate.

450. Defendants' success in exercising their market power is also evidenced by the Blues consistent achievement of outsized profits.

451. The Blues' anticompetitive conduct has no procompetitive benefits or, if there could be any procompetitive benefits from some aspect of Defendants' conduct, those benefits are far outweighed by the anticompetitive effects of the conduct. More specifically:

    a.    Defendants have not created or adopted new products or services that would not otherwise exist absent their anticompetitive conduct, including contracting arrangements such as value-based care or other innovative solutions intended to lower the total cost of delivering health care.

    b.    The formation of ESAs is not necessary to protect any common law trademark rights that might exist. Blues other than the St. Paul and Buffalo Plans never gained independent common law exclusive rights to the Blue Cross and/or Blue Shield trade markets and trade names, either because they were abandoned or because the other Blues were licensees. Additionally, BCBSA has acknowledged that overlapping

1      service areas do not cause consumer confusion. In the limited areas where multiple

2      Blues currently compete (*e.g.*, California, Idaho, New York, Pennsylvania, and

3      Washington), there is also no evidence of customer confusion.

4      c.      The Blues would be able to compete with other commercial health care insurers

5              under Blue or non-Blue brands on a local, state, and/or nationwide basis without the

6              anticompetitive agreements.

7      d.      Defendants' anticompetitive conduct has not increased efficiencies for individual

8              Blues, as the reduced competition has suppressed innovation by the Blues and

9              Defendants' anticompetitive agreements are not necessary for individual Blues to

10             determine whether to remain focused on a single geographic area or to expand.

11     e.      The anticompetitive agreements are not necessary to prevent "free riding" on

12             investments in the Blue brands, as there are other, pro-competitive means of

13             preventing such free riding, none of which require anticompetitive market divisions

14             and prohibitions on operating under non-Blue brands pursuant to the National Best

15             Efforts and/or Local Best Efforts rules.

16     452.    The Blues' collective efforts to demand MFN provisions also have no

17     procompetitive benefits.

18     453.    The BlueCard and National Accounts Programs also increase inefficiencies and

19     reduce consumer welfare. Any purported procompetitive effects of the national programs are

20     outweighed by the anticompetitive effects that they create. Other health insurers and managed care

21     companies have been able to offer nationwide networks of health care coverage without

22     anticompetitive agreements.

23     **VI. <u>The Blue Conspiracies Have Caused Plaintiffs' Antitrust Injuries</u>**

24     454.    Defendants' anticompetitive conduct has caused antitrust injury and harm to

25     competition.

26     455.    Defendants' anticompetitive conduct has caused antitrust injury to Plaintiffs in the

27     form of lower reimbursement rates and the imposition of other unfair contracting terms in respect

28

- 124 -                                                    COMPLAINT

1    of each of the anticompetitive agreements and enforcement mechanisms described above that make

2    up the Blue Conspiracies.

3        456.    The Market Allocation Conspiracy and the agreements made in furtherance of it

4    comprises an aggregation of anticompetitive horizontal restraints that artificially decrease

5    reimbursements to Plaintiffs and other health care providers, reduce output of health care goods,

6    services, and facilities, and increase costs to patients, the Blues' own subscribers. The same is true

7    of the Price Fixing Conspiracy. While each of the Blue Conspiracies is made up of multiple

8    agreements and does not necessarily depend on the existence of any one individual agreement, each

9    of the agreements described above mutually reinforces the others and works synergistically in

10   furtherance of the Blue Conspiracies.

11       457.    The Market Allocation Conspiracy includes a set of agreements creating ESAs and

12   output restrictions. These agreements cause antitrust injury to Plaintiffs. The Defendants have

13   agreed that the Blues will not compete across ESAs by restricting each Blue from selling insurance

14   and from contracting with Plaintiffs outside of a designated geographic ESA. By allocating the

15   markets in which the Blues may operate, Defendants have restrained competition in the Relevant

16   Markets or alternative Relevant Submarkets. The number of commercial insurers and of Blue-

17   branded and non-Blue branded health insurance plans has been reduced, reducing competition

18   among commercial health insurers for the reimbursement rates offered to Plaintiffs and other health

19   care providers and leading to lower reimbursements paid to Plaintiffs and other health care

20   providers. The Blues' restraints on competition have also enabled them to impose unfair,

21   inefficient, and burdensome contract provisions that the Blues use to delay and reduce

22   reimbursements to Plaintiffs and other health care providers. The Blues have agreed to jointly

23   impose unlawful output restrictions, including the so-called National Best Efforts and Local Best

24   Efforts rules, by restricting the Blues' ability to operate under non-Blue brands within and across

25   their ESAs, which has also caused antitrust injury to Plaintiffs. By agreeing that each Blue would

26   limit its revenue from non-Blue branded business in their ESAs, Defendants have directly reduced

27   the amount of competition among the Blues and other commercial insurers in the Relevant Markets

28   or alternative Relevant Submarkets. Absent these output restrictions, the Blues would conduct more

COMPLAINT

1   health insurance business apart from and in competition with their Blue-branded insurance

2   business.

3       458.    In light of each Blue's monopsony power in the Relevant States as a result of the

4   Market Allocation Conspiracy, many Plaintiffs and other health care providers are or have been

5   faced with non-negotiable reimbursement rates provided by their local Blue during contract renewal

6   periods. In these instances, the Blues often provide no alternative to the rates they dictate other than

7   termination or expiration of the parties' agreement, which often is not financially feasible for

8   Plaintiffs.

9       459.    Absent the Market Allocation Conspiracy, there would be more competition among

10  commercial insurers and for the reimbursement of health care goods, services, and facilities

11  purchased from Plaintiffs and other health care providers. This competition would increase the

12  reimbursement rates available to Plaintiffs. There also would be more competition for the business

13  of selling commercial health insurance or administering commercial health plans for private

14  employers, other groups, or individuals. This competition would also decrease the premiums paid

15  by (or increase the coverage available to) individuals covered by commercial health plans.

16      460.    The Price Fixing Conspiracy has also caused antitrust injury to Plaintiffs. The

17  Defendants have engaged in unlawful price fixing agreements by setting pre-determined

18  reimbursement rates and mechanisms under the BlueCard Program and National Accounts Program

19  and by exchanging confidential reimbursement data to set prices. And the Blues have entered into

20  express and tacit side agreements not to compete with each other in the limited instances in which

21  BCBSA rules permit such competition. By colluding to fix reimbursement rates paid by Blues to

22  Plaintiffs and other health care providers, rather than let those rates be set by competition among

23  the Blues, Defendants have reduced competition and set artificially low the amounts that Plaintiffs

24  and other health care providers receive as reimbursement for health care goods, services, and

25  facilities provided to their commercially-insured patients.

26      461.    The agreements comprising the Blue Conspiracies inhibit inter-brand competition

27  by, among other things, promoting local dominance and creating barriers to entry by non-Blue

28

1  brands and hindering the Blues' own ability to compete with other brands through innovation such

2  as cost control and value-based payment.

3      462.   One example of the harm caused by the Blue Conspiracies is Defendant Capital-

4  PA's practice of excluding BlueCard-attributed members from the calculation of quality scores.

5  This practice calls into question the Blues' commitment to value—since they appear unwilling to

6  reward providers for value provided to BlueCard members and only reward their home members.

7      463.   Defendants' conduct includes agreements not to compete with each other and to

8  reduce the total output of commercial insurers' purchasing of health care goods, services, and

9  facilities. Defendants' conduct has prevented, and continues to prevent, each Blue from competing

10  outside of its designated ESA in the purchasing of health care goods, services, and facilities from

11  health care providers on behalf of their subscribers. Defendants' conduct has caused increased

12  market concentration and reduced competition in the Blues' ESAs and throughout the United

13  States, with the effect being lower reimbursement rates paid to Plaintiffs and other providers than

14  what Plaintiffs would have received if competition were not restricted by Defendants'

15  anticompetitive agreements and the Blues' ability to impose one-sided contracting terms causing

16  "payment friction" that results in delayed and reduced reimbursements to Plaintiffs. Plaintiffs are

17  paid for in-network patients pursuant to contracts with the Blues located in local ESAs where

18  Plaintiffs operate, nearly always pursuant to a fee-for-service model in which the overall amount

19  of Plaintiffs' reimbursements are based on the overall amount of health care goods, services, and

20  facilities provided to patient-subscribers. Plaintiffs are forced to accept lower reimbursement rates

21  because there is only one—or, in very limited circumstances, two—Blues in the areas in which

22  Plaintiffs operate.

23      464.   Due to the lack of competition attributable to the Blue Conspiracies, many Plaintiffs

24  have frequently been given offers by the Blues on a "take it or leave it" basis. For example,

25  Defendant HCSC-OK has long used a "take it or leave it" approach during contracting negotiations

26  with Plaintiff INTEGRIS, due to HCSC-OK's market power in the areas in which INTEGRIS

27  operates in Oklahoma. The same is true with respect to Plaintiff Mercy Health's negotiations with

28

1    HCSC-OK. Both INTEGRIS and Mercy Health have had no choice but to accept the terms dictated

2    by HCSC-OK, including HCSC-OK's unique reimbursement methodology.

3         465.    Defendant USAble-AR also has exploited its power to dictate reimbursement rates

4    and refuses to negotiate with Plaintiff Mercy Health in the areas of Arkansas in which Mercy Health

5    operates. Defendants Wellmark-SD and BCBS-ND similarly have adopted a "take it or leave it"

6    approach during contracting negotiations with Plaintiff Sanford, forcing Sanford to accept

7    artificially low reimbursement rates. Defendant Independence-PA has also imposed a "take it or

8    leave it" fee schedule on Plaintiff Main Line Health.

9         466.    Defendant BCBS-NC has told several hospitals that are part of a Plaintiff that it

10   would simply leave the hospitals out of network unless BCBS-NC's "take-it-or-leave-it" offer was

11   accepted. BCBS-NC has also categorically refused to consider changes to its contractual language

12   when contracting with other Plaintiffs.

13        467.    Defendant BCBS-KS has long imposed a statewide "take it or leave it" fee approach

14   for its commercial health plans with Plaintiff Mercy Health, refusing to negotiate on a facility-by-

15   facility basis

16        468.    Defendant Excellus-NY has exploited its market power in its ESA to force Plaintiff

17   UR to accept one-sided contractual language and unfairly low reimbursement rates.

18        469.    The foregoing are examples of the Blues' anticompetitive conduct that has affected

19   all Plaintiffs. Because of the Blues' collective market power with over 100 million total subscribers,

20   Plaintiffs wishing to join or remain in a Blue network must use the BlueCard Program and accept

21   lower reimbursement rates than they would receive if permitted to contract directly with other, non-

22   local Blues.

23        470.    Because of the Blues' unlawfully obtained market power, the Blues have repeatedly

24   sought to impose contractual language in their provider agreements that enables them to reduce

25   reimbursements, even including scenarios that penalize health care providers from reducing their

26   own costs for health care goods, services and facilities. In this way, regardless of the nominal

27   reimbursement rates included in Plaintiffs' contracts, the Blues have the ability to reduce the actual

28   reimbursement amounts they provide to Plaintiffs. In most cases, the Blues have leveraged their

market power to include contractual language permitting them to unilaterally change their reimbursement policies and procedures. Plaintiffs and other health care providers have no practical ability to refuse. Their only contractual remedy—terminating their contract with their local Blue— is often no remedy at all. Because the Blues have such a large percentage of commercially insured patients in the areas in which Plaintiffs operate, being out of network for any meaningful period of time is generally not an option for Plaintiffs.

471.   Because of the market power they have individually and collectively amassed pursuant to the Blue Conspiracies, the Blues have adopted this strategy and have imposed contractual provisions in their provider contracts, through incorporation by reference, enabling them to unilaterally implement prior authorization, claim processing and appeals requirements through "provider manuals," as well as independent coverage and reimbursement policies. These policies and procedures are intended to reduce reimbursements to Plaintiffs and other health care providers, to arbitrarily deny legitimate claims under the guise of "cost savings" to reduce reimbursements, delay payment to, and drain the administrative resources of, Plaintiffs and other health care providers who submit claims for reimbursement to the Blues for the medically necessary services provided to the Blues' subscribers. The Blues' "policy changes" and provider manual "updates" are often in fact pretextual reasons to deny or pay Plaintiff claims below what their contracts require. They have exploited their unlawfully obtained market power to materially reduce the reimbursements that Plaintiffs and other health care providers have received for the health care goods, services, and facilities provided to the Blues' commercially insured subscribers. While disputes between Plaintiffs and other, non-Blue commercial insurers regarding similar behavior have occurred from time to time, the extent to which the Blues have employed this strategy is far more common, and its results far more significant, than any other commercial insurer with which Plaintiffs contract, and is possible only because of the market power the Blues have unlawfully obtained through the Blue Conspiracies.

472.   For example, several Blues, including Defendants BCBS-SC, BCBS-NC, Independence-PA, and BCBS-MI have implemented unilateral policy changes in recent years to

1    reduce reimbursement to certain Plaintiffs where they perform multiple or bilateral procedures

2    during a single patient encounter.

3        473.    In another example, Defendant BCBS-MI has implemented a policy whereby when

4    a claim is either denied or reduced based on a DRG code billed by a health care provider pursuant

5    to a pre- or -post-payment audit by BCBS-MI, the provider is required to then submit a corrected

6    claim with the new DRG code assigned by BCBS-MI. The Blues' general trend of increasing DRG

7    audits in and of themselves creates a financial strain on Plaintiffs by draining their administrative

8    resources to file multiple levels of appeals where they disagree with the revised DRG assigned by

9    a Blue, but in the case of BCBS-MI, adds an additional "procedure" that must be followed by a

10   provider to avoid handing the Blues a reason to fully deny claims for already rendered costly

11   inpatient care.

12       474.    The Blues' increased trend in claims audit requests (which Plaintiffs must comply

13   with pursuant to non-negotiable contract provisions and/or provider manual updates) to many

14   Plaintiffs, in particular related to Emergency Department ("ED") and DRG downgrades, are not

15   only used to pretextually reduce reimbursements to providers such as Plaintiffs, but are also at times

16   weaponized in retaliation against Plaintiffs and other health care providers. For example, when one

17   Plaintiff sought to invoke its legal remedies related to a dispute under their contract with Defendant

18   Anthem-VA, Anthem-VA retaliated first by increasing ED claim audits by Anthem's Special

19   Investigative Unit ("SIU") 50% in the months that followed, and later notified that Plaintiff in

20   August 2023 that it was imposing a pre-payment review on *all* ED visit claims for one of Plaintiff's

21   facilities for its alleged failure to timely submit *2 out of the 60* medical records requested in an SIU

22   audit. This caused an extreme administrative burden on the hospital and was intended to strong arm

23   the Plaintiff into simply accepting whatever payments Anthem-VA sent them and whenever

24   Anthem-VA chose to pay, as opposed to following contractual and statutory timely reimbursement

25   requirements. As another example of the Blues' weaponization of audits against Plaintiffs and other

26   health care providers, within the past year, Defendant BCBS-NC has categorically denied claims

27   involving higher levels of care for ED visits for certain Plaintiffs, intended to increase the

28

1    administrative costs of submitting claims appeals, with BCBS-NC's goal of dissuading certain
2    providers from pursuing legitimate reimbursement claims.

3        475.    Often, Plaintiffs cannot credibly threaten to terminate their agreements with the
4    Blues or go out of network. In fact, Defendant BCBS-NC would cease negotiations and refuse any
5    further engagement with North Carolina-based health care providers, including certain of the
6    Plaintiffs, if those providers even threatened to terminate their agreements with BCBS-NC. In
7    general, most Plaintiffs simply could not afford to forego reimbursements from the Blues for any
8    extended period of time.

9        476.    For many Plaintiffs, the ability to terminate their contracts with their local Blue is
10   made effectively impossible by the Blues' policy of ignoring assignment of benefits forms that
11   direct the Blues to make claim reimbursement payments directly to Plaintiffs. Instead, when
12   Plaintiffs submit out-of-network claims, the Blues direct reimbursement checks to the patients. This
13   requires the Plaintiffs to pursue patients in order to obtain payment for the medically necessary
14   services provided to the Blues' subscribers when Plaintiffs do not have a participation agreement
15   with the Blues. This is untenable from an administrative resource and financial perspective. The
16   Blues are the only major commercial payors that have adopted this delay and uncertainty tactic,
17   which effectively has forced nearly all Plaintiffs to remain in-network with their local Blue and
18   substantially eliminates any leverage many Plaintiffs may have to even threaten termination.

19       477.    Further, reimbursement from the Blues for treating commercially insured patients is
20   necessary for Plaintiffs to collect enough revenue to retain staff and to stay in business. The Blues
21   have an outsized share of commercially insured patients. A disruption in Plaintiffs' cash flows from
22   going out of network, even temporarily, would jeopardize Plaintiffs' viability. The Blues realize
23   this. Defendants have also created and enhanced the barriers for other commercial insurers to enter
24   the Blues' ESAs. Defendants have suppressed amounts paid for Plaintiffs' health care goods,
25   services and facilities and have injured competition. Defendants have further deprived patients of
26   choices in the marketplace for health care providers, as the reduced payments to health care
27   providers (including Plaintiffs) has the reduced the number of health care professionals and staff,
28   in addition to the scope of health care goods, services, and facilities available to patients.

478.    Absent the Blue Conspiracies, other commercial insurers (including other Blues) would have been able to impose competitive constraints, including by potentially expanding into, each of the Blues' ESAs where Plaintiffs operate. These commercial insurers have been prevented from doing so because of Blue Conspiracies and the Blues' market power in these ESAs enabled by the Blue Conspiracies.

479.    Absent the Blue Conspiracies, other Blues would have been permitted to expand, and/or would have in fact expanded, into each of the Blues' ESAs where Plaintiffs operate, either under a Blue brand, a non-Blue brand, or both. The fact that one or more Blues would have been permitted to expand, and/or in fact would have expanded into the Blues' ESAs where Plaintiffs operate but for the Blue Conspiracies, would have restrained the local Blue's ability to exert its unlawfully obtained market power to impose artificially low reimbursement rates on Plaintiffs and other health care providers. This is confirmed by the following:

a.    The Blues expressly established the ESA provisions in the License Agreements for the purpose of limiting competition among themselves, as evidenced by the contemporaneous statements made within BCBSA and its working groups.

b.    If no Blues had a desire or intent to expand into other ESAs—whether for purported trademark protection reasons or otherwise—there would be no need to place contractual restrictions in the License Agreements and to establish draconian penalties for violating those contractual restrictions.

c.    There is no need for the ESA restrictions in the License Agreements as a means for purported trademark protection. Historically, multiple Blues have operated without customer confusion or harm to the brand in at least portions of California, Idaho, Illinois, Kentucky, Maryland, New York, North Carolina, Ohio, Virginia, West Virginia, and Wisconsin. BCBSA has acknowledged that overlapping service areas do not cause consumer confusion. Moreover, health care providers would not experience, and have not experienced, confusion as to separate entities operating under Blue brands. Defendants previously have used "trademark protection" as a mere pretext to justify their naked market allocation agreements.

d.      The Blues have evidenced their desire to expand beyond their 1972 ESAs, including through aggressive merger-and-acquisition efforts, with several Blues expanding beyond their original ESAs by acquiring and re-branding other Blues. Defendant Anthem's executives have stated that Anthem would like to compete for National Accounts in all fifty states, stating that being able to do so would be "exhilarating." Defendant Blue Cross Blue Shield of Alabama identified gaining National Accounts in other states (by requesting the in-state Blue to "cede" those National Accounts) as key to its future growth—because its position in Alabama is already so dominant.

e.      To the limited extent permitted by the so-called Local Best Efforts and National Best Efforts rules, certain of the Blues have expanded within and outside their local ESAs under non-Blue brands. Absent the anticompetitive agreements that constitute the Blue Conspiracies, the Blues would have also expanded under Blue brands and more extensively under non-Blue brands. And despite the Blues' agreement supposedly to end the National Best Efforts rule in 2021, the effects of that rule have continued to cause Plaintiffs and other health care providers be receive artificially low reimbursement rates afterwards.

480.    Defendants' unlawful and anticompetitive agreements have harmed, and will continue to harm, patients—the Blues' own subscribers. As a result of their under-payments, Plaintiffs and other health care providers: (i) employ fewer health care professionals, (ii) offer fewer goods, services, and facilities to patients (including reduced expansion and/or facility closures), and (iii) offer less free or reduced cost care to patients consistent with Plaintiffs' non-profit, mission-driven purposes. Defendants' under-reimbursements have increased Defendants' own profits while causing health care professional shortages and reduced goods, services, and facilities to patients, including the Blues' own subscribers. As a result of Defendants' conduct, consumers of health care goods, services, and facilities have paid more and achieved less access to health care. Consumer welfare is best protected by a competitive marketplace in which commercial insurers purchase health care goods, services, and facilities from providers.

481.    The Blues have also acknowledged that the agreements comprising the Blue Conspiracies have enabled them to achieve lower reimbursement rates from Plaintiffs and other health care providers. An internal BCBSA Assembly of Plans report states that ESAs create "[l]arger market share because other Blues stay out and do not fragment the market. . . . Stronger provider agreements for the same reason." On information and belief, Defendants have acknowledged that it is more difficult to obtain lower reimbursement rates from health care providers in the few states where multiple Blues compete with one another to some degree. The Blue Conspiracies have allowed many of the Blues to obtain market power within their ESAs or within parts of their ESAs. The Blues have used this market power to exclude other competing health insurers and achieve subcompetitive reimbursement rates paid to Plaintiffs and other health care providers.

482.    Defendants' anticompetitive agreements also have the effect of stifling innovation as to the method of purchasing health care goods, services, and facilities. Innovation in health care improves the quality of goods, services, and facilities and reduces costs. Health insurers and health care providers (such as Plaintiffs) may be able to negotiate new forms of reimbursement agreements that incentivize improved health care. However, when a group of health insurers (such as the Blue Defendants) employs anticompetitive agreements to reduce competition and obtain monopsony power, the result is often "take it or leave it" contract offers that pay artificially low reimbursement rates to Plaintiffs and reduce opportunities to innovate. The agreements therefore discourage new and innovative insurer-provider agreements, which harms competition and patients.

483.    Plaintiffs have at times requested that Blues implement new and innovative payment models. For example, certain Plaintiffs have proposed that Blues consider value-based or risk-based approaches in which Plaintiffs are paid commensurate with the value they provide and share in the risk if they cannot effectively manage their patient population. This type of payment model can benefit efficient, low-cost Plaintiffs and reward patients. But the Blues have often rebuffed requests by Plaintiffs to engage in value-based or risk-based contracting and, instead, used the Blue Conspiracies to demand onerous contract terms from Plaintiffs. The absence of competition has disincentivized the Blues from considering more efficient models.

484.    When the Blues face innovative competitors, they engage in anticompetitive activity designed to force those competitors out of the market. For example, when a competitor develops innovative programs that involve paying providers higher reimbursement rates than the Blues pay, while collaborating to reduce the overall cost of health care, certain Blues have attempted to purchase the competitor and/or prevent the on-going implementation of the innovative programs. Instead, the other Blues continue to follow their strategy of paying low reimbursement rates to Plaintiffs and others to maintain their positions as the lowest paying commercial insurer.

485.    Plaintiffs and other health care providers have also been harmed because the Blue Conspiracies restrict their choices. Plaintiffs are not offered the opportunity to contract directly with any Blue other than their local Blue. Many times, the Blue Conspiracies have forced Plaintiffs to choose between subcompetitive rates or effectively being forced out of business.

486.    The Blue Conspiracies have existed and have been continuously ongoing at least since 2008 and continue through the present. Although the Defendants purported to formally terminate the so-called National Best Efforts rule in 2021 in connection with the settlement of antitrust litigation brought by their subscribers, the economic effects of that output restriction, and relating harm to Plaintiffs, have been carrying on and will continue to carry on for many years.

## VII. The Blue Conspiracies Should Be Enjoined

487.    The Blue Conspiracies are each an aggregation of anticompetitive horizontal restraints that are mutually reinforcing and work together synergistically to artificially decrease reimbursements to Plaintiffs and other health care providers, reduce output of health care goods, services, and facilities, and increase costs to patients, including the Blues' own subscribers. The Blue Conspiracies, and their component agreements, viewed separately or together, are unlawful under the *per se*, quick look, and/or rule of reason standards and should be enjoined to prevent further harm to competition. While the precise scope of the injunctive relief needed to address Defendants harm to Plaintiffs cannot now be determined, Plaintiffs provide the examples below.

488.    The agreements comprising the Blues' Market Allocation Conspiracy prevent or reduce competition among the Blues to sell health insurance and contract with health care providers such as Plaintiffs. They prevent Blues from establishing more efficient and innovative contracts

1    with health care providers, which would improve health care quality and lower health care costs

2    for health care providers and patients. They have harmed competition to sell insurance and

3    competition for contracts with health care providers such as Plaintiffs.

4        489.    The agreements comprising the Blues' Price Fixing Conspiracy prevent or reduce

5    competition among the Blues to sell insurance and contract with health care providers such as

6    Plaintiffs. They prevent Blues from establishing more efficient and innovative contracts with health

7    care providers, which would improve health care quality and lower health care costs for health care

8    providers and patients. They have harmed competition to sell insurance and competition for

9    contracts with health care providers such as Plaintiffs. In particular, Plaintiffs should be allowed to

10   opt out of the BlueCard System, with no threat of retaliation, and negotiate at arm's length with

11   Blues other than their local Blue. To the extent that Plaintiffs wish to remain in the BlueCard

12   Program, they should be permitted to do so subject to the structural changes Defendants agreed to

13   implement in connection with their 2024 settlement of the provider class action litigation before

14   the MDL Court.

15       490.    The anticompetitive conduct of the Defendants over a significant period of time will

16   require meaningful injunctive relief. Even with that relief, the conduct and market conditions

17   created by the Defendants will not be remedied overnight. The Court will need to impose reporting

18   and judicial oversight for a significant period of time to ensure that the remedies are adequate and

19   effective.

20       491.    For the avoidance of doubt, Plaintiffs seek injunctive relief only on their own behalf,

21   and do not seek injunctive relief that would alter or interfere with the injunctive relief in the provider

22   class settlement in the MDL Litigation.

23                    **VIII. Plaintiffs' Damages from the Blue Conspiracies**

24       492.    Plaintiffs have been and continue to be damaged by the Blue Conspiracies.

25   Plaintiffs' damages include, but are not limited to, having received (and continuing to receive)

26   artificially lower reimbursement rates and contractual terms less favorable than Plaintiffs would

27   have obtained but for Defendants' anticompetitive conduct.

28

493.    The Blue Conspiracies have caused Plaintiffs to be collectively under-reimbursed by billions of dollars. Additional data obtained through discovery will enable Plaintiffs to identify the full extent of Plaintiffs' damages caused by the Blue Conspiracies.

## CAUSES OF ACTION

### I. First Cause of Action

**Violation of 15 U.S.C. § 1 – Market Allocation Conspiracy**

494.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

495.    As alleged above, Defendants have entered into horizontal agreements to divide markets, reduce output, and unreasonably restrain competition in the Relevant Markets or alternative Relevant Submarkets. Defendants' agreements constitute *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

496.    The court in the MDL Litigation has entered orders concluding that the Market Allocation Conspiracy is subject to the *per se* standard of review and such rulings should apply here.

497.    In the alternative, Defendants' agreements to divide markets, reduce output, and unreasonably restrain competition in the Relevant Markets or alternative Relevant Submarkets violate Section 1 of the Sherman Act under the "quick look" analysis because the agreements have an effect on markets and market participants that an observer with even a rudimentary understanding of economics would conclude are anticompetitive. Defendants' agreements have no pro-competitive effects. The agreements are not related to or necessary for any trademark protection. Nor have Defendants' agreements resulted in the establishment of any new product or innovation. No inquiry into market power is required to determine that Defendants violated Section 1 of the Sherman Act.

498.    In the alternative, Defendants' agreements to divide markets, reduce output, and unreasonably restrain competition in the Relevant Markets or alternative Relevant Submarkets violate Section 1 of the Sherman Act under a "rule of reason" analysis. Defendants' agreements have no pro-competitive effects. The agreements are not related to or necessary for any trademark

1    protection. Nor have Defendants agreements resulted in the establishment of any new product or

2    innovation.

3        499.    Defendants' historical and continuing violations of Section 1 of the Sherman Act

4    have and continue to directly and proximately cause harm to competition in a manner that the

5    federal antitrust laws were designed to prevent and damaged Plaintiffs. Plaintiffs' damages flow

6    directly from the agreements made in violation of Section 1 of the Sherman Act.

7        500.    Plaintiffs' damages include receiving payments at lower rates, less favorable

8    contract terms, and less total revenue than Plaintiffs would have received but for Defendants'

9    violations of Section 1 of the Sherman Act. Pursuant to Section 4 of the Clayton Act, 15 U.S.C.

10   § 15, Plaintiffs are entitled to recover threefold damages, interest, and the costs of suit, including

11   reasonable attorneys' fees.

12       501.    Plaintiffs are also entitled to injunctive relief under Section 16 of the Clayton Act,

13   15 U.S.C. § 26. Defendants' violations of Section 1 of the Sherman Act are causing ongoing harm

14   to Plaintiffs. Plaintiffs are entitled to permanent injunctive relief and other remedies, including

15   monitoring and reporting requirements.

16                          **II. <u>Second Cause of Action</u>**

17              **<u>Violation of 15 U.S.C. § 1 – Price Fixing Conspiracy</u>**

18       502.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

19   set forth herein.

20       503.    As alleged above, Defendants have entered into horizontal agreements to fix prices,

21   reduce output, and unreasonably restrain competition in the Relevant Markets or alternative

22   Relevant Submarkets. Defendants' agreements constitute *per se* violations of Section 1 of the

23   Sherman Act, 15 U.S.C. § 1.

24       504.    In the alternative, Defendants' agreements to fix prices, reduce output, and

25   unreasonably restrain competition in the Relevant Markets or alternative Relevant Submarkets also

26   constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the "quick look" analysis

27   because the agreements have an effect on markets and market participants that an observer with

28   even a rudimentary understanding of economics would conclude is anticompetitive. Defendants'

1   agreements have no pro-competitive effects. Nor have the agreements resulted in the establishment

2   of any new product or innovation. No inquiry into market power is required to determine that

3   Defendants violated Section 1 of the Sherman Act.

4        505.    In the alternative, Defendants' agreements to fix prices, reduce output, and

5   unreasonably restrain competition in the Relevant Markets or alternative Relevant Submarkets also

6   constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, under a "rule of reason"

7   analysis. Defendants' agreements have no pro-competitive effects. Nor have the agreements

8   resulted in the establishment of any new product or innovation.

9        506.    Defendants' historical and continuing violations of Section 1 of the Sherman Act

10  have and continue to directly and proximately cause harm to competition in a manner that the

11  federal antitrust laws were designed to prevent and damaged Plaintiffs. Plaintiffs' damages flow

12  directly from the agreements made in violation of Section 1 of the Sherman Act.

13       507.    Plaintiffs' damages include receiving payments at lower rates, less favorable

14  contract terms, and less total revenue than Plaintiffs would have received but for Defendants'

15  violations of Section 1 of the Sherman Act. Pursuant to Section 4 of the Clayton Act, 15 U.S.C.

16  § 15, Plaintiffs are entitled to recover threefold damages, interest, and the costs of suit, including

17  reasonable attorneys' fees.

18       508.    Plaintiffs are also entitled to injunctive relief under Section 16 of the Clayton Act,

19  15 U.S.C. § 26. Defendants' violations of Section 1 of the Sherman Act are causing ongoing harm

20  to Plaintiffs. Plaintiffs are entitled to permanent injunctive relief and other remedies, including

21  monitoring and reporting requirements.

22                          **III. <u>Third Cause of Action</u>**

23       **Violation of Cal. Bus. & Prof. Code § 16720, *et seq.* – Market Allocation Conspiracy**

24       509.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

25  set forth herein.

26       510.    Plaintiffs bring this claim under Cal. Bus. & Prof. Code § 16720, *et seq.*, for

27  Defendants' violations of the Cartwright Act through the Market Allocation Conspiracy.

28

511.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in California.

512.    Defendants' historical and continuing violations of the Cartwright Act have directly and proximately caused harm to competition in California in a manner that the Cartwright Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Cartwright Act.

513.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

514.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

### IV. <u>Fourth Cause of Action</u>

**Violation of Cal. Bus. & Prof. Code § 16720, *et seq.* – Price Fixing Conspiracy**

515.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

516.    Plaintiffs bring this claim under Cal. Bus. & Prof. Code § 16720, *et seq.*, for Defendants' violations of the Cartwright Act through the Price Fixing Conspiracy.

517.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in California.

518.    Defendants' historical and continuing violations of the Cartwright Act have directly and proximately caused harm to competition in California in a manner that the Cartwright Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Cartwright Act.

519.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

520.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

**V. <u>Fifth Cause of Action</u>**

**Violation of 740 Ill. Comp. Stat. 10/3, *et seq.* – Market Allocation Conspiracy**

521.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

522.    Plaintiffs bring this claim under 740 Ill. Comp. Stat. 10/3, *et seq.*, for Defendants' violations of the Illinois Antitrust Act through the Market Allocation Conspiracy.

523.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Illinois.

524.    Defendants' historical and continuing violations of the Illinois Antitrust Act have directly and proximately caused harm to competition in Illinois in a manner that the Illinois Antitrust Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Illinois Antitrust Act.

525.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

526.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

**VI. <u>Sixth Cause of Action</u>**

**Violation of 740 Ill. Comp. Stat. 10/3, *et seq.* – Price Fixing Conspiracy**

527.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

528.    Plaintiffs bring this claim under 740 Ill. Comp. Stat. 10/3, *et seq.*, for Defendants' violations of the Illinois Antitrust Act through the Price Fixing Conspiracy.

529.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Illinois.

530.    Defendants' historical and continuing violations of the Illinois Antitrust Act have directly and proximately caused harm to competition in Illinois in a manner that the Illinois Antitrust Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Illinois Antitrust Act.

531.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

532.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

## VII. <u>Seventh Cause of Action</u>

### Violation of Ind. Code § 24-1-2-1, *et seq.* – Market Allocation Conspiracy

533.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

534.    Plaintiffs bring this claim under Ind. Code § 24-1-2-1, *et seq.*, for Defendants' violations of Indiana's antitrust statute through the Market Allocation Conspiracy.

535.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Indiana.

536.    Defendants' historical and continuing violations of Indiana's antitrust statute have directly and proximately caused harm to competition in Indiana in a manner that Indiana's antitrust statute was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is

causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of Indiana's antitrust statute.

537.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

538.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

## VIII. <u>Eighth Cause of Action</u>

### Violation of Ind. Code § 24-1-2-1, *et seq.* – Price Fixing Conspiracy

539.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

540.    Plaintiffs bring this claim under Ind. Code § 24-1-2-1, *et seq.*, for Defendants' violations of Indiana's antitrust statute through the Price Fixing Conspiracy.

541.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Indiana.

542.    Defendants' historical and continuing violations of Indiana's antitrust statute have directly and proximately caused harm to competition in Indiana in a manner that Indiana's antitrust statute was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of Indiana's antitrust statute.

543.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

544.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

COMPLAINT

# IX. <u>Ninth Cause of Action</u>

### Violation of Iowa Code § 553.4, *et seq.* – Market Allocation Conspiracy

545.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

546.    Plaintiffs bring this claim under Iowa Code § 553.4, *et seq.*, for Defendants' violations of the Iowa Competition Law through the Market Allocation Conspiracy.

547.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Iowa.

548.    Defendants' historical and continuing violations of the Iowa Competition Law have directly and proximately caused harm to competition in Iowa in a manner that the Iowa Competition Law was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Iowa Competition Law.

549.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

550.    Plaintiffs are entitled to recover exemplary damages, interest, reasonable attorneys' fees, and injunctive relief.

# X. <u>Tenth Cause of Action</u>

### Violation of Iowa Code § 553.4, *et seq.* – Price Fixing Conspiracy

551.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

552.    Plaintiffs bring this claim under Iowa Code § 553.4, *et seq.*, for Defendants' violations of the Iowa Competition Law through the Price Fixing Conspiracy.

553.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Iowa.

COMPLAINT

554.    Defendants' historical and continuing violations of the Iowa Competition Law have directly and proximately caused harm to competition in Iowa in a manner that the Iowa Competition Law was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Iowa Competition Law.

555.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

556.    Plaintiffs are entitled to recover exemplary damages, interest, reasonable attorneys' fees, and injunctive relief.

## XI. Eleventh Cause of Action

### Violation of Kan. Stat. Ann. § 50-101, *et seq.* – Market Allocation Conspiracy

557.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

558.    Plaintiffs bring this claim under Kan. Stat. Ann. § 50-101, *et seq.*, for Defendants' violations of the Kansas Restraint of Trade Act through the Market Allocation Conspiracy.

559.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Kansas.

560.    Defendants' historical and continuing violations of the Kansas Restraint of Trade Act have directly and proximately caused harm to competition in Kansas in a manner that the Kansas Restraint of Trade Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Kansas Restraint of Trade Act.

561.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

1    562.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

2    fees, and injunctive relief.

3    **XII. Twelfth Cause of Action**

4    **Violation of Kan. Stat. Ann. § 50-101,** *et seq.* **– Price Fixing Conspiracy**

5    563.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

6    set forth herein.

7    564.    Plaintiffs bring this claim under Kan. Stat. Ann. § 50-101, *et seq.*, for Defendants'

8    violations of the Kansas Restraint of Trade Act through the Price Fixing Conspiracy.

9    565.    Defendants have entered into horizontal agreements to fix prices, reduce output, and

10    unreasonably restrain competition in the purchase of health care goods, services, and facilities in

11    Kansas.

12    566.    Defendants' historical and continuing violations of the Kansas Restraint of Trade

13    Act have directly and proximately caused harm to competition in Kansas in a manner that the

14    Kansas Restraint of Trade Act was designed to prevent and damaged Plaintiffs. Defendants'

15    anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly

16    from the agreements made in violation of the Kansas Restraint of Trade Act.

17    567.    Plaintiffs' damages include receiving payments at lower rates, less favorable

18    contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price

19    Fixing Conspiracy.

20    568.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

21    fees, and injunctive relief.

22    **XIII. Thirteenth Cause of Action**

23    **Violation of Md. Code Ann., Com. Law § 11-204,** *et seq.* **– Market Allocation Conspiracy**

24    569.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

25    set forth herein.

26    570.    Plaintiffs bring this claim under Md. Code Ann., Com. Law § 11-204, *et seq.*, for

27    Defendants' violations of the Maryland Antitrust Act through the Market Allocation Conspiracy.

28

COMPLAINT

571.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Maryland.

572.    Defendants' historical and continuing violations of the Maryland Antitrust Act have directly and proximately caused harm to competition in Maryland in a manner that the Maryland Antitrust Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Maryland Antitrust Act.

573.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

574.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

## XIV. <u>Fourteenth Cause of Action</u>

**Violation of Md. Code Ann., Com. Law § 11-204, *et seq.* – Price Fixing Conspiracy**

575.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

576.    Plaintiffs bring this claim under Md. Code Ann., Com. Law § 11-204, *et seq.*, for Defendants' violations of the Maryland Antitrust Act through the Price Fixing Conspiracy.

577.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Maryland.

578.    Defendants' historical and continuing violations of the Maryland Antitrust Act have directly and proximately caused harm to competition in Maryland in a manner that the Maryland Antitrust Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Maryland Antitrust Act.

579.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

580.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

### XV. Fifteenth Cause of Action

**Violation of Mich. Comp. Laws § 445.772, *et seq.* – Market Allocation Conspiracy**

581.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

582.    Plaintiffs bring this claim under Mich. Comp. Laws § 445.772, *et seq.*, for Defendants' violations of the Michigan Antitrust Reform Act through the Market Allocation Conspiracy.

583.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Michigan.

584.    Defendants' historical and continuing violations of the Michigan Antitrust Reform Act have directly and proximately caused harm to competition in Michigan in a manner that the Michigan Antitrust Reform Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Michigan Antitrust Reform Act.

585.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

586.    Plaintiffs are entitled to recover disgorgement, treble damages, interest, reasonable attorneys' fees, and injunctive relief.

**XVI. <u>Sixteenth Cause of Action</u>**

**Violation of Mich. Comp. Laws § 445.772, *et seq.* – Price Fixing Conspiracy**

587.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

588.     Plaintiffs bring this claim under Mich. Comp. Laws § 445.772, *et seq.*, for Defendants' violations of the Michigan Antitrust Reform Antitrust Act through the Price Fixing Conspiracy.

589.     Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Michigan.

590.     Defendants' historical and continuing violations of the Michigan Antitrust Reform Act have directly and proximately caused harm to competition in Michigan in a manner that the Michigan Antitrust Reform Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Michigan Antitrust Reform Act.

591.     Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

592.     Plaintiffs are entitled to recover disgorgement, treble damages, interest, reasonable attorneys' fees, and injunctive relief.

**XVII. <u>Seventeenth Cause of Action</u>**

**Violation of Minn. Stat. § 325D.51, *et seq.* – Market Allocation Conspiracy**

593.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

594.     Plaintiffs bring this claim under Minn. Stat. § 325D.51, *et seq.*, for Defendants' violations of the Minnesota Antitrust Law through the Market Allocation Conspiracy.

1    595.    Defendants have entered into unlawful horizontal agreements to divide and allocate

2    markets, reduce output, and unreasonably restrain competition in the purchase of health care goods,

3    services, and facilities in Minnesota.

4    596.    Defendants' historical and continuing violations of the Minnesota Antitrust Law

5    have directly and proximately caused harm to competition in Minnesota in a manner that the

6    Minnesota Antitrust Law was designed to prevent and damaged Plaintiffs. Defendants'

7    anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly

8    from the agreements made in violation of the Minnesota Antitrust Law.

9    597.    Plaintiffs' damages include receiving payments at lower rates, less favorable

10    contract terms, and less total revenue than Plaintiffs would have received but for Defendants'

11    Market Allocation Conspiracy.

12    598.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

13    fees, and injunctive relief.

## XVIII. Eighteenth Cause of Action

### Violation of Minn. Stat. § 325D.51, *et seq.* – Price Fixing Conspiracy

16    599.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

17    set forth herein.

18    600.    Plaintiffs bring this claim under Minn. Stat. § 325D.51, *et seq.*, for Defendants'

19    violations of the Minnesota Antitrust Law through the Price Fixing Conspiracy.

20    601.    Defendants have entered into horizontal agreements to fix prices, reduce output, and

21    unreasonably restrain competition in the purchase of health care goods, services, and facilities in

22    Minnesota.

23    602.    Defendants' historical and continuing violations of the Minnesota Antitrust Law

24    have directly and proximately caused harm to competition in Minnesota in a manner that the

25    Minnesota Antitrust Law was designed to prevent and damaged Plaintiffs. Defendants'

26    anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly

27    from the agreements made in violation of the Minnesota Antitrust Law.

28

COMPLAINT

603.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

604.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

### XIX. Nineteenth Cause of Action

**Violation of Mo. Rev. Stat. § 416.031, *et seq.* – Market Allocation Conspiracy**

605.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

606.    Plaintiffs bring this claim under Mo. Rev. Stat. § 416.031 *et seq.*, for Defendants' violations of the Missouri Antitrust Law through the Market Allocation Conspiracy.

607.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Missouri.

608.    Defendants' historical and continuing violations of the Missouri Antitrust Law have directly and proximately caused harm to competition in Missouri in a manner that the Missouri Antitrust Law was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Missouri Antitrust Law.

609.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

610.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

### XX. Twentieth Cause of Action

**Violation of Mo. Rev. Stat. § 416.031, *et seq.* – Price Fixing Conspiracy**

611.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

612.    Plaintiffs bring this claim under Mo. Rev. Stat. § 416.031, *et seq.*, for Defendants' violations of the Missouri Antitrust Law through the Price Fixing Conspiracy.

613.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Missouri.

614.    Defendants' historical and continuing violations of the Missouri Antitrust Law have directly and proximately caused harm to competition in Missouri in a manner that the Missouri Antitrust Law was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Missouri Antitrust Law.

615.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

616.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

## XXI. <u>Twenty-First Cause of Action</u>

**Violation of Mont. Code Ann. § 30-14-205, *et seq.* – Market Allocation Conspiracy**

617.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

618.    Plaintiffs bring this claim under Mont. Code Ann. § 30-14-205, *et seq.*, for Defendants' violations of the Montana Unfair Trade Practices and Consumer Protection Act through the Market Allocation Conspiracy.

619.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Montana.

620.    Defendants' historical and continuing violations of the Montana Unfair Trade Practices and Consumer Protection Act have directly and proximately caused harm to competition in Montana in a manner that the Montana Unfair Trade Practices and Consumer Protection Act was

designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Montana Unfair Trade Practices and Consumer Protection Act.

621.     Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

622.     Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

### XXII. <u>Twenty-Second Cause of Action</u>

**Violation of Mont. Code Ann. § 30-14-205, *et seq.* – Price Fixing Conspiracy**

623.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

624.     Plaintiffs bring this claim under Mont. Code Ann. § 30-14-205, *et seq.*, for Defendants' violations of the Montana Unfair Trade Practices and Consumer Protection Act through the Price Fixing Conspiracy.

625.     Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Montana.

626.     Defendants' historical and continuing violations of the Montana Unfair Trade Practices and Consumer Protection Act have directly and proximately caused harm to competition in Montana in a manner that the Montana Unfair Trade Practices and Consumer Protection Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Montana Unfair Trade Practices and Consumer Protection Act.

627.     Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

1    628.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

2    fees, and injunctive relief.

3    **XXIII. <u>Twenty-Third Cause of Action</u>**

4    **Violation of N.J. Stat. Ann. § 56:9-1, *et seq.* – Market Allocation Conspiracy**

5    629.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

6    set forth herein.

7    630.    Plaintiffs bring this claim under N.J. Stat. Ann. § 56:9-1, *et seq.*, for Defendants'

8    violations of the New Jersey Antitrust Act through the Market Allocation Conspiracy.

9    631.    Defendants have entered into unlawful horizontal agreements to divide and allocate

10    markets, reduce output, and unreasonably restrain competition in the purchase of health care goods,

11    services, and facilities in New Jersey.

12    632.    Defendants' historical and continuing violations of the New Jersey Antitrust Act

13    have directly and proximately caused harm to competition in New Jersey in a manner that the New

14    Jersey Antitrust Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive

15    conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the

16    agreements made in violation of the New Jersey Antitrust Act.

17    633.    Plaintiffs' damages include receiving payments at lower rates, less favorable

18    contract terms, and less total revenue than Plaintiffs would have received but for Defendants'

19    Market Allocation Conspiracy.

20    634.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

21    fees, and injunctive relief.

22    **XXIV. <u>Twenty-Fourth Cause of Action</u>**

23    **Violation of N.J. Stat. Ann. § 56:9-1, *et seq.* – Price Fixing Conspiracy**

24    635.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

25    set forth herein.

26    636.    Plaintiffs bring this claim under N.J. Stat. Ann. § 56:9-1 *et seq.*, for Defendants'

27    violations of the New Jersey Antitrust Act through the Price Fixing Conspiracy.

28

637.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in New Jersey.

638.    Defendants' historical and continuing violations of the New Jersey Antitrust Act have directly and proximately caused harm to competition in New Jersey in a manner that the New Jersey Antitrust Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the New Jersey Antitrust Act.

639.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

640.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

## XXV. Twenty-Fifth Cause of Action

### Violation of N.M. Stat. Ann. § 57-1-1, *et seq.* – Market Allocation Conspiracy

641.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

642.    Plaintiffs bring this claim under N.M. Stat. Ann. § 57-1-1, *et seq.*, for Defendants' violations of the New Mexico Antitrust Act through the Market Allocation Conspiracy.

643.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in New Mexico.

644.    Defendants' historical and continuing violations of the New Mexico Antitrust Act have directly and proximately caused harm to competition in New Mexico in a manner that the New Mexico Antitrust Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the New Mexico Antitrust Act.

645.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

646.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

**XXVI. <u>Twenty-Sixth Cause of Action</u>**

**Violation of N.M. Stat. Ann. § 57-1-1, *et seq.* – Price Fixing Conspiracy**

647.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

648.    Plaintiffs bring this claim under N.M. Stat. Ann. § 57-1-1, *et seq.*, for Defendants' violations of the New Mexico Antitrust Act through the Price Fixing Conspiracy.

649.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in New Mexico.

650.    Defendants' historical and continuing violations of the New Mexico Antitrust Act have directly and proximately caused harm to competition in New Mexico in a manner that the New Mexico Antitrust Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the New Mexico Antitrust Act.

651.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

652.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

**XXVII. <u>Twenty-Seventh Cause of Action</u>**

**Violation of N.Y. Gen. Bus. Law § 340, *et seq.* – Market Allocation Conspiracy**

653.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

654.    Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 340, *et seq.*, for Defendants' violations of the Donnelly Act through the Market Allocation Conspiracy.

655.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in New York.

656.    Defendants' historical and continuing violations of the Donnelly Act have directly and proximately caused harm to competition in New York in a manner that the Donnelly Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Donnelly Act.

657.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

658.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

### XXVIII. <u>Twenty-Eighth Cause of Action</u>

**Violation of N.Y. Gen. Bus. Law § 340, *et seq.* – Price Fixing Conspiracy**

659.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

660.    Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 340, *et seq.*, for Defendants' violations of the Donnelly Act through the Price Fixing Conspiracy.

661.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in New York.

662.    Defendants' historical and continuing violations of the Donnelly Act have directly and proximately caused harm to competition in New York in a manner that the Donnelly Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing

1    ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation

2    of the Donnelly Act.

3        663.    Plaintiffs' damages include receiving payments at lower rates, less favorable

4    contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price

5    Fixing Conspiracy.

6        664.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

7    fees, and injunctive relief.

8                        **XXIX. <u>Twenty-Ninth Cause of Action</u>**

9            **Violation of N.C. Gen. Stat. § 75-1, *et seq.* – Market Allocation Conspiracy**

10       665.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

11   set forth herein.

12       666.    Plaintiffs bring this claim under N.C. Gen. Stat. § 75-1, *et seq.*, for Defendants'

13   violations of the North Carolina Unfair and Deceptive Trade Practices Act through the Market

14   Allocation Conspiracy.

15       667.    Defendants have entered into unlawful horizontal agreements to divide and allocate

16   markets, reduce output, and unreasonably restrain competition in the purchase of health care goods,

17   services, and facilities in North Carolina.

18       668.    Defendants' historical and continuing violations of the North Carolina Unfair and

19   Deceptive Trade Practices Act have directly and proximately caused harm to competition in North

20   Carolina in a manner that the North Carolina Unfair and Deceptive Trade Practices Act was

21   designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing

22   ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation

23   of the North Carolina Unfair and Deceptive Trade Practices Act.

24       669.    Plaintiffs' damages include receiving payments at lower rates, less favorable

25   contract terms, and less total revenue than Plaintiffs would have received but for Defendants'

26   Market Allocation Conspiracy.

27       670.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

28   fees, and injunctive relief.

1

**XXX. Thirtieth Cause of Action**

2

**Violation of N.C. Gen. Stat. § 75-1, *et seq.* – Price Fixing Conspiracy**

3        671.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

4   set forth herein.

5        672.    Plaintiffs bring this claim under N.C. Gen. Stat. § 75-1, *et seq.*, for Defendants'

6   violations of the North Carolina Unfair and Deceptive Trade Practices Act through the Price Fixing

7   Conspiracy.

8        673.    Defendants have entered into horizontal agreements to fix prices, reduce output, and

9   unreasonably restrain competition in the purchase of health care goods, services, and facilities in

10  North Carolina.

11       674.    Defendants' historical and continuing violations of the North Carolina Unfair and

12  Deceptive Trade Practices Act have directly and proximately caused harm to competition in North

13  Carolina in a manner that the North Carolina Unfair and Deceptive Trade Practices Act was

14  designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing

15  ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation

16  of the North Carolina Unfair and Deceptive Trade Practices Act.

17       675.    Plaintiffs' damages include receiving payments at lower rates, less favorable

18  contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price

19  Fixing Conspiracy.

20       676.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

21  fees, and injunctive relief.

22

**XXXI. Thirty-First Cause of Action**

23

**Violation of N.D. Cent. Code § 51-08.1-02, *et seq.* – Market Allocation Conspiracy**

24       677.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

25  set forth herein.

26       678.    Plaintiffs bring this claim under N.D. Cent. Code § 51-08.1-02, *et seq.*, for

27  Defendants' violations of the North Dakota Uniform State Antitrust Act through the Market

28  Allocation Conspiracy.

679.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in North Dakota.

680.    Defendants' historical and continuing violations of the North Dakota Uniform State Antitrust Act have directly and proximately caused harm to competition in North Dakota in a manner that the North Dakota Uniform State Antitrust Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the North Dakota Uniform State Antitrust Act.

681.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

682.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

## XXXII. Thirty-Second Cause of Action

### Violation of N.D. Cent. Code § 51-08.1-02, *et seq.* – Price Fixing Conspiracy

683.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

684.    Plaintiffs bring this claim under N.D. Cent. Code § 51-08.1-02, *et seq.*, for Defendants' violations of the North Dakota Uniform State Antitrust Act through the Price Fixing Conspiracy.

685.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in North Dakota.

686.    Defendants' historical and continuing violations of the North Dakota Uniform State Antitrust Act have directly and proximately caused harm to competition in North Dakota in a manner that the North Dakota Uniform State Antitrust Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs'

1    damages flow directly from the agreements made in violation of the North Dakota Uniform State

2    Antitrust Act.

3        687.    Plaintiffs' damages include receiving payments at lower rates, less favorable

4    contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price

5    Fixing Conspiracy.

6        688.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

7    fees, and injunctive relief.

8                    **XXXIII. Thirty-Third Cause of Action**

9        **Violation of Ohio Rev. Code Ann. § 1331.04, *et seq.* – Market Allocation Conspiracy**

10        689.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

11    set forth herein.

12        690.    Plaintiffs bring this claim under Ohio Rev. Code Ann. § 1331.04, *et seq.*, for

13    Defendants' violations of the Valentine Act through the Market Allocation Conspiracy.

14        691.    Defendants have entered into unlawful horizontal agreements to divide and allocate

15    markets, reduce output, and unreasonably restrain competition in the purchase of health care goods,

16    services, and facilities in Ohio.

17        692.    Defendants' historical and continuing violations of the Valentine Act have directly

18    and proximately caused harm to competition in Ohio in a manner that the Valentine Act was

19    designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing

20    ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation

21    of the Valentine Act.

22        693.    Plaintiffs' damages include receiving payments at lower rates, less favorable

23    contract terms, and less total revenue than Plaintiffs would have received but for Defendants'

24    Market Allocation Conspiracy.

25        694.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

26    fees, and injunctive relief.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### XXXIV. Thirty-Fourth Cause of Action

### Violation of Ohio Rev. Code Ann. § 1331.04, *et seq.* – Price Fixing Conspiracy

695.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

696.    Plaintiffs bring this claim under Ohio Rev. Code Ann. § 1331.04, *et seq.*, for Defendants' violations of the Valentine Act through the Price Fixing Conspiracy.

697.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Ohio.

698.    Defendants' historical and continuing violations of the Valentine Act have directly and proximately caused harm to competition in Ohio in a manner that the Valentine Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Valentine Act.

699.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

700.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

### XXXV. Thirty-Fifth Cause of Action

### Violation of Okla. Stat. tit. 79 § 203, *et seq.* – Market Allocation Conspiracy

701.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

702.    Plaintiffs bring this claim under Okla. Stat. tit. 79 § 203, *et seq.*, for Defendants' violations of the Oklahoma Antitrust Reform Act through the Market Allocation Conspiracy.

703.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Oklahoma.

COMPLAINT

704.    Defendants' historical and continuing violations of the Oklahoma Antitrust Reform Act have directly and proximately caused harm to competition in Oklahoma in a manner that the Oklahoma Antitrust Reform Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Oklahoma Antitrust Reform Act.

705.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

706.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

## XXXVI. Thirty-Sixth Cause of Action

### Violations of Okla. Stat. tit. 79 § 203, *et seq.* – Price Fixing Conspiracy

707.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

708.    Plaintiffs bring this claim under Okla. Stat. tit. 79 § 203, *et seq.*, for Defendants' violations of the Oklahoma Antitrust Reform Act through the Price Fixing Conspiracy.

709.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Oklahoma.

710.    Defendants' historical and continuing violations of the Oklahoma Antitrust Reform Act have directly and proximately caused harm to competition in Oklahoma in a manner that the Oklahoma Antitrust Reform Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Oklahoma Antitrust Reform Act.

711.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

1    712.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

2    fees, and injunctive relief.

3                    **XXXVII. Thirty-Seventh Cause of Action**

4        **Violation of Or. Rev. Stat. § 646.725, *et seq.* – Market Allocation Conspiracy**

5    713.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

6    set forth herein.

7    714.    Plaintiffs bring this claim under Or. Rev. Stat. § 646.725, *et seq.* for Defendants'

8    violations of Oregon's Trade Practices Act through the Market Allocation Conspiracy.

9    715.    Defendants have entered into unlawful horizontal agreements to divide and allocate

10    markets, reduce output, and unreasonably restrain competition in the purchase of health care goods,

11    services, and facilities in Oregon.

12    716.    Defendants' historical and continuing violations of Oregon's Trade Practices Act

13    have directly and proximately caused harm to competition in Oregon in a manner that Oregon's

14    Trade Practices Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive

15    conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the

16    agreements made in violation of Oregon's Trade Practices Act.

17    717.    Plaintiffs' damages include receiving payments at lower rates, less favorable

18    contract terms, and less total revenue than Plaintiffs would have received but for Defendants'

19    Market Allocation Conspiracy.

20    718.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

21    fees, and injunctive relief.

22                    **XXXVIII. Thirty-Eighth Cause of Action**

23        **Violation of Or. Rev. Stat. § 646.725, *et seq.* – Price Fixing Conspiracy**

24    719.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

25    set forth herein.

26    720.    Plaintiffs bring this claim under Or. Rev. Stat. § 646.725, *et seq*, for Defendants'

27    violations of Oregon's Trade Practices Act through the Price Fixing Conspiracy.

28

COMPLAINT

721. Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Oregon.

722. Defendants' historical and continuing violations of Oregon's Trade Practices Act have directly and proximately caused harm to competition in Oregon in a manner that Oregon's Trade Practices Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of Oregon's Trade Practices Act.

723. Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

724. Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

**XXXIX. Thirty-Ninth Cause of Action**

**Violation of S.D. Codified Laws § 37-1-3.1, *et seq.*– Market Allocation Conspiracy**

725. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

726. Plaintiffs bring this claim under S.D. Codified Laws § 37-1-3.1, *et seq.*, for Defendants' violations of the South Dakota Antitrust Statute through the Market Allocation Conspiracy.

727. Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in South Dakota.

728. Defendants' historical and continuing violations of the South Dakota Antitrust Statute have directly and proximately caused harm to competition in South Dakota in a manner that the South Dakota Antitrust Statute was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the South Dakota Antitrust Statute.

729.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

730.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

**XL. <u>Fortieth Cause of Action</u>**

**Violation of S.D. Codified Laws § 37-1-3.1, *et seq.* – Price Fixing Conspiracy**

731.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

732.    Plaintiffs bring this claim under S.D. Codified Laws § 37-1-3.1, *et seq.*, for Defendants' violations of the South Dakota Antitrust Statute through the Price Fixing Conspiracy.

733.    Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in South Dakota.

734.    Defendants' historical and continuing violations of the South Dakota Antitrust Statute have directly and proximately caused harm to competition in South Dakota in a manner that the South Dakota Antitrust Statute was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the South Dakota Antitrust Statute.

735.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

736.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

**XLI. <u>Forty-First Cause of Action</u>**

**Violation of Wash. Rev. Code § 19.86.030, *et seq.* – Market Allocation Conspiracy**

737.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

738. Plaintiffs bring this claim under Wash. Rev. Code § 19.86.030, *et seq.*, for Defendants' violations of Washington's Unfair Business Practices-Consumer Protection Act through the Market Allocation Conspiracy.

739. Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Washington.

740. Defendants' historical and continuing violations of the Washington Unfair Business Practices-Consumer Protection Act have directly and proximately caused harm to competition in Washington in a manner that Washington's Unfair Business Practices-Consumer Protection Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the Washington's Unfair Business Practices-Consumer Protection Act.

741. Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

742. Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

### XLII. <u>Forty-Second Cause of Action</u>

### Violation of Wash. Rev. Code § 19.86.030, *et seq.* – Price Fixing Conspiracy

743. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

744. Plaintiffs bring this claim under Wash. Rev. Code § 19.86.030, *et seq.*, for Defendants' violations of Washington's Unfair Business Practices-Consumer Protection Act through the Price Fixing Conspiracy.

745. Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Washington.

746.    Defendants' historical and continuing violations of Washington's Unfair Business Practices-Consumer Protection Act have directly and proximately caused harm to competition in Washington in a manner that Washington's Unfair Business Practices-Consumer Protection Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of Washington's Unfair Business Practices-Consumer Protection Act.

747.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

748.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

## XLIII. Forty-Third Cause of Action

### Violation of W. Va. Code § 47-18-3, *et seq.* – Market Allocation Conspiracy

749.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

750.    Plaintiffs bring this claim under W. Va. Code § 47-18-3, *et seq.*, for Defendants' violations of the West Virginia Antitrust Act through the Market Allocation Conspiracy.

751.    Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in West Virginia.

752.    Defendants' historical and continuing violations of the West Virginia Antitrust Act have directly and proximately caused harm to competition in West Virginia in a manner that the West Virginia Antitrust Act was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of the West Virginia Antitrust Act.

753.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

1    754.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

2    fees, and injunctive relief.

3    **XLIV. <u>Forty-Fourth Cause of Action</u>**

4    **Violation of W. Va. Code § 47-18-3, *et seq.* – Price Fixing Conspiracy**

5    755.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

6    set forth herein.

7    756.    Plaintiffs bring this claim under W. Va. Code § 47-18-3, *et seq.*, for Defendants'

8    violations of the West Virginia Antitrust Act through the Price Fixing Conspiracy.

9    757.    Defendants have entered into horizontal agreements to fix prices, reduce output, and

10   unreasonably restrain competition in the purchase of health care goods, services, and facilities in

11   West Virginia.

12   758.    Defendants' historical and continuing violations of the West Virginia Antitrust Act

13   have directly and proximately caused harm to competition in West Virginia in a manner that the

14   West Virginia Antitrust Act was designed to prevent and damaged Plaintiffs. Defendants'

15   anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly

16   from the agreements made in violation of the West Virginia Antitrust Act.

17   759.    Plaintiffs' damages include receiving payments at lower rates, less favorable

18   contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price

19   Fixing Conspiracy.

20   760.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys'

21   fees, and injunctive relief.

22   **XLV. <u>Forty-Fifth Cause of Action</u>**

23   **Violation of Wis. Stat. § 133.03, *et seq.* – Market Allocation Conspiracy**

24   761.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

25   set forth herein.

26   762.    Plaintiffs bring this claim under Wis. Stat. § 133.03, *et seq.*, for Defendants'

27   violations of Wisconsin's antitrust statute through the Market Allocation Conspiracy.

28

- 169 -                                     COMPLAINT

763.   Defendants have entered into unlawful horizontal agreements to divide and allocate markets, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Wisconsin.

764.   Defendants' historical and continuing violations of Wisconsin's antitrust statute have directly and proximately caused harm to competition in Wisconsin in a manner that Wisconsin's antitrust statute was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of Wisconsin's antitrust statute.

765.   Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Market Allocation Conspiracy.

766.   Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

### XLVI. Forty-Sixth Cause of Action

### Violation of Wis. Stat. § 133.03, *et seq.* – Price Fixing Conspiracy

767.   Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

768.   Plaintiffs bring this claim under Wis. Stat. § 133.03, *et seq.*, for Defendants' violations of Wisconsin's antitrust statute through the Price Fixing Conspiracy.

769.   Defendants have entered into horizontal agreements to fix prices, reduce output, and unreasonably restrain competition in the purchase of health care goods, services, and facilities in Wisconsin.

770.   Defendants' historical and continuing violations of Wisconsin's antitrust statute have directly and proximately caused harm to competition in Wisconsin in a manner that the Wisconsin's antitrust statute was designed to prevent and damaged Plaintiffs. Defendants' anticompetitive conduct is causing ongoing harm to Plaintiffs. Plaintiffs' damages flow directly from the agreements made in violation of Wisconsin's antitrust statute.

771.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' Price Fixing Conspiracy.

772.    Plaintiffs are entitled to recover threefold damages, interest, reasonable attorneys' fees, and injunctive relief.

## **REQUEST FOR RELIEF**

Plaintiffs request that this Court provide the following relief:

a.    Enter judgment that Defendants have violated Section 1 of the Sherman Act and the state antitrust laws identified herein;

b.    Permanently enjoin Defendants from all conduct that constitutes violations of Section 1 of the Sherman Act and the state antitrust laws identified herein, including Defendants' agreements and conduct comprising and in furtherance of the Blue Conspiracies, such as entering into or continuing agreements that unlawfully restrict geographic competition, reduce output, fix prices, or otherwise harm competition for the purchase of health care goods, services, and facilities, enforcing MFN provisions, or enforcing restrictions on assignments of benefits and directions of payment.

c.    Permanently enjoin Defendants from retaliating against any Plaintiff for participation in this action or the enforcement of any remedy or judgment;

d.    Enjoin Defendants in the same manner and to the same extent Defendants have stipulated to being enjoined in any other action with respect to the conduct alleged herein;

e.    Impose on all Defendants on-going periodic reporting on compliance obligations, including monitoring by the Court or a Court-appointed special master;

f.    Disgorgement of Defendants' unlawfully obtained profits obtained pursuant to Defendants' anticompetitive conduct;

g.    Award Plaintiffs damages in the form of three times the amount of damages suffered by Plaintiffs as proven at trial;

COMPLAINT

h.     Award costs and reasonable attorneys' fees to Plaintiffs as provided by statute, contract or court rule;

i.     Award pre- and post-judgment interest;

j.     For a trial by jury; and

k.     Award any such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

COMPLAINT

Dated: March 4, 2025

**K&L GATES LLP**

*/s/ Michael J. Stortz*

Michael J. Stortz
4 Embarcadero Ctr, Suite 1200
San Francisco, California 94111
Telephone: (415) 882-8200
michael.stortz@klgates.com

Michael E. Martínez (*pro hac vice forthcoming*)
Lauren Norris Donahue (*pro hac vice forthcoming*)
70 W. Madison St., Suite 3300
Chicago, IL 60602
Telephone: (312) 372-1121
michael.martinez@klgates.com
lauren.donahue@klgates.com

Allen R. Bachman (*pro hac vice forthcoming*)
Derek W. Kelley (*pro hac vice forthcoming*)
601 K St NW # 1
Washington, D.C. 20006
Telephone: (202) 778-9000
allen.bachman@klgates.com
derek.kelley@klgates.com

Stacey A. Hyman (*pro hac vice forthcoming*)
One Newark Center, 1085 Raymond Blvd
Newark, New Jersey 07102
Telephone: (973) 848-4000
stacey.hyman@klgates.com

**FIELDS HAN & CUNNIFF PLLC**

Richard Fields (*pro hac vice forthcoming*)
Martin Cunniff (*pro hac vice forthcoming*)
Edward Han (*pro hac vice forthcoming*)
1701 Pennsylvania Avenue NW, Suite 200
Washington, D.C.
Telephone: (833) 382-9816
fields@fhcfirm.com
martincunniff@fhc.com
edhan@fhcfirm.com

*Attorneys for Plaintiffs*